**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 23-cr-287 (JDB)** |
| **v.** | : | |
| | : | |
| **ODIN MEACHAM,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OMNIBUS RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTIONS TO TRANFER VENUE**
**AND TO DISMISS COUNTS ONE, FIVE, SIX, AND SEVEN**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Omnibus Response in Opposition to Defendant Odin Meacham's Motion to Transfer Venue (ECF No. 24), Motion to Dismiss Count One of the Indictment (ECF No. 25), and Motion to Dismiss Counts Five, Six, and Seven of the Indictment (ECF No. 26). For the reasons stated below, the Court should deny all three of Meacham's motions.

**I.       Background**

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Meacham traveled to Washington, D.C. from his home in Utah on January 5, 2021. When Meacham arrived at the U.S. Capitol on January 6, 2021, a large crowd had assembled on the

restricted grounds surrounding the U.S. Capitol building. Meacham observed that the building was closed to the public and law enforcement officers were actively attempting to keep the crowd from entering the building. And, as Meacham admitted in his post-arrest interview, he knew that that Congress was "ratifying the vote" inside the Capitol.

Between 2:09 p.m. and 2:16 p.m., Meacham committed assaulted three police officers on the West Plaza of the Capitol. Specifically, at approximately 2:09 p.m., Meacham attempted to pull a metal bike rack barricade away from a group of U.S. Capitol Police ("USCP") officers who were attempting to push rioters away from the building. When Meacham's effort failed, he retreated briefly into the crowd, where he picked up a long wooden pole. He then rushed forward and struck an USCP officer on the upper body with the pole.

At approximately 2:14 p.m., Meacham picked up a black metal pole from the ground and threw it at an MPD officer. The pole hit the officer's hand. Upon seeing that he had hit his target, Meacham pointed at the officer and yelled at him in a taunting manner.

At approximately 2:16 p.m., Meacham approached a line of officers on the West Plaza and yelled at nearby rioters to lean into the police line while simultaneously beckoning the rioters behind him to join the effort. Meacham then grabbed onto and attempted to take possession of an MPD officer's baton.

Based on his actions on January 6, 2021, the Indictment charges Meacham with the following eight counts: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts Two and Three); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Four); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1)

and (b)(1)(A) (Count Five); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, under 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Six); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Seven); and engaging in Acts of Physical Violence in the Capitol Grounds or Building, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eight).

Meacham now moves for a change of venue (ECF No. 38), to dismiss Count One (ECF No. 25), and to dismiss Counts Five, Six, and Seven (ECF No. 26). The government will address each motion—and why it should be denied—in turn.

## II. Meacham's Motion to Change Venue

Meacham first moves for a change of venue to an unidentified district "outside of the District of Columbia." ECF No. 24 at 1. Despite recognizing that this Court and others in this District have consistently denied identical requests in indistinguishable cases,[1] Meacham

---

[1] In fact, no judge has granted a change of venue in a January 6 case. *See, e.g., United States v. Ballenger*, 640 F.Supp.3d 34 (D.D.C. 2022) (JEB); *United States v. Nassif*, 628 F.Supp.3d 169, 185-88 (D.D.C. 2022) (JDB); *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-0123, 2023 WL 395985 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, No. 21-cr-0687, ---F.Supp.3d---, 2023 WL 372044 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, 2023 WL 196679 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Gillespie,* No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Barnett*, No. 21-cr-38, ECF No. 90 (D.D.C. Nov. 23, 2022) (CRC); *United States v. Bender, et al.*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Eicher*, No. 22-cr-38, 2022 WL 11737926 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142

maintains that transfer is appropriate because (1) survey data reveals "an overwhelming presumption of guilt among prospective D.C. jurors," (2) certain characteristics of the D.C. juror pool "ensure that prejudice has attached," and (3) pretrial publicity about January 6 has made it so Meacham will "be unable to seat an impartial jury in this district." These claims should be rejected.

## A.    Legal Standard

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United*

---

(D.D.C. Oct. 11, 2022) (APM); *United States v. Brock*, No628 F. Supp. 3d 85 (D.D.C. 2022) (JDB), aff'd, No. 23-3045, 2023 WL 3671002 (D.C. Cir. May 25, 2023); *United States v. Jensen*, No. 21-cr-6, Minute Entry (D.D.C. Aug. 26, 2022) (TJK); *United States v. Seitz*, No. 21-cr-279, Minute Order (D.D.C. Aug. 17, 2022) (DLF); *United States v. Strand*, No. 21-cr-85, ECF No. 89 (D.D.C. Aug. 17, 2022) (CRC); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, 2022 WL 2904352 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303, Minute Entry (D.D.C. July 21, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204, Minute Order (D.D.C. July 15, 2022) (BAH); *United States v. Calhoun*, No. 21-cr-116, Minute Order (D.D.C. July 11, 2022) (DLF); *United States v. Rhodes, et al.*, 610 F. Supp. 3d 29 (D.D.C. 2022) (APM); *United States v. Williams*, No. 21-cr-377, Minute Entry (D.D.C. June 10, 2022) (BAH); *United States v. McHugh*, No. 21-cr-453, Minute Entry (D.D.C. May 4, 2022) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. April 29, 2022) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, 579 F. Supp. 3d 177 (D.D.C. 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158, Minute Order (D.D.C. Dec. 14, 2021) (RC); *United States v. Reffitt*, No. 21-cr-32, Minute Order (D.D.C. Oct. 15, 2021) (DLF); *United States v. Caldwell*, No. 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

*States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

**B.    Argument**

**1.  The Surveys Cited by Meacham Do Not Support a Change of Venue**

Meacham first points to the results of two surveys to contend that a change of venue is warranted. ECF Nos. 24 at 4–7, 24-1, 24-2. Neither survey provides any information about whether any potential in the District has ever heard of Meacham. Rather, the surveys are generic to the events of January 6, and Meacham's argument thus rests on the flawed premise that a jury in this district would be incapable of judging any accused participant in the Capitol Riot on his own merits.

Moreover, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were

prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63–64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id*. at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent

of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir

dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls. And Meacham has not offered any reason to depart from that usual practice here. Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.

### 2. The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue

#### i. The number of federal employees who reside in the District of Columbia does not support a change of venue.

Meacham first points out that the jury pool would have a high percentage of federal government employees and/or those connected to such employees. ECF No. 24 at 8–9. But Meacham does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror.  Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly impacted.  Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture of many federal agencies at the time.  And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote.  There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case.  *See United States v. Bochene*, 579 F.Supp.3d 177, 181-182 (D.D.C. 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting

their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government.  According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017.  OPM, Federal Civilian Employment, available   at   https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.     But   many   federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents.  Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

### ii.   The District of Columbia's political makeup does not support a change of venue.

Meacham also contends that a D.C. jury cannot be impartial because more than 90% of D.C. residents voted for the Democratic Party candidate in the 2020 Presidential Election. ECF No. 24 at 10. The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his

participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F.

Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, 613 F. Supp. 3d 1 (D.D.C. 2020) (ABJ); *United States v. Bannon*, No. 210-cr-670 (CJN).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  613 F.Supp.3d 1, 38 (D.D.C. 2020).  Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

### 3. The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District

Meacham argues that a change of venue is warranted based on pretrial publicity.  ECF No. 24 at 11–14. But "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v.*

*Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to Meacham's contention, those factors do not support a presumption of prejudice in this case.

### i. Size and characteristics of the community

Meacham suggests, ECF No. 24 at 15, that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min*

*v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled."  *Id.*

### ii.     Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Meacham is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.*  Indeed, although any media characterizations of Meacham would be inadmissible, the photos and videos of Meacham that have been published in the media would be both admissible and highly relevant at trial.  *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Meacham also asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6. ECF No. 24 at 12–14. But even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. And the news coverage of January 6 has hardly been focused on Meacham himself. A query of Meacham's name does return limited media coverage results; however, there appears to be no media coverage of Meacham in Washington, D.C., and minimal reporting in and around the Salt Lake City, Utah area from around the time of Meacham's arrest in May 2023. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 900 people. The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, 579 F.Supp. 3d 177, 182 (D.D.C. 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### iii. Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  In this case, 37 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned Meacham himself, and much of the reporting has been national is scope, or limited to localities well outside this district, rather than limited to Washington, D.C.

### iv.  The jury verdict

Because Meacham has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

Moreover, juries in other January 6 trials have either been unable to reach a verdict on certain counts, *see United States v. Williams*, No. 21-cr-618 (D.D.C.), or have acquitted on some counts, *see United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2022).[2]

---

[2] *See also* https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories (noting that approximately 40 defendants have received mixed verdicts).

This indicates that D.C. jurors are carefully weighing the evidence and not reflexively convicting January 6 defendants on all charges. And, as explained below, the jury selection in those cases actually indicates that impartial juries can be selected in this district.

### 4. Voir Dire is the Appropriate Means of Selecting an Impartial Jury

Meacham contends that voir dire could not address the purportedly extreme prejudice of pretrial publicity here. ECF. No. 24 at 5–6. The Supreme Court and the D.C. Circuit, however, have long made clear that a careful voir dire is the appropriate way to address prejudicial pretrial publicity, except in those extreme cases where prejudice is presumed. *See Skilling*, 561 U.S. at 381–82. The Supreme Court observed in Skilling that voir dire was "well suited to th[e] task" of probing the crime's "widespread community impact." *Id.* at 384. And the Court has said that "[i]t is fair to assume that the method we have relied on since the beginning"—voir dire—"usually identifies bias." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807) (Marshall, C.J.)). Similarly, the D.C. Circuit has said that "voir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981); *see Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

### 5. The Publicity and Reduction of the Jury Pool Caused by Other January 6 Trials in this District Do Not Support a Change of Venue

Meacham argues that he is likely to be prejudiced by the publicity generated by other recent trials involving charges based on the events of January 6. ECF No. 24 at 15–16. Although the trials in those cases have generated media coverage, that coverage was not confined to the District of Columbia and was focused on the defendants in those cases, without mentioning Meacham. Meacham cannot show that jurors in this District, carefully selected after a thorough *voir dire* and

properly instructed in the law, would be more likely to convict him simply because they were exposed to media coverage of other January 6 trials.  Nor can Meacham show that any such asserted prejudice would be meaningfully different in another jurisdiction, given the national coverage of these trials.  Additionally, by the time Meacham has gone to trial, even more time will have passed since the siege at the Capitol on January 6, 2021, and since these initial January 6 trials.  And as more January 6 defendants go to trial, the level of media attention given to each particular trial is likely to diminish.

### 6.  The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire

At this point, numerous January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days.  *See, e.g., United States v. Ryan Zink,* 21-cr-191, Minute Entries (Sept. 5, 2023); *United States v. Stephen Horn*, 21-cr-301 Minute Entries (Sept. 13, 2023); *United States v. Reed Christensen*, 21-cr-455, Minute Entries (Sept. 12 & 13, 2023); *United States v. Reffitt*, No. 21-cr-32, Minute Entries (Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, No. 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (June 27, 2022); *United*

*States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. August 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (Sep. 19 & 20, 2022); *United States v. Strand*, No. 21-85, Minute Entry (D.D.C. Sep. 20, 2022); *United States v. Alford*, No. 21-cr-263, Minute Entry (Sep. 29, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, No. 21-cr-178, Minute Entries (D.D.C. Nov. 22 & 29, 2022); *United States v. Gillespie* No. 22-cr-60, Minute Entry (D.D.C. Dec. 19, 2022); *United States v. Barnett*, 21-cr-38, Minute Entries (D.D.C. Jan. 9 & 10, 2023); *United States v. Sheppard*, No. 21-cr-203, Minute Entries (D.D.C. Jan. 20 & 23, 2023); *United States v. Eckerman*, No. 21-CR-623, Minute Entry (D.D.C. Jan. 23, 2023); *United States v. Zink*, 21-cr-191, Minute Entry, (D.D.C. Sept. 5, 2023). The only exceptions have trials involving seditious conspiracy charges. *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022).  And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt*, No. 21-cr-32, ECF No. 136 at 121.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt*, No. 21-cr-32, ECF No. 133 at 23, 30. The Court then followed up during individual voir dire.  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or

impartial jurors.[3]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%).  *See Thompson*, No. 21-cr-161, ECF No. 106 at 170, 172, 181, 190, 193.  The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire.  *Id.* at 4-5, 35.  Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[4]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined).  *See Robertson*, No. 21-cr-34, ECF No. 106 at 73.  The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict."  *Robertson*, No. 21-cr-34, ECF No. 104 at 14.  It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial."  *Id.* at 13, 15.  The Court followed up on affirmative answers to those questions during individual voir

---

[3] For those struck based on a professed inability to be impartial, *see Reffitt*, No. 21-cr-32, ECF No. 133 at 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046); ECF No. 134 at 41-42 (Juror 443), 43-47 (Juror 45), 71-78 (Juror 1747), 93-104 (Juror 432), 132-43 (Juror 514); ECF No. 135 at 80-91 (Juror 1484).  For those struck for other reasons, *see Reffitt*, No. 21-cr-32, ECF No. 134 at 35-41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78-93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6-8 (Juror 1650, over 70 and declined to serve), 62-73 (Juror 548, unavailability), 100-104 (Juror 715, anxiety and views on guns), 120 (Juror 548, medical appointments); ECF No. 136 at 41-43 (Juror 1240, health hardship), 53-65 (Juror 464, worked at Library of Congress), 65-86 (Juror 1054, prior knowledge of facts).

[4] For the three stricken for bias, see *Thompson*, No. 21-cr-161, ECF No. 106 at 51-53 (Juror 1242), 85-86 (Juror 328), 158-59 (Juror 999).  For the six stricken for hardship or inability to focus, *see Thompson*, No. 21-cr-161, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49-50 (Juror 503), 50-51 (Juror 1290), 86-93 (Juror 229), 109-10 (Juror 1266).

dire.  Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[5]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%), *Webster*, No. 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on hardship, *Webster*, No. 21-cr-208, ECF No. 114 at 217-18.  The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*, No. 21-cr-208, ECF No. 113 at 19.  During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly.  *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66.  Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[6]  The *Webster* Court observed that this number "was

---

[5] For those struck based on a professed inability to be impartial, see *Robertson*, No. 21-cr-34, ECF No. 104 at 26-34 (Juror 1431), 97-100 (Juror 1567); ECF No. 105 at 20-29 (Juror 936), 35-41 (Juror 799), 59-70 (Juror 696), 88-92 (Juror 429); ECF No. 106 at 27-36 (Juror 1010), 36-39 (Juror 585), 58-63 (Juror 1160).  For those struck for other reasons, see *Robertson*, No. 21-cr-34, ECF No. 104 at 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55-59 (Juror 1122, language concerns), 92-94 (Juror 505, work hardship); ECF No. 106 at 16-21 (Juror 474, work trip); 50-53 (Juror 846, preplanned trip).

[6] Nine of the 19 stricken jurors were excused based on hardship or a religious belief.  *See Webster*, No. 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, No. 21-cr-208, ECF No. 114 at 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262).  Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office.  *See Webster*, No. 21-cr-208, ECF No. 113 at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster*, No. 21-cr-208, ECF No. 114 at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Webster*, No. 21-cr-208, ECF No. 115 at 7.

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli*, No. 21-cr-37, ECF No. 91 at 106, 111. The Court asked prospective jurors questions similar to those asked in the other trials. *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 72-74 (Questions 16, 20). Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[7]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus

---

[7] *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 61-62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2-5 (Juror 1129), 32 (Juror 182), 36 (Juror 176), 61-62 (Juror 890), 75-78 (Juror 870), 94-97 (Juror 1111), 97-104 (Juror 1412). For the four jurors excused for hardship, see *Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 77-79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

of their own." *Id.*   As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny Meacham's request for a venue transfer and should instead rely on a thorough voir dire to protect Meacham's right to an impartial jury.

For the foregoing reasons, the Court should deny Meacham's motion to transfer venue.

### III.   **Meacham's Motion to Dismiss Count One**

Meacham next moves to dismiss Count One of the Indictment, which charges Meacham with violating 18 U.S.C. § 231(a)(3). *See* ECF. No. 25. The Court should deny Meacham's motion to dismiss because 18 U.S.C. § 231(a)(3) is neither unconstitutionally vague nor overbroad.

#### A.   **Legal Standard**

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). An indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the Government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *See e.g.*, *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) ("[M]otions for summary judgment are creatures of civil, not criminal trials"); *Yakou*, 428 F.3d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-CR-40 (BAH), 2020 WL 6342948 at *5 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the Government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *See United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge

the crimes. *See e.g.*, *United States v. Bingert*, 605 F. Supp. 3d 111, 118 (D.D.C. 2022) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *United States v. McHugh*, 583 F. Supp. 3d 1, 26-28 (D.D.C. 2022) (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-CR-454 (PLF), 2022 WL 823079 at *4 (D.D.C. Mar. 19, 2022) ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the <u>face</u> of the indictment and, more specifically, the <u>language used</u> to charge the crimes") (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

## B.    Argument

### 1.    18 U.S.C. § 231(a)(3) is Not Unconstitutionally Vague

Count One of the Indictment provides fair notice to Meacham of the conduct it punishes and is therefore not unconstitutionally vague. A number of judges in this district have rejected similar challenges to Section 231(a)(3). *See e.g.*, *Nordean*, 579 F. Supp. 3d at 57-58; *United States v. Bingert*, 605 F. Supp. 3d 111, 128-130 (D.D.C. 2022); *McHugh*, 583 F. Supp. 3d at 26-28; *United States v. Fisher*, No. 21-CR-234 (CJN), 2022 WL 782413, at *2-3 (D.D.C. Mar. 15, 2022); *United States v. Williams*, No. 21-CR-618 (ABJ), 2022 WL 2237301, at *4-5 (D.D.C. June 22, 2022).[8]

The "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so

---

[8] Several courts outside this circuit have also rejected similar challenges to Section 231(a)(3). *See e.g.*, *United States v. Phomma*, 561 F. Supp. 3d 1059, 1069-70 (D. Or. Sept. 15, 2021); *United States v. Rupert*, No. 20-CR-104 (NEV/TNL), 2021 WL 1341632, at *16-20 (D. Minn. Jan. 6, 2021); *United States v. Wood*, No. 20-CR-56 (MN), 2021 WL 3048448 (D. Del. July 20, 2021); and *United States v. Howard*, No. 21-CR-28 (PP), 2021 WL 3856290 (E.D. Wis. Aug. 30, 2021).

standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonably opportunity to familiarize itself with its terms and to comply." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation omitted).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because reasonable jurists might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). A statutory provision is "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). A law is not vague because it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

There is a strong presumption that a statute is not vague. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Other courts in this district have recognized that high bar. *See United States v. Gonzalez*, No. 20-CR-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020); *see also United States v. Harmon*, No. 19-CR-395 (BAH), 2021 WL 1518344, at *4 (D.D.C.

Apr. 16, 2021) (finding that the defendant did not meet the "stringent standard" to prevail on a Rule 12 vagueness motion).

Section 231(a)(3) is not unconstitutionally vague. It provides sufficient notice of the conduct it prohibits. The terms with which Meacham takes issue – "any act to obstruct, impede, or interfere" and "incident to and during the commission of a civil disorder" – do not carry the potential for misunderstanding or make the statute "so standardless that it invites arbitrary enforcement." *Johnson*, 5576 U.S. at 595; *see also Nordean*, 579 F. Supp. 3d at 57 (observing that "there are specific fact-based ways to determine whether a 'defendant's conduct interferes with or impedes others,' or if a law enforcement officer is performing his official duties 'incident to and during' a civil disorder."). Meacham's motion "misunderstand[s]" vagueness: "There is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation – the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh*, 583 F. Supp. 3d at 27.

Contrary to Meacham's arguments, the statute's terms are thus quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether a defendant's conduct was "annoying" or "indecent," or those that depend on the victim's state of mind, as in the cases defendant cites. *See Nordean*, 579 F. Supp. 3d at 57; *see also Williams*, 553 U.S. 306 (citing *Coates*, 402 U.S. at 614); *United States v. Kozminski*, 487 U.S. 931, 949-50 (1988). "An ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement." *McHugh*, 583 F. Supp. 3d at 27. In addition, Section 231(a)(3) is not unique; many state and federal statutes likewise criminalize "obstructing" the government's efforts to enforce the law and maintain public order, and they have been upheld. *See, e.g.*, 26 U.S.C. § 7212(a) (prohibiting obstructing or

impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); *United States v. Brice*, 926 F.2d 925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties).

Meacham also claims that the phrase "incident to and during the commission of a civil disorder" is vague because he cannot tell whether the statute requires an individual to have participated in the civil disorder or if it is sufficient that he be in the general vicinity of the event. ECF No. 24 at 5. This argument is also meritless. "The crime set forth by the statute is not mere presence at a civil disorder . . . but an act committed during the course of such a disorder, so 'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a)(3)." *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971); *see also Howard*, 2021 WL 3856290, at *14 ("[T]he statute does not require the government to prove that the defendant created the civil disorder, or that he was participating in the civil disorder."). Contrary to Meacham's argument that any "tumultuous public gathering" could qualify (ECF No. 24 at 4), "it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Mechanic*, 454 F.2d at 853; *see* 18 U.S.C. § 231(1); *cf. United States v. Huff*, 630 F. App'x 471, 489 (6th Cir. 2015) (unpublished) (rejecting vagueness challenge to "civil disorder" term in 18 U.S.C. § 231(a)(2) and citing definition in 18 U.S.C. § 231(1)). *See also McHugh*, 583 F. Supp. 3d at 26, n.22.

And even if a broad range of public gatherings could be deemed "civil disorders," Section 231(a)(3) criminalizes only particular conduct, not mere participation in such a disorder. The "civil

disorder" language operates to <u>narrow</u> the situation where the statute may apply – unlike other statutes, which criminalize acts of obstruction, wherever they may take place. *See* 26 U.S.C. § 7212(a) (criminalizing obstruction of tax laws). The requirement that the *actus reus* take place in the context of a civil disorder does not make Section 231 vague; to the contrary, it limits its application.

Meacham's vagueness claim also fails because his conduct clearly falls within the ambit of Section 231. The Court must consider vagueness "as applied to the particular facts at issue, for a [defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applies to the conduct of others." *Nordean*, 579 F. Supp. 3d at 57 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (cleaned up)); *see generally Wood*, 2021 WL 3048448, at *9 ("Defendant does not have standing to bring a facial vagueness challenge" to Section 231(a)(3) because he failed to "demonstrate that [the statute] is vague as applied to his conduct"). The January 6, 2021 attack on the United States Capitol was clearly a "civil disorder," not just some "tumultuous public gathering" to which the police were called. And there is no question that Meacham participated in the disorder through his actions on the West Plaza. Tracking the statutory language, the superseding indictment alleges that he "commit[ted] an act to obstruct, impede, and interfere with a law enforcement officer." Meacham crossed into the restricted area, entered the West Plaza where rioters were clearly battling officers, and physically assaulted three officers who were attempting to push rioters away from the Capitol building. Meacham was not a bystander, he was an active participant in a civil disorder. The statute is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854.

Meacham's argument that Section 231(a)(3) is vague because it lacks an express scienter requirement or *mens rea* is also wrong. Meacham ignores the fact that Section 231(a)(3) requires *intent*, which narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad); *McHugh*, 583 F. Supp. 3d 24-26 (finding that Section 231(a)(3) includes an intent requirement). The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a law enforcement officer, *i.e.*, the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement).

Judge Berman Jackson reached the same result in *United States v. Riley Williams*, 21-cr-0618, 2022 WL 2237301, at *6-7 (D.D.C. June 22, 2022). She noted that "a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id*. at *7 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)). She concluded that § 231(a)(3) "only criminalizes acts performed 'to obstruct, impede, or interfere with' a law enforcement officer," "in other words, the statute requires obstructive intent." *Id. See also Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) ("It is true that section 231(a)(3) does not specifically refer to intent, but it only applies to a person who 'commits or attempts to commit any act to obstruct, impede, or interfere' with firemen or law enforcement officers."); *Mechanic*, 454 F.2d at 854 (agreeing with *Foran* "that § 231(a)(3) must be construed to require intent").

And even if the statute lacked an express scienter requirement, courts, "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 575 U.S. 723, 734 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual

circumstances, we construe a criminal statute to include a *mens rea* element even when none appears on the face of the statute.").

### 2.  18 U.S.C. § 231(a)(3) Does Not Criminalize Protected Speech Under the First Amendment

Meacham's motion to dismiss should also be denied because Section 231(a)(3) is not overbroad under the First Amendment. Meacham argues that Section 231(a)(3) "reaches a substantial amount of constitutionally protected expressive conduct, well in excess of the law's legitimate sweep." ECF No. 25 at 7. Meacham does not address the differences between "as applied" and facial First Amendment challenges.[9] Regardless, as every other judge in this district who has addressed this claim has held, this claim fails. A criminal law is facially overbroad only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)); *see also Williams*, 553 U.S. at 293; *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). A facial overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as § 231(a)(3) assuredly does. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to ... constitutionally unprotected conduct").

---

[9] One raising a facial challenge must establish "that no set of circumstances exists under which [the challenged statute] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). The person challenging the statute need not show injury to himself. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). On the other hand, to prevail on an as-applied First Amendment challenge, the person challenging the statute must show that the regulations are unconstitutional as applied to their particular speech activity. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984); *accord, Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014).

Judge Berman Jackson recently rejected overbreadth challenges to § 231(a)(3).  Rejecting an overbreadth challenge in *Williams,* Judge Berman Jackson noted that "[i]n the past year, at least four other courts in this district have considered whether section 231(a)(3) is overbroad on its face, and all have concluded it is not." *Williams,* 2022 WL 2237301, at *6.[10] Judge Berman Jackson "agree[d] with the reasoning in those decisions." *Id*. "First, the statute plainly covers conduct, not speech, as it criminalizes 'any *act* to obstruct, impede, or interfere with' a law enforcement officer engaged in the performance of official duties, and the terms 'obstruct, impede, or interfere with' are all plainly understood and must be supported by the facts in any particular case." *Id*. (emphasis added). "Although some 'acts' could also serve an expressive function, and one could come up with a hypothetical scenario in which the alleged interference involved particularly obstreperous speech, the law does not require dismissing a charge merely because there is a possibility that the provision could reach some constitutionally protected activity." *Id*. "Since section 231(a)(3) does not 'make unlawful a substantial amount of constitutionally protected conduct,' it is not overbroad on its face." *Id*. (citing *City of Houston v. Hill*, 482 U.S. 451, 459 (1987)).

Other judges of this district are in accord. *See Mostofsky*, 579 F. Supp. 3d at 22-24 (rejecting overbreadth challenge to § 231(a)(3) and observing that Section 231's "plain text, however, indicates that it is 'targeted primarily if not exclusively at conduct rather than speech'"); *Nordean*, 579 F. Supp. 3d at 56-58 (§ 231(a)(3) is neither vague nor overbroad); *McHugh*, 583 F. Supp. 3d at 24-29 (same).

---

[10] Citing *McHugh*, 2022 WL 296304, at *17; *Mostofsky*, 2021 WL 6049891, at *8–9; *Nordean*, 2021 WL 6134595, at *17; and *Gossjankowski*, 2022 WL 782413, at *3. Judge Berman Jackson also cited three out of district cases that reached the same result. 2022 WL 2237301, at *6, citing *United States v. Howard*, 21-cr-28 (PP), 2021 WL 3856290, at *11-12 (E.D. Wis. Aug. 30, 2021); *United States v. Phomma*, 561 F. Supp. 3d 1059, 1067-68 (D. Or. 2021); and *United States v. Wood*, 20-cr-56 (MN), 2021 WL 3048448, at *7-8 (D. De   l. July 20, 2021).

Those decisions are consistent with the applicable overbreadth principles.  In the typical case, a litigant bringing a facial constitutional challenge "must establish that no set of circumstances exists under which the [law] would be valid," or the litigant must "show that the law lacks a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quotation omitted). In the First Amendment context, a litigant must demonstrate that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (cleaned up). Refusing to enforce a statute because of overbreadth concerns is "strong medicine," and courts will do so on such grounds "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech," *Virginia v. Hicks*, 539 U.S. at 124. The requirement that a defendant who violates Section 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech).

Meacham has given this Court no reason to depart from the unanimous holdings of other judges in this district and elsewhere; Section 231(a)(3) is neither vague nor unconstitutionally overbroad.

For the foregoing reasons, the Court should deny Meacham's motion to dismiss Count One.

## IV.    Meacham's Motion to Dismiss Counts Five, Six, and Seven

Meacham next moves to dismiss Counts Five, Six, and Seven of the Indictment, which charge Meacham with violating several provisions under 18 U.S.C. § 1752. *See* ECF No. 26. Meacham's motion should be denied because (1) former Vice President Pence *was* "temporarily

visiting" the Capitol on January 6, 2021, and (2) Section 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.

### A.      Legal Standard

The same legal standard discussed *supra* in Section III(A) applies here.

### B.      Argument

#### 1.      Former Vice President Pence Was "Temporarily Visiting" The Capitol on January 6

Meacham argues he cannot be guilty of violating § 1752 on January 6 because former Vice President Mike Pence was not "temporarily visiting" the Capitol on that day. ECF No. 24 at 4–6. Specifically, he contends that these charges fail to state an offense because, in his view, the Vice President was not "temporarily visit[ing]" the U.S. Capitol when he was carrying out his constitutionally and statutory mandated obligations in the Capitol building on January 6, 2021. He's wrong.

Meacham's argument defies the plain text, structure, and purpose of the statute. This Court and other judges within this District have rejected permutations of the same arguments in other January 6 cases. *See United States v. McHugh*, 21-cr-453, 2022 WL 296304, at *20-21 (D.D.C. Feb. 1, 2022) (Bates, J.); *United States v. Andries*, 21-cr-93, 2022 WL 768684, at *16-17 (D.D.C. Mar. 14, 2022) (Contreras, J.); *United States v. Puma*, 21-cr-454, 2022 WL 823079, at *16-18 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bingert*, 21-cr-91, 2022 WL 1659163, at *15 (D.D.C. May 25, 2022) (Lamberth, J.). No district judge has sided with Meacham's view. This Court should reach the same conclusion here.

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). Subsection

1752(c)(1)(B) defines "restricted buildings or grounds," in relevant part, as "any posted, cordoned off, or otherwise restricted area … of a building or grounds where the President or other person protected by the Secret Service is or will be *temporarily visiting*." (Emphasis added). In turn, the verb "visit" means, *inter alia*, "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[11] And the adverb "temporarily" adds that the protectee's visit must occur "during a limited time."[12]

As a textual matter, then, definition of "visit" plainly describes the Secret Service protectee's activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the Indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the Capitol building that day for a particular purpose: to observe these proceedings while they were ongoing and Vice President Pence was present.

Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. And all three protectees visited the Capitol temporarily—*i.e.*, during a limited time. Given the nature of the presence of the Vice President (and his family members), the Capitol building plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting," 18 U.S.C. § 1752(c)(1)(B). *See Williams*, No. 1:21-cr-377, ECF No. 88, at 5-6 (adopting the "plain reading of the words" in subsection 1752(c)(1)(B) urged by the government); *McHugh*, 2022 WL 296304, at *21 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol"); *Andries*, 2022 WL 768684, at *16 ("Vice

---

[11] https://www.merriam-webster.com/dictionary/visit (last visited Jan. 28, 2024).

[12] https://www.merriam-webster.com/dictionary/temporarily (last visited Jan. 28, 2024).

President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only. Plainly he did. He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time."); *Puma*, 2022 WL 823079, at *17 (under the plain language of Section 1752, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification."). Meacham has given this Court no reason to depart from the rulings of its colleagues.

### 2. Section 1752 Does Not Require the Government to Prove that the Restricted Area was Restricted at the Secret Service's Direction

Meacham next argues that Counts Three, Five, and Six should be dismissed for failure to state an offense because the U.S. Capitol Police, and not the Secret Service, designated the "restricted area" around the U.S. Capitol on January 6, 2021. ECF No. 24 at 6–7. However, nothing in the express language of Section 1752 requires that the U.S. Secret Service designate the "restricted area," and defendant's attempt to read such a requirement as implied in the statutory language goes against the common sense reading of the text and its legislative history, as all the courts in this district to address this issue have held.[13]

Section 1752 provides in relevant part:

(a) Whoever—

---

[13] *See, e.g.*, *United States v. Griffin*, 549 F. Supp. 3d 49, 52–58 (D.D.C. 2021) (denying motion to dismiss charge of violating 18 U.S.C. § 1752(a)(1)); *United States v. Mostofsky*, 21-CR-138 (JEB), 2021 WL 6049891, at *12–13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Nordean*, 21-CR-175 (TJK), 2021 WL 6134595, at *18–19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1752(a)(1)); *United States v. Andries*, 21-CR-93 (RC), 2022 WL 768684, at *12-16 (D.D.C. Mar. 14, 2022) (18 U.S.C. §§ 1752(a)(1) and (a)(2)); *United States v. Puma*, 21-CR-454 (PLF), 2022 WL 823079, at *13-16 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1752(a)(1) and (a)(2)); *United States v. Sargent*, No. 21-CR-258 (TFH), 2022 WL 1124817, at *9 (D.D.C. Apr. 14, 2022) *United States v. Bingert*, 605 F. Supp. 3d at 130-132 (18 U.S.C. § 1752(a)(1)).

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so; [or]

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

…

(c) In this section—

(1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

Section 1752 also defines "restricted building or grounds" to include any posted, cordoned off, or otherwise restricted area "of the White House or its grounds, or the Vice President's official residence or its grounds" or "of a building or grounds so restricted in conjunction with an event designated as a special event of national significance." 18 U.S.C. §§ 1752(c)(1)(A), (C).

The language of Section 1752 contains no express requirement that the "restricted buildings or grounds" must be restricted by USSS for there to be a violation of Section 1752. Nonetheless, Meacham seems to argue that such a requirement is implicit in the statutory language. ECF No. 24 at 6. However, because the plain language of the statute is clear and unambiguous, reading the implied requirement provided by Meacham is unwarranted. Even if one were to look beyond this plain language, the legislative history of Section 1752 also weighs against Meacham's interpretation.

First, "absent from the text is any mention of a requirement that any specific entity must restrict or cordon off the area, let alone a requirement that only the Secret Service may be the restricting entity." *Andries*, 2022 WL 768684, at *14 (citation omitted). Section 1752 proscribes certain conduct in and around "any restricted building or grounds," *see* 18 U.S.C. § 1752(a), and it provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1),

including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where

the President or other person protected by the Secret Service is or will be temporarily visiting,"

§ 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear that "person[s] protected

by the Secret Service" include the Vice President. § 1752(c)(2); *see* § 3056(a)(1). The proscribed

conduct within a "restricted building or grounds" includes, as relevant here, knowingly and

unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt

government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or

disrupts" "government business," § 1752(a)(2); and knowingly engaging in any act of physical

violence against any person or property, § 1752(a)(4).

    In short, Section 1752 "prohibits persons from knowingly entering without lawful authority

to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a

person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs.*

*Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020). Where, as

here, the words of the statute are unambiguous, "the judicial inquiry is complete." *See*

*Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). However, under

Meacham's interpretation of Section 1752, there is an additional, implied requirement unstated in

the statutory language above that any restricted area must be designated by USSS. There is no such

requirement, nor is there any credible rationale why one should be inferred.

    And while looking beyond the plain language is unwarranted here, *see United States v.*

*American Trucking Associations*, 310 U.S. 534, 543 (1940) (stating that looking beyond clear

statutory text is appropriate where the results would be absurd or demonstrably at odds with clearly

expressed Congressional intent), the legislative history of Section 1752 in fact affirms the plain

reading of the text that Meacham resists. *See Andries,* 2022 WL 768684, at *14 (finding that

similar "extra-textual considerations at best do not support [defendant's] reading [of Section 1752] and at worst undermine it").  When Section 1752 was first enacted in 1970, USSS was part of the Treasury Department, and this original version of the statute explicitly incorporated regulations promulgated by the Treasury Department governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). Specifically, subsection (d) of Section 1752 gave authority to the Department of the Treasury, which oversaw USSS, to "prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). However, when Congress revised Section 1752 in 2006, it struck subsection (d) from the statute, eliminating the requirement that "restricted building or grounds" be necessarily defined or designated by USSS or any other particular law enforcement agency. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). In 2012, Congress further reinforced this interpretation by adding the definitional subsection (c) cited above, which provides the current definition of "restricted building or grounds." Pub. L 112-98, Title I, Sec. 2, 126 Stat 263 (March 8, 2012). Contrary to the Meacham's reading, the legislative history shows that Congress deliberately excised any requirement that a restricted area depend on any definition or determination by USSS.

Both the plain language and legislative history of Section 1752 show that there is no requirement, express or implied, that an area be restricted by a particular law enforcement agency, as courts in this district have unanimously held. *See e.g.*, *Bingert*, 605 F. Supp.3d at 131 ("[D]efendants fashion a bizarre requirement, seemingly out of thin air: that only the Secret Service can designate an area as restricted [for the purposes of 18 U.S.C. § 1752]."); *United States v. Rhine*,

No. 21-CR-687 (RC), 2023 WL 372044, at *11 (D.D.C. Jan. 24, 2023). Meacham's contention that these Counts of the indictment are defective for this reason should be likewise rejected.

Thus, Meacham's motion to dismiss Counts Five, Six, and Seven of the Indictment should be denied.

### V.      Conclusion

For the reasons stated above, the United States respectfully submits that Meacham's motion to transfer venue (ECF No. 24) and motions to dismiss Counts One, Five, Six, and Seven (ECF Nos. 25, 26) should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Madison H. Mumma*
MADISON H. MUMMA
Trial Attorney
NC Bar No. 56546
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
202-913-4794
madison.mumma@usdoj.gov