UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,        .
                                 .
          Plaintiff,             .    CR No. 23-0287 (JDB)
                                 .
      v.                         .
                                 .    Washington, D.C.
ODIN MEACHAM,                    .    Tuesday, June 18, 2024
                                 .    9:07 a.m.
          Defendant.             .
. . . . . . . . . . . . . . . . .     Pages 158 through 283
```

DAY 2
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:              SHALIN NOHRIA, AUSA
                                 BENJAMIN J. SMITH, AUSA
                                 U.S. Attorney's Office
                                 601 D Street NW
                                 Washington, DC 20530

For Defendant:                   EMILY A. STIRBA, AFPD
                                 ADAM G. BRIDGE, AFPD
                                 Federal Public Defender Office
                                 46 West Broadway
                                 Suite 110
                                 Salt Lake City, UT 84101

Court Reporter:                  BRYAN A. WAYNE, RPR, CRR
                                 U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue NW
                                 Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

# C O N T E N T S

### WITNESSES

KYLE KIMBALL:     Direct Examination...................... 160
                  Cross-Examination...................... 182

### EXHIBITS RECEIVED

Government Exhibit No. 603-X ........................... 168
Government Exhibit Nos. 703-A, 703-B, 703-C ............ 168
Government Exhibit No. 705-A .......................... 168
Government Exhibit Nos. 401, 402 ...................... 185
Government Exhibit Nos. 1001-1005 ..................... 186

*   *   *

Government Closing Argument ............................ 185

Defense Closing Argument .............................. 195

Government Rebuttal Argument ........................... 233

Court's Ruling and Verdict ............................. 244

*   *   *

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  We're on the record in criminal

 3    case 23-287, United States of America versus Odin Meacham.

 4    Starting with government counsel, please approach the podium and

 5    state your appearance for the record.

 6          MR. NOHRIA:  Good morning, Your Honor.  Shalin Nohria

 7    on behalf of the United States, joined with AUSA Benjamin Smith,

 8    Paralegal Specialist Jena Lee, and Special Agent Benjamin Jones.

 9          THE COURT:  Good morning to you all.

10          MS. STIRBA:  Good morning.  Emily Stirba and Adam

11    Bridge on behalf of Mr. Meacham, who is present.

12          THE COURT:  Good morning to you all.

13       All right.  Anything preliminarily before we have the last

14    government witness?

15          MR. NOHRIA:  Not from the government, Your Honor.

16          MS. STIRBA:  Not from us, Your Honor.

17          THE COURT:  All right.

18       Let's call your next witness, please.

19          MR. SMITH:  Good morning, Your Honor.  The government

20    calls Sergeant Kyle Kimball.

21       KYLE KIMBALL, WITNESS FOR THE GOVERNMENT, SWORN

22                    DIRECT EXAMINATION

23    BY MR. SMITH:

24    Q.   Good morning, Detective Sergeant Kimball.  If you could,

25    please introduce yourself to the Court and spell your full name
```

1  and give your full title.

2  A.   Detective Sergeant Kyle Kimball.  K-Y-L-E, K-I-M-B-A-L-L.

3  Employed by the Washington Metropolitan Police Department.

4  Q.   Thank you.  And just for ease of reference, is it okay if

5  I call you Sergeant Kimball?

6  A.   That's fine.

7  Q.   And you mentioned you worked at the Metropolitan Police

8  Department.  Is that correct?

9  A.   Correct.

10  Q.   And your title there is detective sergeant?

11  A.   Currently.

12  Q.   What is your current assignment within MPD?

13  A.   Assigned to the Criminal Investigative Division, Second

14  District supervisor.

15  Q.   And what does that assignment entail?

16  A.   Quite a bit, but the basics are to supervise detectives

17  and their cases, make sure they're accurate and thorough.

18  Q.   And when did you take on this new assignment, or this

19  new role?

20  A.   Approximately two years ago, or more.

21  Q.   And before you took on this assignment, what kind of work

22  did you do for MPD?

23  A.   Before this I was a patrol sergeant assigned to the First

24  District, and then prior to that a detective, and then a regular

25  officer prior to that.

1  Q.   And when did you join MPD?

2  A.   September 2008.

3  Q.   And did you do any kind of work before you joined MPD?

4  A.   I did.

5  Q.   And describe that for me.

6  A.   Well, I just graduated high school and joined the Marine

7  Corps.

8  Q.   And when did you join the Marine Corps?

9  A.   Well, technically, I think it was July 2003.

10  Q.   And how long did you serve in the Marine Corps?

11  A.   Four years.

12  Q.   So am I correct in understanding that you joined MPD

13  around 2008?

14  A.   Yes.

15  Q.   So you've been with MPD for about 16 years?

16  A.   Correct.

17  Q.   And you were with MPD on January 6, 2021.

18  A.   I was.

19  Q.   So I want to talk about the events of January 6, 2021.

20  What was your assignment when you reported to work that morning?

21  A.   So our assignment was a rapid response platoon.  My specific

22  assignment, as a squad leader for a rapid response platoon.

23  Q.   And Sergeant Kimball, if you could just briefly describe

24  for me what kind of work the Rapid Response Team does.

25  A.   So they're also known as a hardened platoon.  You have

1    different levels.  The hardened platoon are the ones that wear

2    the padding and flame-retardant suits and -- yeah.  Just the

3    additional padding with the flame-retardant suits when things

4    reach a level where that level is deployed by the department.

5    Q.   And would it be correct in understanding that the Rapid

6    Response Team would be responsible for responding to specific

7    sorts of events or emergencies?

8    A.   Yes.  So they are deployed when the situation is no longer

9    under control, more or less.  That is a general term, but they

10   are the last resort, I guess is the best way to describe it.

11   Q.   And on January 6, 2021, when you were with the Rapid

12   Response Team, what was your rank at that time?

13   A.   Sergeant.

14   Q.   And what would be your responsibility or duties as a

15   sergeant on the Rapid Response Team?

16   A.   Supervise the platoon when they're deployed for First

17   Amendment activities.

18   Q.   So going to the morning of January 6, 2021, do you remember

19   when you entered on duty that day?

20   A.   It was in the morning.  I don't know the exact time.

21   Q.   When did you first learn about what was unfolding at the

22   Capitol --

23   A.   Around noon.  I started hearing on the radio.  Noonish.

24   Q.   And do you recall where you were at at the time you first

25   heard about the events that were unfolding at the Capitol?

1    A.    Yes.    We were actually behind the court here on C Street,

2    staged.

3    Q.    And describe for me what happened next after you heard the

4    call go out.

5    A.    So we heard the frantic, I guess if you want to call them

6    transmissions on the radio, and then we heard Inspector Glover

7    raise for CDU-12 to respond to the Capitol, yelling for CDU-12

8    to respond to the Capitol multiples times, which was my platoon.

9    Q.    And CDU stands for Civil Disturbance Unit.    Is that

10    correct?

11    A.    Correct.

12    Q.    And what does the Civil Disturbance Unit do for MPD?

13    A.    Mainly deal with First Amendment activities, make sure they

14    remain safe, you know, for everybody, the community and the

15    participants, and respond appropriately if things get out of

16    hand.

17    Q.    And is the CDU something different than the Rapid Response

18    Team?    Do they do similar jobs, or are there differences between

19    the two?

20    A.    They're encompassed within CDU.

21    Q.    So I want to bring up what has been marked as Government's

22    Exhibit 206.    You're going to see this pop up on your screen

23    here momentarily, and I want to use this just to orient us to

24    where you responded to the Capitol.

25        So, Sergeant Kimball, can you see an image on your screen?

1    A.    Yes, I can.

2    Q.    Can you identify what this image represents?

3    A.    The U.S. Capitol, or what a lot of people refer to as the

4    West Front.

5    Q.    And on January 6, 2021, when you received the distress

6    call, you mentioned you were offsite at the time.  Where did

7    you first respond to the Capitol ground?

8          Before we get into the specifics of this image in front

9    of you now, can you describe for us how you responded to the

10   distress call that you heard on January 6 where you went on the

11   Capitol grounds initially.

12   A.    I was behind the courthouse, as I said.  We loaded our

13   police vehicles, and we responded expediently as fast as we

14   could to the U.S. Capitol.

15   Q.    And is it fair to understand that at some point you

16   proceeded to the West Front of the U.S. Capitol?

17   A.    Correct.

18   Q.    In using this image -- and you can draw on the screen

19   to indicate where you eventually were located -- where did

20   you eventually take a position at this location?

21   A.    So we came -- we came from this side over here, and we made

22   our way down -- there was a set of stairs over here, I believe,

23   right around that area.  Then we took up position along the CDU

24   line initially.

25   Q.    And for the record, Sergeant Kimball initially indicated

1    his initial position on the south side of the Capitol building,

2    the upper right-hand corner of this image.  He then indicated

3    that he and his unit proceeded northwards along the West Front

4    of the Capitol, eventually taking a position on the north side

5    of the West Plaza.  That's the center left-hand side of this

6    image.

7        And Sergeant Kimball, you indicated that you took a

8    position in a location to the left side of this image that

9    we're looking at?

10   A.   Yes.  So initially we took up position, you know, where

11   I drew the line, and then eventually later in the day I made

12   my way right here.

13   Q.   And just for the record, Sergeant Kimball indicated moving

14   from the West Front Plaza line by the West Plaza steps eastwards

15   towards the Capitol -- Sergeant Kimball, am I correct in

16   understanding that to be what appears to be an elevated platform

17   that you just drew a circle around?

18   A.   Correct.

19   Q.   And was it your understanding at the time that that was a

20   permanent part of the Capitol building or a temporary structure?

21   A.   Temporary structure.

22   Q.   And so you eventually ended up taking a position on that

23   elevated temporary structure.

24   A.   Correct.

25   Q.   So before we proceed any further, I want to go ahead, if

1    the Court's amenable, to a batch introduction of some video

2    evidence that we're going show to Sergeant Kimball.

3         So, Sergeant Kimball, I'm going to introduce Government's

4    Exhibit 603-X, which is an open-source video, Government's

5    Exhibit 703 --

6              THE COURT:  What was the first one?

7              MR. SMITH:  603-X.  Government's 703-A, which is

8    Sergeant Kimball's body worn camera; 703-B, which is also

9    Sergeant Kimball's body worn camera; 703-C, which is also

10   Sergeant Kimball's body worn camera; 705-A, which is MPD Officer

11   Brian Peake's body worn camera.

12   BY MR. SMITH:

13   Q.   And Sergeant Kimball, have you had an opportunity to review

14   each of those items that I just listed off?

15   A.   I have.

16   Q.   And is it your understanding that they all are fair and

17   accurate representations of the events of January 6?

18   A.   It is.

19             MR. SMITH:  The government would also note that these

20   exhibits are covered by stipulation of the parties, including

21   Stipulation 1000, which is the MPD body worn camera; Stipulation

22   1003, which is the open-source; and Stipulation 1004, which is

23   all three videos.  And at this time the government would move

24   for admission of each of those exhibits.

25             MS. STIRBA:  No objection.

1              THE COURT:  Without objection, Government Exhibits

2    603-X, 703-A, 703-B, 703-C, 705-A -- I believe that's it.

3    Is that correct?

4              MR. SMITH:  Correct.

5              THE COURT:  Are all admitted.

6              MR. SMITH:  Thank you, Your Honor.

7                          (Government Exhibit No. 603-X

8                           received into evidence.)

9                          (Government Exhibit Nos. 703-A,

10                          703-B, 703-C received.)

11                         (Government Exhibit No. 705-A

12                          received into evidence.)

13   BY MR. SMITH:

14   Q.   Sergeant Kimball, I'd like to pull up for you what has just

15   been marked as Government's Exhibit 603-X.  This is a 1-minute,

16   19-second video clip.  Can you see an image on your screen now?

17   A.   I can.

18   Q.   So we're going to walk through this clip.  Before we do,

19   can you identify the scene that we're looking at here in this

20   image?

21   A.   Yes.

22   Q.   And where does this image appear to be taken from?

23   A.   So I guess it would be to my right if I was facing the

24   crowd.  That's me on the pedestal.  I'm positive it's me.

25   It's very distinctly me.

1   Q.   And if you don't mind, Sergeant Kimball, can you actually

2   circle yourself on the screen?  You can touch the screen as

3   well.

4   A.   (Witness complies.)

5   Q.   And for the record, Sergeant Kimball circled himself on

6   the left-hand side of the screen on an elevated platform.

7        And Sergeant Kimball, can you tell where on the Capitol

8   grounds this scene --

9   A.   So this is the West Front, and this would be the raised

10  platform that I circled previously.

11  Q.   So the area we were just talking about.

12  A.   Correct.

13  Q.   So if we could start the clip at the 20-second mark and

14  play it and pause at the 25-second mark, please.

15       (Video played.)

16       So, Sergeant Kimball, this is a slowed-down version on what

17  was caught on this camera, on this video.  Can you describe what

18  we just watched in these five seconds?

19  A.   So the crowd, and then the individual in the red hat raising

20  an arm with an object in his hand, black pole appears to be.

21  Q.   And let's play the video from this point and pause at the

22  28-second mark.

23       (Video played.)

24       And what did we just see there in those three seconds?

25  A.   That black pole flying direct -- like right at me and hit

1    me.

2    Q.   Let's rewind back to the 22-second mark and play again,

3    pausing at the 25-second mark.

4        (Video played.)

5        And, Ms. Lee, if you could advance frame by frame for me,

6    please.  And let's stop here, please.

7        Sergeant Kimball, I'm going to circle an object on the

8    screen.  Can you identify that for me, please?

9    A.   The same black pole that just hit me in the video.

10    Q.   And what does the individual in the red hat appear to

11    be doing or has he just done with this pole?

12    A.   He just threw it at me.  I mean his arm's extended.

13    The pole just left his hand and headed towards my direction.

14    Q.   Let's jump to the 46-second mark, please, and continue

15    playing, pausing at the 56-second mark.

16        (Video played.)

17        And Sergeant Kimball, do you see an individual wearing

18    a red hat circled in red on the screen?

19    A.   I do.

20    Q.   And does he appear to be the same individual that just

21    threw a pole at you?

22    A.   He does.

23    Q.   Let's continue playing this and pause at the 1:06 mark,

24    please.  (Video played.)

25        And Sergeant Kimball, can you describe for me what this

1    image is showing us?

2    A.    Him pointing at me.

3    Q.    Thank you.  That's all we need from that exhibit.

4          Ms. Lee, if we could pull up Government's 703-A, which is a

5    1-minute, 48-second video clip.  And again, Sergeant Kimball,

6    just to orient us to time and place, can you -- this may not

7    be a great image.  Could we advance maybe one or two frames?

8          Sergeant Kimball, can you identify where this location is

9    depicted on the image?

10   A.    Yes.  This is the raised platform.  I remember some of

11   the people directly in front of it.

12   Q.    And can you identify where this footage comes from?

13   A.    My body camera, I believe.

14   Q.    And if you could for me, can you identify the time stamp

15   and read the time captured by this image?

16   A.    So January 6, 2021, at military time 14:14:19.

17   Q.    And is that 2:14 for civilians?

18   A.    Correct.  Yeah.

19   Q.    If we could play this clip from the 20-second mark, so

20   jump to the 22nd mark and play until the 28-second mark.

21         (Video played.)

22         So can you describe what we're seeing in the opening

23   seconds of this clip?

24   A.    The young lady with a PVC pipe with an American flag,

25   trying to hit me in the face with it, and I sprayed her.

1    Eventually, I grab it.  I remember her.  I grab and take it away

2    from her.

3    Q.   And do you also see an individual circled in red wearing a

4    red hat in this image?

5    A.   I do.

6    Q.   And is that the same individual that we just talked about

7    in a prior video?

8    A.   Previously, yes.

9    Q.   That threw a black metal pole at you?

10   A.   Correct.

11   Q.   Let's continue this video -- actually, before we do --

12   sorry, Sergeant Kimball.  I'm going to draw a circle on this

13   screen, and can you identify what I just circled there on the

14   screen?

15   A.   It appears to be a long, black pole consistent with what

16   I saw earlier.

17   Q.   And does it appear to be held by a specific individual?

18   A.   It appears to be held by the same gentleman with the red

19   hat.

20   Q.   Let's continue this video and pause at the 33-second mark.

21        (Video played.)

22        And Sergeant Kimball, this is obviously a frozen image of

23   the video and then zoomed in to enhance the picture.  Can you

24   see on the left-hand side of your screen the zoom-in of that

25   individual in the red hat?

1    A.    I do.

2    Q.    And does he appear to be holding something in his right

3    hand?

4    A.    The same pole I pointed out before.

5    Q.    Let's jump to the 42-second mark of this video and play to

6    55 seconds.

7         (Video played.)

8         So, again, this is a slow-motion version of your body worn

9    camera, obviously.

10        And Ms. Lee, if you could advance frame by frame for me.

11        And Sergeant Kimball, if you could narrate what we're

12   seeing frame by frame in those frames we just watched.

13   A.    That's the point where I see it, or just like a split

14   second prior, I recognize it's heading my direction I put

15   my hand up.

16   Q.    So is that your left hand appearing in the image?

17   A.    Correct.

18   Q.    And do you see another object appearing in that image?

19   A.    I mean, I have my OC spray in my right hand and the crowd

20   below and then the pole.

21   Q.    If it might be helpful, let me circle an image here.

22   A.    I mean, yeah, the pole.  That's what I just said.  I see

23   the pole like heading towards me.

24   Q.    Right.

25   A.    Like a second when this video started, like you see my hand

1    come up, and that's me recognizing the pole is heading my way

2    for protection or whatever.

3    Q.   I'd be correct in understanding you're raising your left

4    hand to protect yourself from --

5    A.   Oh, yeah.  Natural reaction for me to protect myself.

6    Q.   Let's continue the video.  Actually, let me clear this

7    quickly, and we'll continue the video and pause again at the

8    1-minute mark, please.

9         (Video played.)

10        And just for clarity, Sergeant Kimball, did we just watch

11   the pole strike you?

12   A.   Yeah, on my left side.

13   Q.   And in this frame here, can you see the individual in the

14   red hat?

15   A.   Yeah.  He's right there in the right, right-hand side of

16   the frame, next to the eagle.

17   Q.   Thank you.  So we obviously just watched this in slow

18   motion.  I want to watch it in real time so we can kind of see

19   how it played out in the actual time that you experienced it.

20        So if we could wind back to the 1-second mark of this

21   video, and we're going to play through at normal speed to the

22   14-second mark and then pause at that point, please.

23        (Video played.)

24        And Sergeant Kimball, did you hear a sound toward the end

25   of that clip?

 1   A.    Yes.

 2   Q.    Describe that for me.

 3   A.    A metal ring, ringing noise, a metal-on-metal or metal-

 4   striking-something noise.

 5   Q.    And from watching this video clip now a couple of times,

 6   what would be your understanding of what caused that sound?

 7   A.    The pole.  It was the pole when it hit the -- that

 8   construction, like the platform area right after it -- right

 9   after I put my arm up and it hit me and then fell down and hit

10   the platform.

11   Q.    Thank you.  That's all I need for this exhibit.  If we

12   could pull up Government's 703-C, which is a 19-second video

13   clip.

14         (Video played.)

15         And again, Sergeant Kimball, do you recognize the image

16   we're seeing here?

17   A.    This is my body camera, yes.

18   Q.    And from the same location, on the West Front of the

19   Capitol?

20   A.    Yes, sir.

21   Q.    And let's proceed to the 6-second mark and pause there,

22   please.

23         (Video played.)

24         So, again, this is a pause, freeze-frame, and then a zoom-

25   in, and the zoom-in is to the left of your screen, obviously.

1    Can you identify the individual circled in red on the screen?

2    A.    Same individual that was there before.

3    Q.    And what does he appear to be doing in this image?

4    A.    Pointing and yelling at me.

5    Q.    Let's play through and pause at the 9-second mark, please.

6          (Video played.)

7          It was very brief, but what did you observe in those few

8    seconds we played for you there?

9    A.    Him pointing at me, the guy next to him yelling at me, too,

10   so the two of them pointing and yelling at me.

11   Q.    Thank you.  That's all we'll need for that exhibit.

12         If we could pull up Government's 703-B, which is a

13   49-second video clip.

14         And Sergeant Kimball, before we play this, do you recognize

15   the scene we see here in this image?

16   A.    Yes.

17   Q.    And what does this depict?

18   A.    This is one of many times where I had to go decon after

19   getting pepper-sprayed in the face by protesters.

20   Q.    Is this the West Front of the Capitol?

21   A.    It is.

22   Q.    And would it be fair to say this is a bit behind and to the

23   left of where you're standing on that pedestal?

24   A.    Correct.

25   Q.    And could you read for me the time stamp on the upper

1    right-hand corner of this image?

2    A.    So 2:10 p.m. and 5 seconds.

3    Q.    And just to get our sequencing correct, would it be

4    accurate to say that this is a few minutes before the videos

5    we were just watching from the pedestal?

6    A.    Yes.  I think four minutes, maybe.

7    Q.    If we could advance and play through to the 4-second mark.

8         (Video played.)

9         And what are we seeing in this image?

10   A.    So you're seeing a bunch of -- so the fire extinguisher-

11   looking things or the -- it's called OC, or commonly referred

12   to as pepper-spray canisters that I was using and others were

13   using, and then next to that you have the square, elongated

14   metal poles that were being thrown at us all day.  And then

15   water bottles.

16   Q.    And the elongated metal poles, you mentioned those being

17   thrown at you all day.  Can you describe when that started, how

18   long it went on?  Was it the entire time you were on the West

19   Front?

20   A.    When I was aware of it, it started before I made it to

21   the pedestal area.  We were -- amongst ourselves, we figured out

22   that they were throwing these long metal poles once they started

23   hitting our members.  So that's when it started, and then it

24   kind of lasted throughout the time we were there, as far as I

25   know.

1    Q.    And let's play through to the 11-second mark and pause at

2    11 seconds, please.

3         (Video played.)

4         And Sergeant Kimball, what are we seeing in this image?

5    A.    So you're seeing, of course, what I described before, some

6    more metal poles.  You see what appears to be some fencing of

7    some sort and more officers looking like they're deconning

8    behind the line.

9    Q.    And when you mention "decon," were the water bottles used --

10   A.    Yeah.

11   Q.    -- to kind of pour over yourselves?

12   A.    So the water bottles were brought out so we were able to

13   wash our faces of the chemicals and get back to work.

14   Q.    If we could play through from this mark into the 19-second

15   mark and pause there, please.

16        (Video played.)

17        What are we seeing in this image?

18   A.    The same.  Same canisters, metal poles, a flag, American

19   flag, and fencing and water bottles.

20   Q.    And Sergeant Kimball, at this point we've shown you a lot

21   of footage of black metal poles, specifically here behind the

22   pedestal position.

23   A.    Yep.

24   Q.    Are the black metal poles you're seeing here consistent

25   with the black metal pole we just saw the man in the red hat

1    throw at you while you were on the pedestal or something

2    different?

3    A.   Yes, they are.  They're the same.

4    Q.   And we will proceed and play through the rest of the video,

5    please.

6         (Video played.)

7         And Sergeant Kimball, if you could just describe for us

8    briefly what we saw through the remainder of the video clip.

9    A.   So the object.  And that was me trying to compose myself

10   and get some water to wash the chemicals off of me.

11   Q.   Thank you.  And that's all we need from that exhibit, and

12   no more videos.

13        Sergeant Kimball, at any point did law enforcement lose

14   control of the line at the West Front of the Capitol building?

15   A.   Yes.  So I was actually -- so we did lose control.  I was

16   there to the very end.  So I was one of the last people, last

17   officers up the stairwell to what's referred to as the tunnel.

18        So there's a single stairwell.  So myself and some other

19   supervisors covered the withdrawal, because we were hardened,

20   so we had a little bit more protection than the rest of them,

21   covered the withdrawal back up into the tunnel.  So after we

22   lost control and they were able to break through our line.

23   Q.   And can you briefly describe for us what happened at the

24   tunnel once you took a position at that location?

25   A.   So we were in the tunnel.  We set up as best we could in

1    that confined space a bunch of officers line upon line upon --
2    as many officers -- I don't remember how wide they were
3    body-wise, but we tried to hold that entryway in the tunnel so
4    the protesters could not gain entry into the Capitol.
5        So it was -- it was like, I don't know, people describe it
6    as like the *300*, the movie.  But it was just like a melee, you
7    know, because they would be assaulting us in so many ways with
8    baseball bats and everything you can think of and chemicals and
9    everything else, and we were doing our best to hold them back in
10   the tunnel, and then, of course, dealing with all the chemical
11   irritants and tear gas and fire extinguishers and whatever else
12   they were spraying at us.  So it was intense.
13   Q.   And how long were you on the Capitol grounds on January 6?
14   A.   I was there from the beginning to the end, so I think over
15   four hours.
16   Q.   And did you seek medical attention on January 6?
17   A.   I did.
18   Q.   Describe that for us.
19   A.   Besides the chemical irritants on my body, the primary
20   reason I sought medical attention was because, when I was in the
21   tunnel with the pushing of the protesters, there was a little
22   bannister which was the perfect height for my back, and I got
23   crushed over that little bannister.  And after so long, I just
24   couldn't take the pain.  So I had to fall back and go seek some
25   help from medical staff and eventually go to the hospital.

1    Q.   And the medical staff, were they the staff on site at

2    the medical triage center that was set up at the Capitol?

3    A.   So there was medical staff in an area of the Capitol, yeah.

4    There's a facility in the U.S. Capitol building where medical

5    staff are located where I sought initial treatment, and then

6    from there I went to George Washington Hospital, where a lot

7    of the officers end up going.

8    Q.   And what did they tell you after you sought medical

9    attention at either the triage center at the Capitol or at

10   George Washington?

11   A.   So when I first made it to the triage area, which was a

12   long ways away, unfortunately, I got there, they assessed --

13   they took my vitals, they assessed me.  The doctor, the female

14   doctor, they were concerned because my blood pressure and my

15   pulse were so high they were concerned that I was going to have

16   a heart attack.

17        So they put me on a heart monitor when I was there.  And

18   then they wanted to give me an IV, but I had so much chemical

19   irritants all over my skin, like my whole suit was soaked with

20   all types of chemical irritants, my body was burning the entire

21   time.  So I didn't want them to poke my skin for an IV because I

22   didn't want to feel -- I mean, I just was worried because I had

23   all the chemicals on me.

24        So they kept a nurse with me to monitor me as I just drank

25   water until eventually I was -- until eventually I made my way

1    up to D.C. Fire and they took me to the hospital.

2    Q.    In addition to everything you just mentioned, did you have

3    any bruises or abrasions?

4    A.    Many.  Even though I had padding, I didn't have padding

5    over my whole body, but I was assaulted so many times that day.

6    I had bruises all over my body.  The burning lasted for almost a

7    week.  Every time I took a shower, my body would burn again, it

8    would be reactivated.  So I was prescribed pain meds and rest.

9    And that's pretty much what I did to the best of my ability.

10   Q.    And Sergeant Kimball, you've been in law enforcement for

11   almost 20 years.  Is that correct?

12   A.    Correct.  Sixteen-plus.

13   Q.    In those 16 years, have you ever experienced anything like

14   you experienced on January 6?

15            MS. STIRBA:  Objection.

16            THE COURT:  Noted, but overruled.

17       You may answer that question.

18            THE WITNESS:  To that degree, no.

19            MR. SMITH:  No further questions.

20            THE COURT:  Ms. Stirba.

21                      CROSS-EXAMINATION

22   BY MS. STIRBA:

23   Q.    Good morning, sir.

24   A.    Good morning.

25   Q.    I'll be brief.  I only have a few questions for you.

1   A.   Okay.

2   Q.   When you first arrived at the Capitol that morning, there

3   was a very large crowd of people in front of that inaugural

4   staging area.  Is that right?

5   A.   Correct.

6   Q.   Thousands of people?

7   A.   It could have been.  I believe so.

8   Q.   And people were yelling?

9   A.   They were.

10  Q.   Screaming, even?

11  A.   Correct.

12  Q.   It was very loud?

13  A.   Extremely.

14  Q.   And chaotic?

15  A.   It was.

16  Q.   Now, in preparation for your testimony today, you sat

17  down with the prosecutors and reviewed your video footage?

18  A.   Yes, I did.

19  Q.   You had also reviewed your video footage with law

20  enforcement about a year or so back as well.

21  A.   Correct.

22  Q.   Now, sitting here today, you don't remember the specific

23  incident with that metallic pole and the man in the red cap.

24  A.   Not until after I reviewed multiple cameras and my

25  memory -- I could recollect what took place that day.  But I

1    was assaulted so many times that day, dozens of times that day,

2    the first initial interview I didn't recollect it, but upon

3    further review of more and more and more videos and more

4    extended videos, my actions, then my memory was jogged slightly,

5    slightly of what took place.

6    Q.   Slightly.

7    A.   Yes.

8    Q.   But it's fair to say a lot went on that day.

9    A.   Oh, it's very fair to say that.

10   Q.   And this is a few seconds of many hours of what happened

11   that day?

12   A.   Correct.

13   Q.   And obviously, because multiple things were happening that

14   day, evidence collection was not in any way at the forefront of

15   your mind.

16   A.   It was not reasonable.  It was not possible that day.

17   Q.   Not even possible.

18   A.   No.

19   Q.   And obviously, we don't have whatever this object that was

20   thrown at you.

21   A.   As far as I know, no, you do not.

22              MS. STIRBA:  Thank you.  That's all I have.

23              THE COURT:  Redirect?

24              MR. SMITH:  No redirect, Your Honor.

25              THE COURT:  Sergeant Kimball, thank you very much.

1    Appreciate you coming.

2              THE WITNESS:  Thank you, Your Honor.

3          (Witness steps down.)

4              THE COURT:  Further evidence from the government?

5              MR. NOHRIA:  No, Your Honor, but the government would

6    like to admit, with the consent of the defense, Government's

7    Exhibit 401 and 402.  Those are --

8              THE COURT:  Let me turn to them.  401, 402.

9              MR. NOHRIA:  Yes.

10             THE COURT:  That's two videos.  Without objection, is

11   that correct, Ms. Stirba and Mr. Bridge?

12             MS. STIRBA:  Correct.

13             THE COURT:  All right.  401, 402 are admitted.

14                              (Government Exhibit Nos. 401, 402

15                               received into evidence.)

16             MR. NOHRIA:  Lastly, I know different courts address

17   this differently, but would the Court like us to admit the

18   stipulations as exhibits?

19             THE COURT:  Yes.  Put the stipulations in as exhibits.

20             MR. NOHRIA:  Then the government would move for

21   admission of stipulations, which are 1001, 1002, 1003, 1004, and

22   1005.

23             THE COURT:  All right.  Those are stipulations marked

24   as Exhibits 1001, 1002, 1003, 1004, 1005.  And obviously, as

25   stipulations, that is without objection.  So those are admitted.

1                          (Government Exhibit Nos. 1001-1005

2                             received into evidence.)

3              MR. NOHRIA:  And with that, the government rests,

4     Your Honor.

5              THE COURT:  All right.  Ms. Stirba.

6              MS. STIRBA:  Your Honor, we have no evidence to present.

7              THE COURT:  All right.  That completes the evidence in

8     the case.

9              MS. STIRBA:  I'm sorry.  I should move for judgment of

10    acquittal which -- on all counts.

11             THE COURT:  And do you wish to argue anything to the

12    court?

13             MS. STIRBA:  No.

14             THE COURT:  All right.  I'm going to be deciding

15    this case based on the evidence presented.  There's no further

16    evidence to be presented, so your motion for judgment of

17    acquittal will be reserved until my ruling in the case, and

18    I'll hear argument from counsel before I do so.

19         With that, would you like a brief break, and would you then

20    be ready to proceed with arguments from each side?

21             MR. NOHRIA:  The government's ready to proceed, but it

22    can also accept a break.  Either way.

23             MS. STIRBA:  If I could just have 10 minutes.

24             THE COURT:  You certainly can have the 10 minutes.

25    The government wanted to show that it didn't need those 10

 1    minutes, but --

 2         (Laughter.)

 3         -- in any event, we will take the 10 minutes.  And I'll see

 4    you then.  How long do you expect the government's closing will

 5    take?

 6              MR. SMITH:  Hopefully, no more than 10 minutes,

 7    Your Honor.

 8              THE COURT:  That's a hopeful estimate.  All right.

 9         And for the defense?

10              MS. STIRBA:  I would say reserve half an hour.

11              THE COURT:  All right.  We'll see you in 10 minutes.

12         (Recess from 9:47 a.m. to 10:10 a.m.)

13              THE COURT:  All right.  We're ready to proceed.

14              MR. NOHRIA:  Just very briefly, Your Honor, the

15    government was going to ask if we could just do a brief colloquy

16    with the defendant to confirm his decision not to testify on the

17    record.

18              THE COURT:  Sure, we can do that.  Since we haven't

19    had anything said on that yet, let's go ahead and confirm that.

20         So, Mr. Meacham, why don't you -- you can just speak into

21    the microphone there.  You understand that the decision whether

22    to testify is a decision of you alone.  You have control over

23    that decision.  Do you understand that?

24              THE DEFENDANT:  Yes, Your Honor.  I understand that.

25              THE COURT:  But you should consult with your attorney

1    about it, and I assume that you have done so.  Have you

2    discussed with your attorney whether you should testify in your

3    defense or not?

4              THE DEFENDANT:  I have, in fact, discussed that with

5    my attorneys, and at this time I've decided not to testify.

6              THE COURT:  And you've made that decision voluntarily,

7    without any coercion from any other source?

8              THE DEFENDANT:  Yes, I did.

9              THE COURT:  And you've made it considering both the

10   advice of your attorney and all the circumstances relating to

11   this case.

12             THE DEFENDANT:  Yes, I did.

13             THE COURT:  All right.

14             THE DEFENDANT:  Thank you.

15             THE COURT:  Let's go forward.

16                    GOVERNMENT CLOSING ARGUMENT

17             MR. SMITH:  Rage.  Violence.  Purpose.

18        At the U.S. Capitol on January 6, 2021, Odin Meacham was

19   the living embodiment of those words.  In the days prior to

20   January 6, Odin Meacham drove 2,000 miles across country to

21   Washington, D.C.  He had a purpose.

22        And when he arrived at the doorstep of the United States

23   Capitol, the heart of our democracy, on the day that Congress

24   was meeting to certify the results of the 2020 election, he

25   violently assaulted three law enforcement officers, taunted an

1    officer that he had just assaulted, attempted to breach the line

2    of officers defending the Capitol, and yelled threatening and

3    abusive language at another group of officers.

4    For his conduct on January 6, Odin Meacham has been charged

5    with eight crimes, and the government's evidence has shown

6    beyond a reasonable doubt that he is guilty of each of the eight

7    charges brought against him.  Odin Meacham should be held

8    accountable for the violence he committed on January 6 and also

9    his role in the assault on the Capitol.

10    Odin Meacham is charged with three separate counts of

11    assaulting law enforcement officers.  The first two assault

12    charges, Counts 2 and 3 of the indictment, charge Meacham with

13    assaulting, resisting, or impeding officers while using a deadly

14    or dangerous weapon in violation of 18 U.S.C. § 111(a) and (b).

15    To find Meacham guilty on these counts the Court must find

16    that he forcibly assaulted, resisted, opposed, intimidated,

17    impeded, or interfered with officers, that he acted voluntarily

18    and intentionally, that the subject officer was performing his

19    duties, and that Meacham intentionally used a deadly or

20    dangerous weapon during the commission of the assault.

21    As we heard from Captain Augustine, immediately after

22    Meacham tried to breach the police line on the West Front and

23    was sprayed with pepper spray, he ran forward into a group of

24    police officers and struck a Capitol Police officer with a large

25    wooden pole.  Meacham hit the officer so hard that the pole

1    snapped in half.  The evidence clearly shows that Meacham

2    voluntarily, intentionally, and forcefully charged at and struck

3    this U.S. Capitol Police officer, so the first elements of the

4    crime are satisfied.

5         What sets these assaults apart is Meacham's use of a deadly

6    and dangerous weapon.  We saw the video evidence of Meacham

7    striking a U.S. Capitol Police officer with a large wooden pole

8    and we saw how Meacham struck the officer so hard that the pole

9    broke in half under this trial's legal framework, one of the

10   ways the Court can find that the wooden pole was a deadly or

11   dangerous weapon is that the Court finds that it was an object

12   capable of causing serious bodily injury or death to another

13   person and the defendant used it in that manner.  The evidence

14   shows that Meacham took a long wooden pole an object that

15   appears to be nearly as tall as he is and used it like a

16   baseball bat to strike an officer and he strikes the officer

17   with enough force to snap the pole in half.  You can imagine a

18   scenario where determining whether or not an object was used in

19   a deadly --

20         COURT REPORTER:  Slow down, please.

21         MR. SMITH:  Sure.

22         You can imagine a scenario where determining whether an

23   object was used in a way that could cause serious bodily injury

24   or death would be a close call, where the factfinder would

25   really have to assess the nature of the object and the way it

was used.  This is not one of those scenarios.  Meacham used a
long wooden pole like a baseball bat and broke it over an
officer's body.  It's just that simple.

But the wooden pole strike wasn't the end of Meacham's
violence on January 6.  He kept going.  Moments after breaking
a wooden pole over an officer's body and attempting to strike
officers again with the remaining half of that same wooden pole
Meacham picked up a black metal pole and from just feet away
hurled that pole directly at MPD Officer Sergeant Kyle Kimball.
We heard from Sergeant Kimball about his experiences that day
about how he was under constant assault from the rioters
including Odin Meacham.  We also heard from Sergeant Kimball's
own body worn camera the sound of the black metal pole's impact.

We then saw from two angles Meacham's taunting Sergeant
Kimball after assaulting him just like the wooden pole strike
Meacham's use of a black metal pole on January 6 satisfies all
the elements of this crime right after assaulting one officer
Meacham reached down and picked up a long metal pole and
launched it right at Sergeant Kimball directly striking him
just like his use of the wooden pole Meacham's use of the black
metal pole was incredibly dangerous and put these officers at
risk of bodily injury throwing a long metal pole from a short
distance directly at an officer with enough force that we can
hear the sound of the pole's impact is exactly the kind of
behavior captured by the § 111(b) enhancement and should be

1    applied here.

2         This is especially true because this court and others in

3    this district have found that wooden poles and metal objects can

4    be deadly and dangerous weapons but again Meacham wasn't done.

5    Even after hitting two police officers with poles and attempting

6    a third assault with a pole he kept going we heard from MPD

7    Officer Jesse Leasure about how Meacham approached the police

8    line defending the Capitol pushed between two other rioters and

9    grabbed Officer Leasure's baton Officer Leasure was forced to

10   wrest his baton away from Meacham at which point Meacham turned

11   and smirked at the officers defending the Capitol Meacham was

12   charged for this assault on Officer Leasure under 18 U.S.C.

13   § 111(a) under this trial's legal framework the elements of this

14   crime track exactly with those applicable to Meacham's other two

15   assaults with one significant exception for this charge instead

16   of proving that Meacham used a deadly or dangerous weapon in

17   committing the assault the government must prove that he made

18   physical contact with Officer Leasure or acted with the intent

19   to commit another felony here because Meacham is also charged

20   with civil disorder which is a felony the Court has two paths to

21   conviction it may find that Meacham made physical contact with

22   Officer Leasure or that Meacham otherwise assaulted Officer

23   Leasure in the course of committing a civil disorder.  The

24   evidence in this case supports either conclusion.

25         The evidence shows that Meacham intentionally and forcibly

1   grabbed Officer Leasure's baton while Officer Leasure was

2   defending the U.S. Capitol.  Officer Leasure testified that he

3   had to wrest his baton out of Meacham's grasp and that he was

4   concerned for his safety during the assault.  Under any of the

5   verbs provided by § 111(a) Meacham's conduct towards Officer

6   Leasure would constitute an assault but even after this assault

7   Meacham wasn't done as we heard from Special Agent Ben Jones

8   Meacham then ranted and yelled at and threatened officers

9   calling them Nazis dogs cowards traitors even asking them if

10  they were scared.

11      The first count of the indictment charges Odin Meacham with

12  participating in a civil disorder in violation of § 231(a)(3).

13  To convict Odin Meacham of civil disorder the Court must find

14  that he knowingly committed an act with the purpose of

15  obstructing impeding or interfering with officers those officers

16  were engaged in lawful performance of official duties during a

17  civil disorder and the civil disorder obstructed delayed or

18  adversely affected either commerce the movement of any article

19  or commodity in commerce or the performance of any federally

20  protected function.  We heard from Agent Jones about the riot's

21  impact on commerce within and around the District of Columbia

22  and we also heard from Captain Summers and Inspector Hawa about

23  the riot's impact on Congress's work to certify the election.

24  The January 6 assault on the Capitol was very clearly an example

25  of a civil disorder and Meacham was a violent participant in

1   that riot.

2       We also heard from MPD Captain David Augustine about the

3   police line defending the west side of the Capitol and how

4   rioters repeatedly attacked the officers holding that line in

5   particular we heard about Odin Meacham's attempt to pull a bike

6   rack barricade away from officers and how Captain Augustine

7   sprayed Meacham with pepper spray.  Captain Augustine's

8   testimony and the related video evidence clearly showed that

9   Meacham was trying obstruct impede or interfere with the

10  officers defending the Capitol.  Together this conduct satisfies

11  the elements of the crime but Meacham didn't stop at trying to

12  wrestle away a bike rack from officers and he didn't stop when

13  Captain Augustine sprayed him with pepper spray in fact as we

14  just discussed he only escalated his violent assaults on the

15  officers defending the Capitol including with two different

16  deadly and dangerous weapons.

17      Meacham is also charged with four counts that relate

18  to his trespass on restricted grounds as well as his use of

19  a deadly or dangerous weapon under Count 5 of the indictment

20  Meacham is charged with entering or remaining on restricted

21  grounds with a deadly or dangerous weapon in violation of 18

22  U.S.C. § 1752(a)(1) and (b)(1)(A) the statute requires the

23  government to prove that Meacham knowingly entered or remained

24  in a restricted building or grounds without lawful authority and

25  knowingly used or carried a deadly or dangerous weapon during

the commission of the offense we heard from U.S. Capitol Police
Captain Tia Summers and U.S. Secret Service Inspector Lanelle
Hawa about the restrictions on Capitol grounds on January 6 as
Captain Summers showed us on January 6 the restricted perimeter
was very clearly marked by Area Closed signs snow fencing and
bike rack barricades.  None of this stopped Odin Meacham.  He
arrived at the west side of the Capitol building at around 2
p.m. on January 6 and that's when as shown by the evidence he
put his purpose into violent practice Meacham was not deterred
by the various indicators that the Capitol grounds were closed
that day.  He had no legal authority to enter the grounds and he
twice used a deadly or dangerous weapon to assault the officers
defending the Capitol.

Under Count 6 of the indictment Meacham is charged with
disorderly or disruptive conduct in a restricted area or grounds
with a deadly or dangerous weapon in violation of 18 U.S.C.
§ 1752(a)(2) and (b)(1)(A) the statute requires the government
to prove that Meacham knowingly engaged in disorderly or
disruptive conduct in a restricted building or grounds with the
intent to impede or disrupt government business that he actually
impeded or disrupted the orderly conduct of government business
and that he knowingly used or carried a deadly or dangerous
weapon in relation to the offense.

The Court has heard from multiple witnesses over the last
two days about Meacham's violent disorderly and disruptive

conduct on January 6 whether taken individually or together

Meacham's purposeful intentional violent acts that day two of

which included the use of a deadly or dangerous weapon

contributed to Congress's recess of the certification process

and unequivocally disrupted government business.  The third

charge related to trespass on restricted grounds --

THE COURT:  What's the evidence that he had intent to

impede or disrupt government business?

MR. SMITH:  The government would submit that

Mr. Meacham's conduct at the police line on the West Front

indicate clear intent on multiple occasions to disrupt

government business up to and including the officers attempting

to protect the Capitol.  So that would include his interference

with the bike rack barricade proceeding to his two violent

assaults with deadly and dangerous weapons and then ultimately

concluding with his interference with Officer Leasure at another

police line.

THE COURT:  So the government business that you're

relying on there would be the business of the officers in

attempting to protect the Capitol?

MR. SMITH:  Correct.  Specific to that element of the

crime, it would be the officers from both Capitol Police and

Metro PD in their efforts to protect the Capitol.

The third charge related to trespass which is engaging in

physical violence in a restricted building or grounds with a

deadly or dangerous weapon in violation of 18 U.S.C. 1752(a)(4) and (b)(1)(A) requires the government to prove that Meacham knowingly engaged in an act of physical violence against a person in a restricted building or ground and that he knowingly used or carried a deadly or dangerous weapon during that offense. The Court can rely on the same evidence just outlined to find Meacham guilty of this charge.

The evidence showed that Meacham assaulted three officers on January 6 two of them with a deadly or dangerous weapon. Although the Court can find Meacham guilty of Counts 5, 6, and 7 based simply on his carrying of a metal pole and a wooden pole in the Capitol the evidence is clear that he used both those objects Meacham struck one officer so hard it snapped a pole in half he then threw a long metal pole at an officer with such force that we can hear the impact on the officer's body worn camera.

Meacham's intentional use of two different deadly or dangerous weapons justifies the enhancements of these three statutes as well as the enhancements of § 111(b) Meacham's purposeful and violent use of a wooden pole and a metal pole and assaulting officers is exactly the kind of conduct captured by these statutes and it should be applied here Meacham didn't make a mistake he didn't accidentally use a wooden pole he didn't accidentally use a metal pole, he clearly chose those two objects specifically because they can inflict serious bodily

injury and hurt his intended victims.

Finally Meacham is charged with an act of physical violence at the Capitol building or grounds in violation of 40 U.S.C. 5104 (e)(2)(F) the government's burden here is to prove that Meacham willfully and knowingly engaged in an act of physical violence within the Capitol grounds again the Court has heard testimony from three law enforcement officers as well as the FBI case agent specifically describing Meacham's violent conduct on January 6 the testimony from any of these witnesses alone would support conviction on this final charge taken together the evidence as unequivocal.

As this court has seen as the evidence has shown for Odin Meacham January 6 was a day of purpose, rage, and violence. Based on the evidence, this court should find him guilty of all eight charges and hold him accountable for his conduct that day.

THE COURT:  Thank you, Mr. Smith.

Ms. Stirba.

DEFENSE CLOSING ARGUMENT

MS. STIRBA:  There is no doubt that what happened at the Capitol on January 6 was devastating.  On a conceptual level, it was an event that shook public faith in our democracy and our political institutions.  On a human level, it was a painful and terrifying day for law enforcement officers there to protect the Capitol and the people in it.

I have been told in my career that judges are people too,

1    and so I want to acknowledge the very human reaction that is

2    to feel sympathy for those who were at the front lines of this

3    event and those who continue to endure the toll of that day.

4    But this case is not about January 6 writ large.  It is about

5    the government's specific charges against one person, Odin

6    Meacham.

7         Your Honor, no one is saying that Mr. Meacham's behavior

8    that day was praiseworthy, but they are not the crimes that the

9    government has charged.  And even for historic and unprecedented

10   events, the government must still satisfy its burden at the

11   highest legal standard we have in our legal system, and the

12   government has not done so today.

13        I'm going to address the charges in categories.  I'll

14   start first with the assault charges, and I will take the two

15   111(b) counts first, Counts 2 and 3.  Our defense is simple:

16   The objects that Mr. Meacham used do not meet the legal standard

17   for a dangerous or deadly weapon.

18        Now, I must take a moment to discuss the applicable law

19   here, because it's important.  The legal question before the

20   Court is not whether Mr. Meacham used a weapon.  The legal

21   question is whether he used a dangerous or deadly one.  We

22   cannot dilute that definition or lose sight of its narrow

23   contours.  There are two key parts to this definition, and we

24   must keep both in mind.

25        First is the standard of injury, which is death or serious

bodily injury.  This is a high legal standard.  We are not

talking about any kind of injury.  We are not even talking about

substantial injury for the kind referenced in 18 U.S.C. 113,

which involves temporary but substantial disfigurement or

temporary but substantial loss or impairment of a bodily member

or organ or mental faculty.  What we are talking about with

serious bodily injury is the kind of injury that hovers right

below death, injuries that involve a substantial risk of killing

somebody, protracted loss or impairment of a limb or an organ,

protracted loss or impairment of cognitive functioning.  These

kinds of injuries, in short, are horrific.  That is part one.

Part two is that the object has to be capable of inflicting that

high level of injury by the manner in which it was used.

         Now, I have reviewed the Court's legal framework, and we

maintain as we submitted last week that the Court should be

using a framework that an object must be likely to inflict this

injury.  I understand the Court's ruling.  We maintain that as

our position.  But even if an object need only be capable, the

notion of capability can't extend to the furthest emanation of

remote possibility because theoretically any object could be a

dangerous weapon depending on how it's used, but that does not

mean --

         THE COURT:  Some courts have found objects to be

dangerous weapons that on examination seem to be far from

dangerous.

1          MS. STIRBA:  But it depends on the manner of use.

2          THE COURT:  It does.  And here we have a wooden pole.

3     The testimony is that it appeared to be a wooden pole, and

4     certainly the videos depict it as something of that nature — a

5     wooden pole, you know, of some thickness, not as thick as a big

6     flagpole, but of some thickness — that was wielded in a manner,

7     with great force, to strike a specific officer standing there,

8     and did in fact strike that officer near his head.

9          Why is that not a dangerous weapon?  Because it is

10    something capable of inflicting serious injury, and, indeed, I

11    think most of us would think that someone being struck with that

12    force, by that type of object, it would be likely to inflict

13    serious bodily injury but for the fact that the officer happened

14    to have a helmet on.

15         MS. STIRBA:  Your Honor, if you're looking for answers

16    to those questions, you've come to the right place.  I have

17    answers to each and every one of those points.  But this is

18    actually why I want to just finish up the legal framework on

19    this.  Because of the pole, I think it is to lose sight of the

20    standards for this injury and list towards an object was used,

21    seems like it could have hurt, that satisfies the test.

22         So that's why I want -- this is worth the investment.

23    And that's why I'm saying that this must be realistically

24    capable, not notionally capable, because otherwise it would be

25    so broad and all encompassing, a definition of dangerous weapon,

1    it would lose all meaning.  It would be empty.

2         So I'm going to address each of these incidents and objects

3    in turn, and I'll start with the wooden pole, the flagpole.  But

4    I will note there is an overarching point to both, which is we

5    don't have these objects.  Neither was collected.  That's

6    nobody's fault.  It's just they're not here and --

7              THE COURT:  You do have video of them.

8              MS. STIRBA:  Sorry?

9              THE COURT:  We do have video of them.

10             MS. STIRBA:  We do, but we don't have the actual

11   objects.  And these objects are not the type that are easily

12   recognized and universally known — for example, a sledgehammer

13   or a baseball bat, something that you see it, you know exactly

14   what it's nature is.  We can't start from that place of

15   assumption because these are not those types of objects.

16   So let's talk about what we do have.

17        Okay.  Starting with this wooden pole, I think in terms of

18   the nature of whatever we know about what this object was, we

19   know it was flimsy, and I'll tell you why.  First, because that

20   makes sense with what it most likely was.  I agree with the

21   government's evidence.  I think it was most likely used to carry

22   a flag, but that does not -- at this rally.  But that does not

23   mean that all flagpoles are the same.  And in this context, with

24   the video that we have, the fact that it was used and carried at

25   this rally actually shows how light it must have been, because

1    this was an item brought to a public political event.  That

2    means that for an object that long it was something that a

3    person had to hold and carry for hours with the added weight

4    of a flag and the wind resistance that met it.  So that means

5    that this, by design, was something brought to this rally that

6    had to have been light, easily carried by a person, and that

7    means it was insubstantial.

8        Now, I think the video evidence actually precisely

9    corroborates that this object was flimsy, because this is where

10   we segue into the manner of use.  We know the nature of this

11   object because we see what actually happened to it.  When

12   Mr. Meacham swings that pole, it breaks on the shoulder of a

13   Capitol Police officer.

14       Now, the government has tried to focus on the fact that the

15   object broke.  But actually play that through.  The government

16   is trying to make a leap from the fact that it broke to some

17   capacity for damage, but the fact that it broke actually shows

18   the opposite.  It shows how insubstantial this was.  And because

19   we know that, because this was a direct hit to a Capitol Police

20   officer with a big swing --

21       THE COURT:  -- do with the evidence that shows that

22   prior to that Mr. Meacham swung that same object forcefully

23   against a metal bike rack and it had a loud clang of hitting it

24   and didn't break.

25       MS. STIRBA:  That was after.  That actually followed

1    this initial strike.

2              THE COURT:  It was after the flagpole broke?

3              MS. STIRBA:  It was, yes.  It broke, and then that

4    followed it, on the fencing.

5         But we submit this is actually a very big hole for the

6    government because I'm not sure what we conclude with that.

7    To me it sounds like an object hitting another object.  That

8    does not mean, certainly not at a reasonable doubt standard,

9    that we can conclude that that had heft and had substantial

10   thickness and solidity, especially because the government has

11   done nothing to corroborate this.  If that was really important,

12   we have no demonstratives, we have no testing, we have no

13   comparisons, nothing to actually prove what this sound from a

14   body camera actually means.  And with the government's burden,

15   that's on them, especially when what we do have with the -- the

16   best evidence we have about what this was is what happens when

17   it hits the Capitol Police officer.

18             THE COURT:  I appreciate your clarifying for me that

19   the striking of the bike rack with the flagpole was afterwards,

20   but it still indicates an object that was smashed against the

21   bike rack and that didn't break and that made a loud sound of

22   forceful hitting against the metal bike rack.

23             MS. STIRBA:  And here I think, is there some

24   information to be gleaned?  Maybe, possibly.  But it didn't

25   break because it's also a much shorter pole at that point than

1    it is when it's longer.  Things -- I think that you can't draw

2    the same inference, because when something is shorter, it's just

3    much less likely to break, but it doesn't mean that it's more

4    substantial.  So is it a sound of another object hitting another

5    object?  Yes.  But I think what is much more informative to the

6    Court and certainly worth a doubt --

7        THE COURT:  So a flagpole that's long may not be a

8    dangerous object, but if it's only half of that flagpole, it

9    may be a dangerous object?

10        MS. STIRBA:  No.  What I'm saying is --

11        THE COURT:  Is that a conclusion you want me to reach?

12        MS. STIRBA:  No.  What I'm saying is -- what we're

13    trying to get at is this object that we don't have here, what is

14    it like?  Is it capable of inflicting this level of injury by

15    the manner of its use?  One thing we have to start with is what

16    is this thing?  And we don't have that Capitol Police officer

17    here to testify.  And I'll -- that's important because that's

18    how we have the inference that I'm asking the Court to make at a

19    minimum a doubt.  Because with this type of swing, with an

20    object this long, if it had the heft of a baseball bat coming

21    down directly on someone's shoulder, there would be injuries.

22    There would be significant injuries.  We have no such evidence

23    in this case at all.  We don't even have the identity of who

24    this person was.  And the reason we don't have that, I would

25    submit to the Court, is because this didn't have any effect on

```
1    the officer, not at the type of injury level required to make --

2          THE COURT:  There's no proof of the injury suffered by

3    the officer.  I agree with that.

4          MS. STIRBA:  But I think it's actually even stronger

5    than that.  We don't even know this person, this identity.  And

6    if this person had been injured in a significant way, I submit

7    we would know that.  We also have this officer's response --

8          THE COURT:  Whether we know it or not, there's no

9    proof of it.  So I don't have any proof of any injury to that

10   officer.

11         MS. STIRBA:  True.  And the absence of evidence can be

12   alone a reason to doubt, especially when the burden is on the

13   government.  And so we also have not only what happened to the

14   object but the officer's reaction to it.

15      (Visual displayed.)

16      I'm not sure why my PowerPoint didn't play the image.

17      (Visual displayed.)

18            It's in evidence.

19         THE COURT:  Since we're on the baseball analogy, you

20   want to try a third strike?

21         MS. STIRBA:  Sure.

22      (Visual displayed.)

23         MS. STIRBA:  Struck out.

24      But it's slide 60 -- it's Government's Exhibit 601, and I

25   ask the Court to watch that because you can actually see the
```

1    officer's response immediately after being hit.  He doesn't

2    stagger.  He doesn't drop to the ground.  He doesn't rub his

3    shoulder.  He just keeps moving the bike rack.  It doesn't even

4    appear that he is affected much, if at all, which I think also

5    goes to show that this object was not capable of inflicting that

6    level of injury in the manner in which Mr. Meacham used it,

7    because it didn't, especially when we have to consider under the

8    umbrella of manner of use the way in which it was actually used.

9    This includes the circumstance of the person against whom it was

10   used.  And in this situation, it was used against a kitted-out

11   member of the Capitol Police in riot gear.  Now, I've put on the

12   screen the Capitol Police officer who was struck, and I would --

13        THE COURT:  Since we're talking about the law a little

14   bit here, do you have any authority for the fact that something

15   would not -- that something that would otherwise be a dangerous

16   or deadly weapon that was capable of inflicting injury and

17   indeed was used in that manner would not be under the law a

18   dangerous and/or deadly weapon because the victim of the strike

19   happened to have protective gear on?

20        MS. STIRBA:  No, but I have case law that takes into

21   account the particular circumstances of the person who was

22   assaulted.  I can get the cite.  I don't have it up here.  It's

23   a Ninth Circuit case in which a person was convicted of assault

24   with a dangerous weapon for hitting a two year-old with a belt

25   buckle, and the Ninth Circuit said that the manner of use

against a two year-old satisfied the legal definition.  And if

the Ninth Circuit can take into account the assaultee's

vulnerabilities, particular vulnerabilities, the reverse is

also true, that you can also take into account the victim's

protections.

 And that's exactly what we have here.  We have a Capitol

Police officer in what Sergeant Augustine called a riot --

 THE COURT:  It's almost like taking into account the

fact that the victim happens to be 5-foot-1-inches tall, and the

swing, which I don't really think was a baseball swing -- it was

an overhand swing down.  Most people don't hit baseballs that

way.  If the victim was only 5 foot 1 and the swing went over

their head, you take that into account?

 MS. STIRBA:  I think manner of -- well, I think that

doesn't -- I'm not sure because I think manner of use is a very

fact-specific inquiry.  But the legal standard, as the Court has

outlined it, is that it has to be capable by the manner in which

it was used.  And in this case it was used against a member of

the Capitol Police who was completely clad in riot gear.  And I

ask the Court to take into -- to just note for the moment --

 THE COURT:  Well, this instruction is usually given to

a jury.  You don't think it's an instruction that is sort of, if

it is capable of causing serious bodily injury or death to

another person and Mr. Meacham used it in that manner, you think

that that requires the jury to assess how protective the gear

1    was that the individual had on?

2         MS. STIRBA:  When assessing that second part, how

3    Mr. Meacham specifically in this case used the object, yes,

4    I do.  I think it does fall under the umbrella --

5         THE COURT:  So if he had swung this at Captain

6    Augustine, who didn't have the same protective gear on, he had

7    a helmet but not the same protective body gear from the videos,

8    then it might be a dangerous or deadly weapon.  But because he

9    swung at this particular Capitol Police officer, it's not?

10        MS. STIRBA:  Our position is, in terms of the nature

11   of this object full stop, just starting there, it's too flimsy

12   to inflict this level of injury.

13        THE COURT:  I understand that's your position.

14        MS. STIRBA:  But assuming it's a baseball bat, then

15   I think at a minimum it would be one less argument I could make.

16   But that's not what we have here.  That's not what has been

17   charged in this case.  And we can see how decked out -- so I ask

18   the Court, note the back of this Capitol Police officer's

19   helmet.  You'll see a square -- a white square on the back.

20   Keep that in mind, because I want to go through what these

21   Capitol Police officers were wearing that day.

22        So on this next slide, you see a line of Capitol Police

23   officers, and you can see their helmets, you can see their

24   padding, you can see their protective vests.  Now, the next

25   slide you can see -- on the left-hand side of the screen, you'll

1    see that there's an officer, Capitol Police officer, with that

2    square on the back of the helmet, so we get a better view of the

3    person most likely who was at issue here.  And you can see they

4    have arm protection, they have a visor, helmet, and then as I'm

5    scrolling through, you can also see they have shoulder

6    protection from this same Capitol Police officer.

7        And so the fact that someone is outfitted in gear

8    specifically designed to protect law enforcement officers from

9    blows just like this one shows that this blow was not -- was not

10   capable of inflicting that level of injury by the manner in

11   which it was used.  And this is where the legal standard really

12   matters, because there is this poll, like the tide, to look at

13   an assaultive act and think, well, that looks bad, that could

14   have caused injury, an object was used and that looks like it

15   could have hurt.  That does not mean it could have inflicted

16   serious bodily injury.

17            THE COURT:  It sounds to me like what you're arguing

18   is that it's the government's obligation to put on evidence --

19   basically, it would be expert evidence -- saying that an object

20   of this kind, swung with that force, against an officer who had

21   this specific kind of gear on, would or would not cause serious

22   bodily injury.  It sounds like that's what you're saying is

23   necessary as an element of proof from the government for this

24   offense, either Count 2 or Count 3.

25            MS. STIRBA:  I think that's not quite what I'm saying,

1    but what I am saying --

2            THE COURT:  It's close.

3            MS. STIRBA:  But what I am saying is, of course, it is

4    the government's burden to prove beyond a reasonable doubt that

5    the object they have alleged meets the legal definition.  When

6    you start off as a baseline where you don't have that object,

7    all you have is some video clips of it, then that is a lean

8    amount of evidence to begin with.  When you add to that we don't

9    have the person who was struck, the evidence gets leaner.

10           THE COURT:  Well, I don't understand how the person

11   who was struck is going to provide any evidence.  Let's assume

12   for the moment that there wasn't actually — actually — a serious

13   bodily injury.  What's the person who's been struck add to the

14   evidentiary base?

15           MS. STIRBA:  Well, we had two other people who were

16   the complainants in the counts --

17           THE COURT:  So what?  What's the person who was struck

18   going to add?

19           MS. STIRBA:  Well, this is why I objected to the

20   person testifying all of those times the Court overruled,

21   because I think that if they don't remember and are testifying

22   from the video, they don't add much.  But if they know what the

23   object was and they could describe how heavy the specific injury

24   they know was linked to that, then they could add a lot.

25           But again, it's not our burden to show that, and it is not

1    unreasonable.  In fact, it is constitutionally required for the

2    government to meet that burden.  And if the Court has a doubt or

3    a hole or an absence or a question, that's the answer, even if

4    the Court supremely disapproves of what the Court has seen here

5    today and yesterday.

6        So again, I think this is why the level of injury is

7    important, because is it possible that you hit somebody with

8    what we think is pretty insubstantial that could cause bruising?

9    Sure.  Absolutely.  Is it possible that it could even cause

10   temporary but substantial disfigurement?  Maybe.  But that's not

11   the legal standard.  The Court has to have no doubt about what

12   this object was and its capacity given the manner of use, and

13   that's not what the government has brought here today.

14       THE COURT:  I don't think the standard is no doubt.

15   That's not the standard.

16       MS. STIRBA:  I apologize.  That's true.  That's true.

17   I've been called out for that before.  It's not any doubt, but

18   it is a reasonable one.  And there are more than enough holes

19   for the Court to have reasonable doubt on this count.

20       Now, I want to talk about the black object that was thrown

21   at Sergeant Kyle Kimball.  Again, we don't have it.  Who knows

22   what that was.  I think it is fair.  I think the government is

23   right that it sounds metallic by the sound of its hitting, but

24   keep in mind, something can be both metallic and flimsy.  For

25   example, aluminum.  An aluminum rod or pole.  And I think you

1   can also conclude from that sound that that object is hollow.

2   If you listen to it, I think that's a fair conclusion from the

3   sound.

4        Beyond that, I'm not really sure how much else we can

5   conclude about this object at the reasonable doubt standard,

6   especially when the other evidence also shows that this object

7   was insubstantial.  You can tell -- let me pause here.  It's

8   another video, so everyone brace themselves.

9        (Video played.)

10        First, by how Mr. Meacham holds it and throws it.  Now

11  I'm going to play this and then go back, but watch specifically

12  Mr. Meacham's wrist movement.

13        (Video played.)

14        Now, what you can see is Mr. Meacham holding an object

15  that's several feet long, with one wrist, one hand moving it

16  back and forth just with wrist strength.  That is not something

17  you would be able to do and flick like that if that object were

18  very substantial and heavy.  And the government has provided

19  other evidence about what their best conjecture is about this

20  object in that it was essentially a spindle in some temporary

21  fencing around the Capitol.  We heard that from Sergeant

22  Kimball's testimony earlier today with the body camera of the

23  poles lying on the ground and the fencing behind.  And then

24  the government didn't play it, but the government did introduce

25  this next exhibit.  Court's indulgence, I'm having some

1    technological issues.

2        We're going to play this clip, which is Government's 604.

3        (Video played.)

4        Now I'm going to ask the Court specifically to watch the

5    gentleman in the blue sweatshirt and the backpack and the people

6    around him.

7        (Video played.)

8        Now, what we've just watched is a couple of people holding

9    an entire rack of these -- of this fencing material, including

10   at least half a dozen spindles.  We see a person holding that

11   rack with one hand and physically with bare hands ripping it

12   apart with the other.  We see a couple other people bending,

13   moving, destroying this, which just shows -- which is consistent

14   with what this material is.  It's temporary, it is modular, it

15   is meant to be quickly erected, quickly broken down.  It is not

16   meant to withstand the sands of time.  And if people can do that

17   with that kind of material -- if that were hefty, you couldn't

18   physically do that with your bare hands.  You couldn't

19   physically hold up a rack with that many spindles.  So if that

20   is what this object is, as it seems the government's theory is,

21   this is not a substantial object.

22       In fact, looking at Sergeant Kimball's body camera from

23   earlier this morning, you can actually see I've taken a still

24   shot, and then on the right is a more zoomed-up view of the

25   spindles.  You can actually see they are in fact hollow.

1    You can see on the right there are holes in them.  These are

2    not solid metal poles.  They're spindly.  They're spindles.

3        And so again, if you threw that kind of an object at

4    someone's body, there is just no way that could cause you to

5    die.  There is no way that could cause you to have a serious

6    risk of dying.

7            THE COURT:  Wait a minute.  Wait a minute.  Wait

8    a minute.  If you were -- I'll use you as an example.

9            MS. STIRBA:  Yep.

10           THE COURT:  If you were standing there, this distance

11   from me, and I took that object and threw it at you and it

12   struck you in the face, you think that could not cause or would

13   not be capable of causing you serious bodily injury?

14           MS. STIRBA:  Well, so this is -- that's why I want to

15   divide them between the body and the face, because I think the

16   government's strongest argument is that this object hits a

17   sensitive area like the face.  I'm going to talk about that.

18           THE COURT:  How about the neck?

19           MS. STIRBA:  Well, but I guess I would include that

20   as an vulnerable sensitive area, shoulders up particularly, but

21   yes.  Are you zealous?  Are you zealous?  From my client, yes.

22   If the Court wanted to throw a pole at my body from this

23   distance, yes, I would take that hit.  So -- but in terms of --

24           THE COURT:  You're not talking to a jury.  I don't

25   think that's an argument that's worth making, Ms. Stirba.

1          MS. STIRBA:  I'm just saying I feel very confident

2     that if the Court threw a pole at my body from this distance

3     of this type, would it hurt?  Probably.  Would it bruise?

4     Probably.  But I don't think it would kill me.  Now, I think

5     that the real issue is --

6          THE COURT:  It doesn't have to kill you.  That's not

7     the standard.

8          MS. STIRBA:  No.  But this is why, again, it's not

9     that far off with the level of injury.  There's bodily injury,

10    there's substantial bodily injury, and then there's serious

11    bodily injury.  And that's why the standard is so high.  It's

12    not any object, it's not any weapon, it's a deadly weapon.  And

13    that is a defined term.  Now, the government's --

14         THE COURT:  It's a deadly or dangerous weapon.

15         MS. STIRBA:  Yes.  But the legal standard for both is

16    we end up in the same place, which is it has to be capable of

17    causing either death or serious bodily injury.  Whether you call

18    it a dangerous weapon, deadly weapon, that's the standard.

19         THE COURT:  That's fine, but the definition is deadly

20    or dangerous weapon.

21         MS. STIRBA:  Yes.  A rose by any other name.  So the

22    real question is whether -- what would happen if it hits a

23    sensitive area?  The natural impulse is isn't that capable,

24    wouldn't you say.  Again, you have to look at the manner in

25    which this was used, because I've put on the screen a still

1    shot of Sergeant Kimball from that day and what we heard from

2    Sergeant Kimball earlier is that he was part of a -- what he

3    called the hard platoon.  And he said that part of the reason he

4    went into the tunnel was because he had -- because that hard

5    platoon, they had a little bit more protection than others.

6    We also see in this image that Sergeant Kimball is wearing a

7    helmet with a visor specifically covering that part -- that

8    sensitive part of his face.

9        So this particular throw and the manner in which it was

10   used against Sergeant Kimball, he's protected.  It could not

11   have caused that level of injury because of the protections

12   he was wearing.  And we also know it was impossible because it

13   didn't.  We do have a direct throw.  That is what actually

14   happened on January 6.

15       And Sergeant Kimball -- today he has a small fraction of a

16   memory of this moment.  When he talked to officers a year ago,

17   he had none, because if he had been injured dramatically, he

18   would remember.  But we don't have any information, certainly

19   not from Sergeant Kimball, that this throw ended in any injury

20   to him.  In fact, if you watch the video, he doesn't make an

21   audible sound, he doesn't react, he doesn't take a moment to

22   recover, he doesn't shake his hand out, which shows that this

23   throw didn't do anything at all.

24       So at best our submission to the court is that for Counts 2

25   and 3 the government has made a 111(a) at best.

1          Now I'd like to turn to Count 4.

2               THE COURT:  At best.  But do you contend that they

3     have not made that 111(a) on Counts 2 and 3?

4               MS. STIRBA:  No.  I don't think I can say that.

5     I think they've made out 111(a).

6          Turning to Count 4, we maintain that the government has

7     certainly not made out an assault on this count.  Now, I

8     understand the Court has reserved ruling on our contention that

9     the Court, in its legal framework, should adopt the holdings of

10    the Ninth and Tenth Circuits saying that 111(a) requires at

11    least some form of assault, some intentional attempt to threaten

12    or inflict injury on someone else.  And I understand that the

13    Court has reserved ruling on that, but we submit it's directly

14    applicable here because there's no assault here.

15         What the evidence shows for this count is that for a few

16    seconds Mr. Meacham put his hand on the officer's baton, and I

17    submit it's very tough to tell exactly what happens next.  Now,

18    I understand that Officer Leasure testified that Mr. Meacham

19    tried to pull this baton towards him, meaning Mr. Meacham, but

20    I think the Court should rely much more heavily on the video

21    evidence than Officer Leasure's memory because, as Officer

22    Leasure testified, this happened under conditions that were

23    confused, very erratic, and with a lot going on.

24              THE COURT:  So in this instance you'd like me to rely

25    on the officer's testimony rather than the video?

1          MS. STIRBA:  No, the reverse.

2          THE COURT:  I'm sorry.  On the video rather than the

3     officer's testimony, whereas with respect to the pole-striking,

4     you say that it would be wrong for me to rely on the video

5     because the officer would have been better evidence and the

6     government should have produced him?

7          MS. STIRBA:  No, no, no.  And I want to clarify.

8     That's not what I'm saying.  I'm not saying that the --

9          THE COURT:  It's not a missing witness argument or

10    anything like that, but you're --

11         MS. STIRBA:  I'm saying --

12         THE COURT:  -- you're saying that the testimony from

13    the officer as to what happened with respect to the pole-

14    striking would have been important?

15         MS. STIRBA:  Yes.  And I'm saying that --

16         THE COURT:  Well, why not with respect to the baton-

17    seizing as well?

18         MS. STIRBA:  Let me go back and clarify.  What I'm

19    saying is the only evidence that the government has offered

20    about what this object was is the video evidence.  That's it.

21    That's not bad evidence.  Video's great for what it is, but

22    when video is incomplete or confusing or just unclear or doesn't

23    quite get you there, if that's what the Court has, that doesn't

24    reach the legal standard.  And so what I'm saying for --

25         THE COURT:  Okay.  Get back to Count 4.  I didn't mean

1        to divert you onto what we've already discussed.

2            MS. STIRBA:  This entire incident, this moment, this

3        count lasted three, maybe four seconds.  That is over the course

4        of a chaotic day that spanned hours.  It's been two and a half

5        years since, and you can see on video much more than you

6        realistically could perceive in the moment.

7            You can slow video down.  You can pause it.  You can go

8        frame by frame just as we have been doing in this trial.  But

9        when you actually look at this video -- and I'm a little afraid

10       to play it, but I'll go still by still.  You actually see, if

11       you go frame by frame, things that you wouldn't be able to see

12       or understand in the heat of such a short moment.

13           There is an older gentleman on the right side of

14       Mr. Meacham, on the right side of the screen.  That gentleman

15       also leans in right about the time that Mr. Meacham grabs the

16       baton.  So then what you see in those seconds is Mr. Meacham's

17       arm goes up, but you also see Officer Leasure, as I have on the

18       screen, holding his wrist.  You see the older gentleman from the

19       right also grab the baton, this time over Mr. Meacham's hand,

20       and then after Mr. Meacham lets go, that other gentleman

21       continues to have his hand on the baton.  And in fact, that man

22       has to essentially -- you can see the resistance as it's pried

23       out of that man's hands after another officer in the area is

24       also screaming, "Let go, let go."

25           So what we have is multiple people in a 3-second period

1    grabbing this baton, including Mr. Meacham's own hand, in a

2    scuffle.  And there is murkiness, we submit, in what was

3    apportioned to Mr. Meacham and what was apportioned to other

4    people.  But, at a minimum, we submit that reaching for a baton

5    does not make the elements of an assault.

6        THE COURT:  What about grabbing a baton rather than

7    reaching for?

8        MS. STIRBA:  Right.  Grabbing a baton, reaching,

9    putting your hand on a baton, that's not an assault.  It might

10    be other things, but it's not an assault.  And the use of

11    force -- as the Court has in its legal framework the use of

12    force is not the same thing as finding that someone attempted

13    to or threatened to inflict injury.  Maybe we have resistance,

14    maybe we have interfering, but we don't have an assault.  And

15    we submit, consistent with the Ninth and Tenth Circuits, that

16    is a requirement to make a finding under 111(a).

17        I'd like to turn now to the trespassing charges, the three

18    1752 charges, and we submit there are, I would say, 3.5 reasons

19    to doubt.  So I'm going to do 3 now and the .5 in a second.  But

20    before I do that, I want to say quickly, I know the Court has

21    ruled on this, the *mens rea* requirement for 1752.  I think we're

22    all waiting with bated breath for the powers that be to tell us

23    what the marching order is.

24        THE COURT:  I hope that a decision in *Griffin* hasn't

25    come down today, but I think it has not.

1          MS. STIRBA:  That would make one side or the other

2     very happy.  But I would say that we will --

3          THE COURT:  Maybe.  Not every court of appeals

4     decision gives perfect clarity to a trial.

5          MS. STIRBA:  We maintain that the Court must find that

6     Mr. Meacham knew that Vice President Pence was there in order to

7     find that he was knowingly in a restricted area, and there's not

8     any evidence that he did.  But moving on to the Court's legal --

9          THE COURT:  Well, there may be evidence.  It's not

10    evidence that I've reviewed closely, but apparently, in the

11    evidence before me are pieces from the speech that Mr. Meacham

12    was in attendance for that refer to Vice President Pence, but I

13    don't know whether any of those excerpts say anything about Vice

14    President Pence being at the Capitol.

15         MS. STIRBA:  Your Honor, I would submit we actually

16    don't even have that evidence.

17         THE COURT:  Well, I don't know what that evidence

18    contains, because they admitted it but they didn't play it for

19    me.

20         MS. STIRBA:  Well, I would say I don't think we have

21    evidence of literally anything that Mr. Meacham did other than

22    drive from Myton, Utah, to Washington, D.C., and be present as

23    he's depicted in the first video before the Court at 2:07 p.m.

24    We do not have evidence of his actions or behavior in that time.

25    We don't.  The government -- there are no statements from

1    Mr. Meacham that were introduced.  We have no evidence that

2    he was on any video before that.  That is a gaping hole.  It

3    is a black hole.  That's what we know.

4        And even if we were to surmise -- I don't see how we get

5    there, but even if we were to surmise he was at the speech, the

6    clips from Trump's speech that reference Vice President Pence

7    are just that, they're references to Vice President Pence.

8    They do not --

9            THE COURT:  Yeah.  I haven't reviewed them for

10   purposes of this case, so I don't know.

11           MS. STIRBA:  They don't in any way say where Vice

12   President Pence was.  In fact, the one locationally-related clip

13   indicates the opposite.  Trump says, go down to the Capitol;

14   let's talk to our Congress people.  Specifically, he does not

15   mention Vice President Pence being there, and there is no

16   evidence of any understanding that Mr. Meacham had about what

17   was going on, anything in his head.  That's a gulf.

18           THE COURT:  All right.

19           MS. STIRBA:  So my three reasons why the government

20   has not met the legal standard for 1752:  First, Mr. Meacham

21   had a good-faith belief that he was not in a restricted area.

22   Stay with me here.  I have three subpoints under this heading.

23   I'm going to call them A, B, and C.

24       So point A is that the area where Mr. Meacham was is not

25   an area of the Capitol grounds that is always restricted.  I

1    have put on the screen Government's 204.  There are no permanent

2    barriers.

3         THE COURT:  The small version thereof.

4         MS. STIRBA:  My tech expertise could improve.  But,

5    yes, you can get the idea.  There are no prime barriers keeping

6    people from this area of the Capitol.  The walkways are open,

7    the grassy areas are open, and specifically Mr. Meacham was on

8    the Lower West Terrace -- I'm going to show you with my pointer,

9    which is this area that I'm circling right here.

10        Anyone who has ever lived in D.C. and had family come visit

11   them has been on this Lower West Terrace and taken pictures and

12   selfies on this Lower West Terrace.  Anyone who has ever been on

13   a morning jog on the Mall has been on this northwestern terrace.

14   Any eighth grader taking a field trip in the DMV area has been

15   on this Lower West Terrace.  This is a known fact that you're --

16   that's out and people can walk, jog, bike, take selfies,

17   tourists are there.  It's different in an important way than the

18   interior of the Capitol, which by its nature a person knows you

19   can't go inside the Capitol without authorization.

20        So, in fact, that's the very reason that Capitol Police

21   erected these barriers in the first place for January 6, because

22   they are not blocked off.  They are publicly accessible without

23   them.  So point B is whatever signage and fencing that there was

24   had been dismantled by the time there was any evidence that

25   Mr. Meacham was at the Capitol.  The government presented to the

1    Court photos and signs of snow fencing and bike racks.  And as

2    the sun rose --

3            THE COURT:  This argument would mean that anyone who

4    arrived at the Capitol after 1:30, let's say, could not be found

5    guilty of 1752?

6            MS. STIRBA:  No.  I don't think -- I think it depends

7    on what the evidence is for that specific person.

8            THE COURT:  Well, if the person testifies and they can

9    be examined -- well, let's assume the person doesn't testify.

10    How else are you going to prove that the person actually saw the

11    bike racks?

12            MS. STIRBA:  Well, if the government has evidence that

13    a person saw bike racks --

14            THE COURT:  We know Mr. Meacham saw bike racks.

15            MS. STIRBA:  How do we know that?

16            THE COURT:  He --

17            MS. STIRBA:  I'm sorry.  Those bike racks.  I thought

18    you meant earlier much more close to the Washington Monument.

19    But I would submit, if the government doesn't have that —

20    statements, text messages, admissions — that's not a defense

21    problem, that's a government problem, and we don't have that

22    here, because what we do have here in terms of the evidence

23    is that whatever signage and fencing was up on the morning of

24    January 6, it was not there at 2:07 p.m. when we first see

25    Mr. Meacham in the body cam.

1          THE COURT:  I don't think we have evidence that it was

2     not there.  We have evidence that it was not all up.

3          MS. STIRBA:  That's fair.  That's a good correction.

4          THE COURT:  The evidence is that it was still there;

5     it's just that it was not all erect.

6          MS. STIRBA:  Because what we do have -- and these

7     were the exhibits that were entered today I put on the screen --

8     is video footage from the Capitol, looking down on the western

9     side of the Capitol.  And what we can see is as of 12:57,

10    already protesters are streaming in.

11         Captain Summers testified that there was report of a breach

12    at the Peace Circle a little bit before 1:00, and you can see

13    how quickly these temporary structures were knocked down,

14    trampled, moved, and people start streaming into the Capitol

15    area, thousands of them.  I've put on the screen what the view

16    was at 1 o'clock.  1:18.  This is an alternative view, and you

17    can see, up in the left-hand corner, 1:30.  It's the same view,

18    just over on the northern side.  1:45.  2:01.

19         There is no evidence that Mr. Meacham was in any position

20    to have seen people take down these barriers, move them, or have

21    any knowledge that it happened.  And there's no evidence that he

22    saw any of the detritus from this either, because by 2 p.m., as

23    the Court can see, people are packed in around the inaugural

24    stage.

25         We heard Officer Leasure testify that his unit came in

1    and they started side by side but eventually had to go single

2    file because of the crowd and how it extended out and pressed

3    on all sides.  It's very hard to see anything at the feet of

4    such a crowd like this or bike racks that have been moved

5    and surrounded by thousands of other people, and there's no

6    evidence that Mr. Meacham did.

7        And so my Point C on this is, by the time that we see

8    Mr. Meacham on Capitol grounds at about 2:07, the Court needs

9    to assess what that scene looked like from his perspective.

10   Thousands of people had walked down Pennsylvania Avenue with no

11   restrictions, no interference from law enforcement, no one

12   trying to stop them.

13       Police had retreated to this perimeter line that I have up

14   on the screen.  You can see it at 2:05 p.m.  You can see the

15   line around that terrace area behind the inaugural stage.  But

16   on the western side of that perimeter line, thousands of people

17   are walking around without any interference from law enforcement

18   whatsoever.

19       So it would stand to reason that whatever earlier

20   preparation, of which we submit Mr. Meacham knew nothing, by the

21   time we see Mr. Meacham on Capitol grounds, a conscious decision

22   had been made to let protesters be there in front of the

23   Capitol.  We would submit -- and I know Captain Augustine -- I

24   just want to preempt this.

25       I know Captain Augustine made a mention of some

1    announcement on a loudspeaker.  He didn't say what time that

2    happened.  He said at some point.  He didn't say how often it

3    was playing or how, when, and even if it was playing on repeat,

4    which we don't have evidence of.  That doesn't show that

5    Mr. Meacham heard that, because every single person there that

6    day talked about, with emphasis, how loud this was.  People were

7    screaming, yelling.  There was chaos.  And so it was extremely

8    difficult to hear.

9        And so even if there's some mention of that down the line,

10   there's no evidence that Mr. Meacham heard that and understood

11   that.  And I understand that the Court has already mentioned

12   that there was like wrestling with the police officers in the

13   bike racks up at this perimeter line, and that's true.  That's

14   on video.  That might be interfering, but that doesn't mean it's

15   knowingly trespassing, because the government has also presented

16   no evidence that he ever went beyond that perimeter.  He stayed

17   on the western side of it.  That's the evidence before the

18   Court.  And so while grabbing a bike rack and tearing it away

19   from a police officer or moving it, it might be something else,

20   but he didn't cross that.  There's no evidence before the Court

21   that he did.

22       And lastly, I'll say it's our -- it's not our burden to

23   prove that Mr. Meacham had a good-faith belief.  The government

24   has to prove to this court beyond a reasonable doubt that he did

25   not, that he knew he was in a restricted area and did not have

1    authority --

2              THE COURT:  There's no evidence of Mr. Meacham's

3    belief.  There's no evidence with respect to good-faith belief.

4    Whether it's your burden or not, there's no evidence.

5              MS. STIRBA:  Well, yes, but I want to be clear, it's

6    not our burden to prove that.

7              THE COURT:  I understand that.  I understand that.

8    But there's nothing before me that would indicate that

9    Mr. Meacham had any particular belief, much less a good-faith

10   belief.

11             MS. STIRBA:  The government has to prove that he did

12   not.

13             THE COURT:  I understand it's the government's burden.

14             MS. STIRBA:  Okay.  I think we're saying the same

15   thing, but I just want to be clear.  What we are saying to the

16   Court is these are reasons to doubt, and the government can only

17   overcome that if they prove beyond a reasonable doubt that he

18   did not.  And we think --

19             THE COURT:  Your two most essential points seem to me

20   -- with respect to many of these counts, seem to be that it

21   wasn't a dangerous or deadly weapon and there's no evidence that

22   he knowingly was in a restricted building or grounds.

23             MS. STIRBA:  Yes.  In a nutshell, it's not a dangerous

24   weapon for Counts 2 and 3, it's not an assault for Count 4.  He

25   wasn't -- but I actually have -- like I said, I have two more

1    points on this.  So it's -- second, and these are quicker, but

2    they're reasons to doubt.

3              THE COURT:  I never would have given you this time

4    before the jury, but go ahead.

5              MS. STIRBA:  Well, then, I'm grateful I'm here.

6         Second, we maintain that one can't temporarily visit a

7    place of work.

8              THE COURT:  I'm sorry.  You what?

9              MS. STIRBA:  That one cannot temporarily visit a place

10   of work.  And let me -- in order to prove that this was a

11   restricted area, one of the things the government has to show

12   is that it was a place temporarily visited by a Secret Service

13   protectee.

14        Now, I understand, we filed a motion to dismiss on this.

15   As a legal matter, the Court denied it.  I understand that.

16   But I think it's still an argument that can be made at a trial

17   stage, at a finding stage, and that's what we're asking the

18   Court to do, which is the government hasn't showed that this is

19   a place of temporary visitation.  You don't temporarily visit

20   the place where you work.

21        The vice president works at the Capitol.  He or she has a

22   permanent office there.  Captain Summers testified she's seen

23   the vice president there sometimes weekly for sessions, for

24   events, for various official business, and that's just not where

25   one temporarily visits.  Everyone who works in this building are

in this building probably more than eight hours a day.  People
spend more waking hours in this building than they do in their
own homes.  So it is simply not accurate to say, for the people
who work in this building, I'm going to temporarily visit my
place of employment.

THE COURT:  We all know that's not true of the vice
president.  We all know that he or she does not spend more time
at the Capitol than they do at home or at the Capitol than they
do in the White House in their office.  We know that it's much
less time than that.  We know that it's infrequent rather than
frequent, although it occurs with some regularity.

MS. STIRBA:  I think that's fair.  I think that's a
fair thing to say.  But it's a place of employment.  It's a
place of official business such that there's even an office for
the vice president, and that alone makes it not a temporary
place --

THE COURT:  So I have responsibilities -- just to use
me as an example, I have responsibilities with respect to the
Judicial Conference of the United States, and occasionally I
go over to the Administrative Office of U.S. Courts to talk to
people in connection with those responsibilities.  I might do it
once a month.  So you're saying I don't temporarily visit the
Administrative Office of the United States Courts because it's
part of my job responsibilities?

MS. STIRBA:  No, but I don't think there's a

1   one-to-one comparison.  The vice president presides over the

2   Senate and has an official permanent office at the Capitol.

3          THE COURT:  I have a place at the Administrative

4   Office as well.  I have staff there.

5          MS. STIRBA:  But -- I guess I'm not in a good position

6   to comment on those types of responsibilities, but I would say

7   in this case, with what we know about the vice president, it's

8   not a temporary place of visitation.  It's a place of work.  And

9   that means that it doesn't fit within this statutory definition

10   of a restricted place.  That's our point 2 on this, and it's a

11   reason to doubt.

12       And then third, we would say that even if the Court

13   concludes that Mr. Meacham was in a restricted area and knew he

14   was in a cordoned-off area without authorization, he didn't do

15   it while using or carrying a dangerous weapon.  I'd incorporate

16   my earlier arguments, but I would also note that in order to

17   prove carrying versus use, the government must prove beyond a

18   reasonable doubt that Mr. Meacham intended to use that object as

19   a dangerous weapon.  That's what it has to prove to show that

20   someone carried a dangerous weapon, that is, use that object in

21   a way that was capable of causing death or serious bodily

22   injury.

23       But the very factors that I have argued that show that

24   these two objects were not capable of that also show that that

25   was not his intent, because neither object was sufficiently

hefty and because both objects were very obviously protected by

gear.  We submit this not only goes to whether an object was a

dangerous or deadly weapon, but it also goes to Mr. Meacham's

perception of what he was doing and his intended use about

whether these objects were capable of causing serious bodily

injury, and we would submit there's a reason to doubt.

Lastly, I'm going to address civil disorder, and this is

the .5, the intent prong for Count 6, which is intending to

disrupt government business, which I think is tied -- the same

arguments apply to the intent prong of civil disorder.  And I

will say -- I will be brief on this point.  And in full candor,

this is a finer point, but it is a real one, and I think it is

worth the doubt.

The civil disorder charge requires the government to prove

that Mr. Meacham committed this act with the intended purpose of

obstructing, impeding or interfering with law enforcement

officers.  And then for Count 6 it's with the intended purpose

to disrupt government business.  I think the evidence about his

intent is lean to nonexistent.  So we just have the video, we

have the actions that we see and what is depicted on the video

footage from that day, and this is where we need to separate out

intents from effects.

All of the government's alleged acts took place within this

10-minute period.  As Officer Leasure testified, at the time that

he saw Mr. Meacham, Mr. Meacham had the look of someone who had,

as he put it, lost all reason.  His look, the word Officer

Leasure used, was "blank."  And he compared it to a look he sees

in people who are intoxicated.  And we submit that Mr. Meacham's

intent during these fevered minutes that day was not to obstruct

or interfere or disrupt.  That *mens rea* is too targeted.  It's

too ends-driven.  It's too specific.

Mr. Meacham really didn't have a specific intent.  This

10-minute period was an expression of anger.  It was a momentary

loss of reason and emotional control.  And no one's saying

that's good, but the intent to express anger is not the same as

the intent to interfere or obstruct or disrupt.  That's why

these two charges of civil disorder and then that specific 1752

charge just don't totally fit this behavior, not for Mr. Meacham,

not at the evidentiary standard the government must meet.

And if the Court has even one reason to doubt his specific

intent that day, even if it's based on behavior that this court

strongly condemns, then the Court must find him not guilty of

this charge.

Your Honor, for so many reasons, for so many people,

January 6 will also be a deeply sad and tragic day for this

country.  There were many people who did wrong that day, and

Odin Meacham is one of them.  But he did not commit the criminal

acts that the government has alleged in this case.

And there is perhaps no greater indictment of the overall

wrongful behavior on January 6 than for this court to say, even

though I profoundly object to your actions, I will hold the
government's feet to the fire and I will not convict you of
crimes that you did not commit without the necessary evidence
to do so.  The government has not produced the evidence in this
case, and we ask for the Court to find Mr. Meacham not guilty.

THE COURT:  It seems to me you may have conceded some
criminal conduct, though.  Have you conceded that with respect
to Counts 2 and 3?  I think you've conceded that he committed
a violation of 111(a).

MS. STIRBA:  I think I have --

THE COURT:  I asked you that.

MS. STIRBA:  Yes.  I think that's fair.

THE COURT:  And I haven't heard any argument that
would lead me to conclude that he didn't commit the offense
in Count 8, an act of physical violence in the Capitol grounds.
It doesn't require a restricted area, it doesn't require a
dangerous weapon, and it doesn't require anything beyond
physical violence, which is much lower than what we've been
discussing with respect to other things.

MS. STIRBA:  The Court correctly noted an absence
of argument on that point, and I think that's fair too.

THE COURT:  All right.  Thank you.

I'm sure you have several things to say, Mr. Nohria.
I'd like you particularly to address, not in any particular
order, the argument with respect to intent that relates to civil

1   disorder on Count 1, as well as Count 6, the dangerous weapon

2   issue, the knowingly in a restricted grounds or building, and

3   the question of whether there was an assault for purposes of

4   Count 4.

5          MR. NOHRIA:  Yes, Your Honor.

6      Is my PowerPoint showing up on the screen?

7          THE COURT:  Not at the moment.  Now it is.

8          MR. NOHRIA:  Perfect.

9              GOVERNMENT REBUTTAL ARGUMENT

10         Your Honor, I'd like to start with the defendant's

11  knowledge that the area was restricted.  So the public was not

12  permitted within these red lines on January 6, regardless of any

13  other day, regardless of eighth graders on their school trip.

14  On January 6, 2021, no member of the public was permitted within

15  these red lines.  And even if the defendant didn't know the

16  exact contours of the restricted map, he knew he wasn't supposed

17  to be there.  And at around 2 p.m. --

18         THE COURT:  How do I know that?

19         MR. NOHRIA:  At around 2 p.m., the defendant's not

20  in the back of this mob.  He's not in the middle of this mob.

21  He is at the very front of this mob, challenging that established

22  police line that is right at that front.  And so even if all the

23  Area Closed signs, even if all the fencing had somehow evaporated,

24  even if the defendant had been able to hear the loudspeaker

25  announcing that people needed to leave, the defendant, while

1    he's surrounded by individuals wearing gas masks, using pepper

2    spray against the officers wielding flagpoles, would have known

3    that he wasn't supposed to be there.  By the very nature that

4    he's repeatedly challenging this police line, he knows he's not

5    supposed to be there.  And as you can see, he sees the bike rack.

6         THE COURT:  Why does he know he's not supposed to --

7    finish your thought, and then I'll ask my question.

8         MR. NOHRIA:  Your Honor, the police officers are

9    engaged in constant combat with the rioters --

10        THE COURT:  You're answering my question instead of

11   what you were going to say.  So my question was going to be, how

12   does he know he's not supposed to be there as opposed to knowing

13   he's not supposed to go any further?

14        MR. NOHRIA:  I think the circumstances all point to

15   that conclusion.  Essentially, the use of rioters repeatedly

16   pushing against the police line, the rioters using pepper spray,

17   as is visible in this frame, with the defendant against the

18   officers to try to force them back.

19        If you recall, Officer Leasure even, when he's holding his

20   baton in a horizontal fashion, is repeating, "Please, step back."

21   And the defendant repeatedly challenges Officer Leasure, walking

22   up to him, yelling "Lean in" to the other rioters and grabbing

23   Officer Leasure's baton, not to mention the fact that he is

24   assaulting the Capitol Police officer with a wooden pole and

25   throwing the metal pole at Sergeant Kimball.

1        And if you recall, even after the wooden-pole strike,

2   the officers then grab a bike rack and place it in between

3   themselves and the rioters for protection, and the defendant

4   then runs up, challenges that line, and hits the bike rack

5   barricade with that pole.

6        So all of those conditions, in addition to the fact that

7   Captain Summers testified those Area Closed signs, those

8   fencings, they don't just disappear.  Maybe they were on the

9   ground, maybe they were torn asunder, but they're still there.

10  And so all the context clues can lead the Court that the

11  defendant knew he wasn't supposed to be there.

12            THE COURT:  You were about to say something about

13  what's shown in this still shot?

14            MR. NOHRIA:  Just the context of the scene,

15  Your Honor, that the defendant is surrounded by the other

16  rioters; they're challenging the police line; the police are

17  forming up; there's gas masks; there's pepper spray being

18  deployed against the officers.  I mean, this is very clear

19  evidence that the defendant knew he wasn't supposed to be there.

20  And I'd like to point out that it's entering or remaining.  And

21  I think as we can see, over that 10-minute period, the defendant

22  stays in that area even though he knows he should leave.

23            THE COURT:  You might have been about to say something

24  about that sign, but that's not a restricted-area sign on that

25  bike rack barricade.

1          MR. NOHRIA:  No, Your Honor.  No.

2          THE COURT:  That's just a property sign.

3          MR. NOHRIA:  Yes.  It's identifying that it belongs

4    to the Capitol Police, and it also would have been in place at

5    other implements to sort of halt the defendant's progress.

6          And so then I'd like to move on to the assault on Officer

7    Leasure.  So I think the context of the defendant's assault on

8    Officer Leasure is important because that occurs at approximately

9    2:16 p.m.  In that same 10-minute period, the defendant has

10   already performed two flagpole strikes against officers, and

11   he's thrown a metal pole at Sergeant Kimball.  So that's the

12   defendant's mindset as he's approaching Officer Leasure.

13         Officer Leasure is in the middle of a full-blown riot that

14   the defendant has already been an aggressor in.  Officer Leasure

15   is repeating, "Please step back," and the defendant walks up,

16   yells, "Lean in," again vocalizing his intent and showing the

17   next steps he's going to do and grabs Officer Leasure's baton,

18   in the center of the baton, and then yanks it towards himself.

19         Now, (a) Officer Leasure told you that he was in fear for

20   his safety at that time and that he had concerns for his safety;

21   (b) Officer Leasure could have been pulled off balance, fallen

22   and been injured; (c) even just grabbing the baton with that

23   force caused Officer Leasure to have to then perform his

24   training of repeatedly twisting the baton to try to get the

25   defendant's hands off of it.

1       The assault would be an offensive touching: trying to

2   remove an officer's baton, forcibly taking it from him in the

3   same way as if the defendant had grabbed his helmet, grabbed his

4   clothes, tried to, you know, essentially forcibly remove his

5   shield, all of these are removing the primary way an officer

6   can defend himself in a riot.  They are putting the officer at

7   further risk of falling as a result of the physical force.

8       And so if the Court reviews the legal framework, the

9   assault is an attempt that will -- it refers to the injury,

10  and the injury is a touching that's offensive.  There can be no

11  doubt that Officer Leasure found that touching offensive in the

12  middle of the riot, considering the defendant's actions, his

13  intent, his vocalization of "lean in" at the time that this is

14  occurring.

15      Second, regardless of the assault, the defendant resisted

16  and impeded Officer Leasure with the intent to commit civil

17  disorder.  When he yells "lean in," he grabs Officer Leasure's

18  baton, that's vocalizing his intent.  And again, this is in the

19  middle of the civil disorder.  So even relying on the other

20  verbs, putting aside defense counsel's argument, the other verbs

21  in combination with the intent to commit another felony mean

22  that the government has met its burden with 111(a).

23      I'd like to then address the metal pole.  So I think the

24  defense has essentially conceded that this is a metal pole, and

25  they're arguing as to what's the strength of this metal pole.

 1    So first Sergeant Kimball tells you that this pole is thrown at

 2    him and that him and the other officers have experience because

 3    multiple ones of these metal poles are being thrown at them

 4    throughout the day.  So not only is he feeling this metal pole

 5    against himself, he also has prior experience with this.

 6         Second, to be clear, this is not a charge of attempted

 7    homicide.  The government didn't have to prove that the

 8    defendant was trying to kill Sergeant Kimball or any of the

 9    other officers on that day.  It's a substantial -- it's a risk

10    of causing serious bodily injury, which includes an extreme

11    risk of pain, disfigurement, or impairment of a mental faculty.

12         All of those would be met with a metal pole being thrown at

13    an individual, especially in a situation where Sergeant Kimball

14    is elevated.  The defendant is below him.  So when he's throwing

15    it, it can easily be directed at Sergeant Kimball's face and hit

16    him.

17         Now I want to briefly address the argument that because

18    Sergeant Kimball is wearing riot gear or is wearing some

19    protective gear that he then is immune from the charge of

20    dangerous weapon because --

21              THE COURT:  This is an argument that applies not

22    just to Count 3 but also to Count 2.

23              MR. NOHRIA:  Yes, Your Honor.  Yes.

24         So, for both of those, that simply cannot be the legal

25    framework.  As the government has noted in its filings under

*Feola*, this intent for 111(b) and 111 in general was to protect federal officers carrying out their federal functions. The idea that if an officer is wearing bulletproof vest and is shot, that then there is no way that it could be a dangerous weapon, or if he's behind bulletproof glass or in a bulletproof car and a person shoots that person that essentially they've escaped the confines of 111 cannot be accurate. These officers were in the middle of a full-blown riot.

And I'd like to point out that even with that protective gear, they are not immune from injury. How do we know? Because you heard from Sergeant Kimball. He told you about the numerous bruises he experienced after January 6, about the numerous assaults he had to endure. So we know that this gear is not some sort of protective Pope-mobilesque, bulletproof glass. You can still be injured with it, and Sergeant Kimball was.

THE COURT: I'm not sure how far that argument takes you, because Sergeant -- except for the pepper spray or other substances, Sergeant Kimball's injuries that he testified to might not fit into the category of serious bodily injury. He testified to bruises and the like.

I don't know that those in and of themselves are serious bodily injury. Now, there's still an argument, obviously, in terms of the capability of either of these two objects to inflict serious bodily injury, but Sergeant Kimball himself didn't necessarily suffer serious bodily injury from any of the

1    bruises that he testified to.

2         MR. NOHRIA:  Yes, Your Honor.  I guess the point was

3    essentially that the capability, the officer's gear, whether

4    it's, you know, an over or a helmet, it's not invincible.  And

5    I don't think we can treat it like that, and that's not the

6    standard that we're expected to meet; it's is it capable of

7    causing serious bodily injury.

8         Now, you can also infer about the sort of heft or the

9    characteristics of the dangerous weapon based on how the

10   defendant uses it.  The defendant wouldn't have thrown some sort

11   of balloon or some sort of item like that at the officer if he

12   intended to hit him.  No.  He picked up a metal pole and threw

13   it at Sergeant Kimball.  And after it hits Sergeant Kimball, the

14   sound it made is one of a metal object.  And so it's one of

15   those things where it's not a -- it's creating a distinctive

16   sound that's audible on a body worn camera, and the defendant's

17   use of it indicates the sort of characteristics that it had.

18         THE COURT:  It seems to me that --

19       (Video played.)

20         MR. NOHRIA:  Yes, Your Honor.

21         THE COURT:  The defense has virtually conceded that

22   it was a metal object.  Their argument is that it was a flimsy

23   metal object.

24         MR. NOHRIA:  Yes, Your Honor.  And there's simply no

25   indication of that.  I mean, Sergeant Kimball's the one who

testified that he had poles thrown at him, and I understand
defense's playing of that video where the rioters are
essentially tearing apart that fence.

First, if the pole came from there, the fence is literally
designed to stand as an implement from one person reaching
another area.  So by that very nature, it has some sort of
durability to it.

Second, the rioters appear to be removing it from its
hinges.  It's not like they were snapping the pole in half and
then removing it.  And so I don't think that really goes to sort
of the capability of causing serious bodily injury that the item
had.  And the evidence we have is that Sergeant Kimball told you
it was a metal pole thrown at him from a downward-to-upward angle.

And in terms of the use, I mean there's just no way around
it.  The defendant doesn't have to intend to cause serious
bodily injury.  He only has to intend to use it as essentially
a weapon, and it has to be used in a manner that's capable of
causing serious bodily injury.  And the defendant wasn't using
this metal pole to hammer nails.  He was throwing it at Sergeant
Kimball.  And this was a short-distance throw as well.

And moving to the flagpole, so I think it's been conceded
this is a flagpole, so I won't linger on this.  You have the
white tag, the metal hook at the top, which I think can also
factor into its capability.  And it cannot be the case, as the
suggestion by the defense, that in order to qualify as a

1    dangerous weapon, an object has to be so heavy that it can't

2    be carried for a few minutes.  And there's no indication that

3    the defendant was carrying it for hours and hours and hours or

4    days.  We have a very limited time where a number of flagpoles

5    are present at the scene.  The defendant could pick one up --

6            THE COURT:  Indeed, there's no evidence that he

7    brought the flagpole to the scene.

8            MR. NOHRIA:  That's correct, Your Honor.  So this

9    isn't a situation where his holding it in this moment goes to

10   the nature of what the object is.  Besides the fact that it's

11   a flagpole, it's designed to carry a flag to withstand the

12   elements.  And he's using it as a weapon.  He's wielding it like

13   a baseball bat.  And I understand the motion.  It's different --

14           THE COURT:  Whatever.

15           MR. NOHRIA:  Yeah, but I think it also goes to the

16   defendant's essentially -- the baseball-bat analogy I think is

17   useful because it also shows the way you can use an object like

18   that in the sense of the defendant stepping forward, using that

19   leverage, using that momentum, lifting his back foot.  All of

20   those go to the capability to cause injury, especially in a

21   situation where you're striking someone in their upper body.

22       And as the Court noted, when the defendant strikes that

23   bike rack barricade, the pole does not bend like some sort of

24   cardboard.  It doesn't shatter into a million pieces.  It holds

25   up and creates a distinctive clang that's very similar to the

1    officer's baton when he strikes the bike rack barricade

2    immediately afterwards.

3        (Video played.)

4        With respect to the defendant's intent, I think the Court

5    can look at not only the defendant's full actions in terms of

6    his drive from Utah to Washington, D.C., his entrance onto

7    the restricted -- within the restricted perimeter, entering into

8    the Capitol grounds, but his clear assaults on the Capitol

9    Police officers whose function it is is to protect the Capitol

10   building and the resultant impact by breaching the restricted

11   perimeter on the Secret Service.

12       And Inspector Hawa told you how they had to relocate the

13   vice president as a result of the breach.  She also mentioned

14   how it would not have been advisable for the vice president to

15   have returned to the Senate and House chambers while rioters

16   were still within the restricted perimeter.

17       Lastly, the defendant's own words.  The defendant called

18   the officers "Nazis."  He also said, "You are protecting

19   criminals."  Now, who was the defendant referring to?  The

20   members of Congress inside the Capitol building.  "You are

21   protecting criminals."  That's the reason -- his mentality is

22   the reason he escalated again and again and again on January 6.

23       He hits an officer with a flagpole.  He throws a metal pole

24   at another officer.  He grabs Officer Leasure's baton and yells

25   "lean in."  And all of these are enough to demonstrate his

 1    intent.  But if that wasn't, you can use the defendant's words

 2    himself.

 3         (Video played.)

 4         The government would ask that the Court hold the defendant

 5    accountable and find him guilty on all counts.

 6              THE COURT:  All right.  Thank you.

 7         So why don't we do this:  Why don't we come back at

 8    2 o'clock and I'll render a decision.  All right?

 9         Anything further before we break until 2 o'clock?

10    I will see you then.

11         (Recess from 11:47 a.m. to 2:09 p.m.)

12              THE COURT:  All right.  So we're here following a

13    two-day bench trial, and it's now my responsibility both to

14    resolve the pending Rule 29 motion and, assuming that it is

15    denied, to then go on and decide the defendant's guilt or

16    innocence on each of the charges pending against him.

17         There have been a lot of motions in this case and in other

18    cases.  Many motions in cases turn on the resolution of factual

19    issues.  There's not a lot of factual dispute in this case.

20    The facts are pretty plain.  There's not a lot of dispute as to

21    what Mr. Meacham said or did.  The question is what his conduct

22    amounts to: Did it amount to a violation of the law on January

23    6, 2021.

24         There are questions relating to his intent, to whether he

25    acted knowingly, to whether he had a deadly or dangerous weapon,

1    and those will be addressed in the course of the findings and

2    conclusions that I'm about to enter.

3        Now, under Rule 29, after the government closes its case or

4    after the close of all evidence, the Court, on the defendant's

5    motion, must enter a judgment of acquittal of any offense for

6    which the evidence is insufficient to sustain a conviction.

7        When ruling on a motion for judgment of acquittal, the

8    Court must consider "the evidence in the light most favorable to

9    the government and determine whether, so read, it is sufficient

10   to permit a rational trier of fact to find all of the essential

11   elements of the crime beyond a reasonable doubt."  And I'm

12   quoting from *United States v. Kayode,* 254 F.3d 204, 212-13

13   (D.C. Cir. 2001), which itself is quoting from *United States v.*

14   *Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997).

15       The Court must "accord the government the benefit of all

16   legitimate inferences" and deny the motion if "any rational

17   trier of fact could have found the essential elements of the

18   crime beyond a reasonable doubt."  *United States v. Jabr*.

19   That's No. 18-CR-0105, 2019 WL 13110682 at *3 (D.D.C. May 16,

20   2019), which itself quotes *United States v. Weisz*, 718 F.2d 413,

21   437 (D.C. Cir. 1983) and *United States v. Arrington* at 309 F.3d

22   40, 48 (D.C. Cir. 2002).  "The same standard guides a district

23   court in resolving a Rule 29 motion whether it's in the context

24   of a bench trial or a jury trial," citing *Jabr* at *4.

25       At the moment of deciding a motion for judgment of

acquittal, "this Court is not the trier of fact." *United States v. Recognition Equip., Inc.,* 725 F.Supp 587, 588, n.1 (D.D.C. 1989).  Accordingly, the Court is not yet stepping into the jury's shoes to assess the defendant's guilt on or to make any findings about the witness's credibility but, rather, is "simply applying a legal standard to the government's evidence." Same citation.

The Court will deny Mr. Meacham's motion for judgment of acquittal.  The Court concludes that the government presented sufficient evidence such that a rational factfinder could find beyond a reasonable doubt that all elements of each of the charges against Meacham have been met.

For the sake of brevity, the reasons for the Court's denial of the Rule 29(a) motion for judgment of acquittal are the same as the reasons the Court will give in its findings of fact and conclusions of law in deciding the case.  And that's consistent with what was done, for example, in *United States v. Rivera*, Criminal Case No. 21-060, in an order of June 17, 2020, and that's found at ECF No. 63 in that case, as well as by me in *United States v. Bozell*, Criminal Case No. 21-216, in an oral order on September 23, 2023.

So now to the verdict.  In early January 2021, Mr. Meacham traveled from Utah to Washington, D.C., where he participated in the riot at the United States Capitol on January 6.  The details of his participation have been described by witnesses and

1    through the evidence presented in this trial over the past

2    day and a half.

3        Specifically, the government alleges that his conduct on

4    January 6 violated a number of federal statutes that's set out

5    in the eight counts in the indictment.  And we're familiar with

6    what those eight counts are, and I'll get to them as we move

7    along.

8        Over the last two days, the government called six witnesses:

9    Jesse Leasure, a Metropolitan Police Department officer; David

10   Augustine, a United States Capitol Police captain; Tia Summers,

11   now a captain, then a lieutenant with the Capitol Police;

12   Lanelle Hawa, a Secret Service inspector who was stationed at

13   the Capitol on January 6, 2021, and was assigned to Vice President

14   Pence's detail; Benjamin Jones, a special agent with the FBI;

15   and Kyle Kimball, an MPD sergeant.  The defense did not call

16   any witnesses.

17       Officer Leasure, Captain Augustine, and Sergeant Kimball

18   all testified to interactions they had with Mr. Meacham at the

19   West Terrace of the Capitol.  Testimony from the other witnesses

20   and videos track some of Mr. Meacham's movements on the Capitol

21   grounds and illustrated the breach of the Capitol that occurred

22   on that date.  After considering all the evidence and the

23   arguments, for the reasons that I am now going to explain, I

24   find Mr. Meacham guilty on all counts.

25       Count 1 of the indictment charges Mr. Meacham with civil

disorder, in violation of 18 U.S.C. § 231(a)(3).  To find

Mr. Meacham guilty of this offense, I must find that the

government proved each of the following elements beyond a

reasonable doubt:

1) Mr. Meacham committed or attempted to commit an act with

the intended purpose of obstructing, impeding, or interfering

with one or more law enforcement officers;

2) that he did so knowingly;

3) at the time of the actual or attempted act, the

law enforcement officer or officers were engaged in the lawful

performance of their official duties incident to and during a

civil disorder; and

4) the civil disorder in any way obstructed, delayed, or

adversely affected either commerce or the movement of any

article or commodity in commerce or the conduct or performance

of any federally protected function.

Again, I find that Mr. Meacham knowingly committed an

act with the intended purpose of obstructing, impeding, or

interfering with one or more law enforcement officers when he

repeatedly challenged the police lines and made physical contact

with the officers, sometimes violent physical contact.

A person acts "knowingly" if he realizes what he is doing

and is aware of the nature of his conduct and does not act

through ignorance, mistake, or accident.

Between 2:09 and 2:18 p.m. on that day, Mr. Meacham

1    used force against officers at least three times, screamed

2    obscenities at officers, and made physical contact with the

3    bike rack barriers police put in place.  Doing so impeded the

4    officers' purpose that day, which was to protect the Capitol

5    grounds by keeping the barricades in place and keeping the

6    rioters out.

7         It is reasonable for the Court to infer that his actions

8    were intended to interfere with the officers' official duties

9    given his admonition to the U.S. Capitol Police officers and

10   MPD officers that they are traitors, Nazis, and protecting

11   criminals.  That's Government Exhibit 704.

12        Second, I find that the law enforcement officers who

13   Mr. Meacham impeded by striking them were engaged in the lawful

14   performance of their official duties incident to and during a

15   civil disorder.

16        The term "civil disorder" means any public disturbance

17   involving acts of violence by groups of three or more persons

18   which (a) causes an immediate danger of injury to another

19   individual, (b) causes an immediate danger of damage to another

20   individual's property, (c) results in injury to another

21   individual, or (d) results in damage to another individual's

22   property.

23        The riot at the Capitol on January 6 was certainly civil

24   disorder.  As we heard through testimony and saw on video

25   footage, the actions of the rioters at the Capitol involved

violence and resulted in personal injury and property damage.
In addition to rioters pushing barricades into police, video
footage shows that several rioters, including Mr. Meacham,
were striking police officers with various weapons on the West
Terrace.  That is shown in Government Exhibits 601, 603, and 707.

Officer Leasure testified that at some point he was hit
with pepper spray and was temporarily disabled.

Sergeant Kimball testified that he was pushed into a
bannister, exposed to chemical irritants, and eventually sought
medical attention on the scene and then at a hospital.

Captain Summers testified to the chaos of the day including
her call at approximately 1 p.m. for officers to come to the
West Terrace to assist with multiple breaches along the west
side of the Capitol: the congressional duress alarms, the
distress calls from officers at the Capitol, and U.S. Capitol
Police calls to local police requesting assistance from
departments having civil disturbance units.

This chaos ultimately caused the evacuation of the vice
president and a delay of the Electoral College certification
proceedings.  Hence, the events of January 6 were civil
disorder.  And by engaging in violence with several officers,
Mr. Meacham's actions impeded the lawful performance of those
officers' official duties incident to and during that civil
disorder.

Last, I find that the civil disorder that occurred at the

Capitol on January 6 adversely affected commerce.  The term
"commerce" means commerce or travel between one state, including
the District of Columbia, and any other state, again including
the District of Columbia.  It also means commerce wholly within
the District of Columbia.

The government introduced business records from Safeway
grocery stores within the District that showed a dramatic
decrease in sales from the projected levels on January 6
resulting from store closures due to the Capitol riot.  That's
Government Exhibit 503.  This constituted an adverse affect on
commerce.  Hence, I find Mr. Meacham guilty on Count 1.

Counts 2 and 3 of the indictment charge Mr. Meacham
with forcibly assaulting, resisting, opposing, impeding,
intimidating, or interfering with an officer using a dangerous
weapon.  Those charges are levied under Title 18 of the U.S.
Code § 111(a)(1) and (b).

To find Mr. Meacham guilty of these offenses, particularly
of 111(b), I must find that the government proved each of the
following elements beyond a reasonable doubt as to each count:

1) Mr. Meacham forcibly assaulted, resisted, opposed,
impeded, intimidated, or interfered with an officer from the
U.S. Capitol Police or the Metropolitan Police Department;

2) he acted voluntarily and intentionally;

3) the officer who was assaulted, resisted, opposed,
impeded, intimidated, or interfered with was an officer or

employee of the United States then engaged in the performance

of his or her official duties or was assisting an officer or

employee of the United States that engaged in the performance

of his or her official duties; and

4) that Mr. Meacham used a deadly or dangerous weapon.

Count 2 charges Mr. Meacham under Section 111(b) through

his act of striking an officer with a wooden pole, and Count 3

charges him through his act of throwing a metal pole at, and

hitting, an officer.  The defense concedes that Mr. Meacham

is guilty of the lesser-included offenses in Count 2 and 3

under § 111(a)(1).

First, I find that Mr. Meacham committed an assault when

he hit a U.S. Capitol Police officer with a wooden pole and that

he committed an assault when he threw the metal pole at Sergeant

Kimball and struck him.

A person commits an assault when he acts forcibly and with

the intent to inflict or threaten injury.  Injury, in turn,

means any physical injury, however small, including a touching

offensive to a person of reasonable sensibility.

Video footage from Captain Augustine's body worn camera

shows Mr. Meacham swinging a wooden pole while walking toward

the police barricade.  That's Government Exhibit 701.  Video

footage from another officer's body worn camera then catches

Mr. Meacham swinging the pole over his head and striking a U.S.

Capitol Police officer with it, with such force that the pole

1    breaks on contact.  That's Government Exhibit 707-X.

2        With respect to the metal pole, Sergeant Kimball's body

3    worn camera footage depicts the moment when he sees the pole

4    fly towards him and he attempts to block it with his hands.

5    Government Exhibit 703-A.  The pole then strikes him and falls

6    to the ground, at which point the footage picks up the sound

7    of the metal clanging.  Both acts clearly constitute a physical

8    injury, as they would certainly be offensive to a reasonable

9    person.

10        And Mr. Meacham did so forcibly.  The term "forcibly" means

11    to use force, attempt to use force, or threaten to use force.

12    Physical force or contact is sufficient, but actual physical

13    contact is not required.

14        Mr. Meacham made physical contact with a U.S. Capitol

15    Police officer when he struck him with a wooden pole and with

16    Sergeant Kimball when he threw the metal pole at him, striking

17    Sergeant Kimball.

18        And I find that Mr. Meacham had the intention to threaten

19    or inflict physical injury.  The Court cannot conceive of any

20    other intention behind approaching an officer and swinging a

21    wooden pole at him, towards his head and shoulder, with such

22    force that the pole immediately broke upon contact with the

23    officer's body.

24        The Court finds the same with respect to the incident

25    with the metal pole.  Mr. Meacham clearly intended to strike

Sergeant Kimball with force.  Such intent is further confirmed by Mr. Meacham's conduct after the pole hit Sergeant Kimball, when Mr. Meacham continued to taunt Sergeant Kimball.  That's shown in Government Exhibit 703-C.

Second, I find that Mr. Meacham did so voluntarily and intentionally.  Captain Augustine testified, and his body worn camera shows, that the MPD were in the midst of trying to fend off the crowd when Mr. Meacham walked toward the police barricade with the wooden pole.  No one pushed him; Mr. Meacham acted of his own volition.

He approached the police barricade and swung the wooden pole at a police officer — hitting him — and for the reasons I explained earlier, I find that Mr. Meacham intended to strike the officer.  And for the same reasons, I find that Mr. Meacham acted knowingly and intentionally when he threw the metal pole at Sergeant Kimball and hit him with it.

Third, I find that both individuals assaulted, resisted, opposed, impeded, intimidated, or interfered with in Counts 2 and 3 were officers or employees of the United States who were then engaged in the performance of their official duties.

All Capitol Police and MPD officers stationed at the Capitol grounds on January 6, 2021, were performing their official duties of protecting the Capitol and maintaining the police line to keep rioters out or back.  Accordingly, Mr. Meacham impeded and interfered with the officers' official

duties in protecting the Capitol when he struck a U.S. Capitol Police officer with a wooden pole and when he struck Sergeant Kimball with a metal pole, all in the conduct of trying to push forward when met with resistance from the police line.

Last, I find that in doing such acts, Mr. Meacham used a deadly or a dangerous weapon.  Relevant here, an object is a "deadly or dangerous weapon" if it is capable of causing serious bodily injury or death to another person and Mr. Meacham used it in that manner.  In determining whether the object is a deadly or dangerous weapon, I consider both physical capabilities of the object used and the manner in which the object was used.

Both the wooden pole and the metal pole that are involved here are certainly capable of causing serious bodily injury. Given the wooden pole's shape and size, the pole could have caused serious damage if it hits someone in the head, particularly if it struck someone in the eye or other sensitive area.  And as discussed earlier, I find that Mr. Meacham used the wooden pole with the intent to strike an officer forcibly and violently.

The defense argues that the footage of the wooden pole breaking proves the pole was flimsy and cannot be considered a dangerous weapon.  I disagree.

First, no footage ever shows the pole bending in a manner consistent with a flimsy or a cardboard-like object.  The pole remained straight and intact as Mr. Meacham swings it around and

violently hits an officer, and the pole breaks in half on the officer's shoulder.

Second, footage shows Mr. Meacham using a remaining piece of the pole to smash the bike rack, and that strike does not break the wooden pole.  Moreover, an audible clang can be heard when the wooden pole makes contact with the bike rack, suggesting the pole's durability and strength.  That's Government Exhibit 602.

With respect to the metal pole, the defense argues that Mr. Meacham did not use the pole in a manner capable of causing serious bodily injury.  Even if I agree that the metal pole Mr. Meacham used appears to be hollow, I still conclude that the pole was used in a manner capable of causing serious bodily injury.

As I just discussed, the metal pole could cause serious damage if it hits someone in the head, particularly if it struck someone in the eye or other vulnerable area, and the metal clanging sound the pole made when it hit the floor convinces the Court that it could have caused serious harm to an officer.

Whether the officer actually suffered serious bodily injury from either of Mr. Meacham's strikes is not legally relevant to the question of whether he used the weapon in a manner capable of causing serious bodily injury or death.  Although the officers wore helmets and other padding, Sergeant Kimball testified that he did not have padding over his entire body, and video footage depicts other officers, including Captain

1    Augustine, wearing even less protection.

2        Mr. Meacham could not have known with certainty whether

3    the officer he struck had protection in a particular area or

4    sufficient to fend off any violent strike with a wooden pole.

5    Nor could Mr. Meacham have known with certainty that all the

6    officers in the police line were wearing helmets.  And in any

7    event, Sergeant Kimball also testified that he had bruises on

8    his body even under the padding.  While such bruising does not

9    reach the level of serious bodily injury, it further satisfies

10    the Court that Mr. Meacham used the metal pole in a manner

11    capable of causing serious bodily injury.

12        Mr. Meacham's forceful assaultive conduct is not, moreover,

13    insulated from culpability by the fact that the officers he

14    violently struck had on some protective gear.  Hence, I find

15    that the wooden pole Mr. Meacham used against the officer and

16    the metal pole that he threw at Sergeant Kimball, hitting

17    Sergeant Kimball, are both deadly or dangerous weapons, and I

18    therefore find that Mr. Meacham is guilty on Counts 2 and 3.

19        Count 4.  That count charges Mr. Meacham with assaulting,

20    resisting, or impeding certain officers and making physical

21    contact or acting with the intent to commit another felony.

22    That's alleged to be in violation of § 111(a)(1) of Title 18,

23    and this relates to the grabbing of a baton.

24        To find Mr. Meacham guilty of this offense, I must find

25    that the government proved each of the following elements

beyond a reasonable doubt:

   1)  that Mr. Meacham forcibly assaulted, resisted, opposed, impeded, intimidated or interfered with an officer from the U.S. Capitol Police or the Metropolitan Police Department;

   2) that he acted voluntarily and intentionally;

   3) that the officer assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or employee of the United States then engaged in the performance of his or her official duties or was assisting an officer or employee of the United States then engaged in the performance of his or her official duties; and

   4) that Mr. Meacham made physical contact with that officer or acted with the intent to commit another felony.  For the purposes of this element, another felony refers to the offense charged in Count 1.

   The parties dispute whether § 111(a)(1) requires the government to prove that Mr. Meacham committed an assault. I do not need to resolve that question because I find that Mr. Meacham did commit an assault when he grabbed Officer Leasure's baton.

   First, I find that Mr. Meacham assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the Capitol Police or MPD who were assisting the Capitol Police in the performance of his official duties through his actions with respect to Officer Leasure's baton.

1    For the U.S. Capitol Police and MPD on January 6, 2021,

2    the term "official duties" means policing the U.S. Capitol

3    building and grounds and enforcing federal law and D.C. law in

4    those areas and protecting the Capitol building and grounds.

5        Officer Leasure, who helped form the perimeter that

6    Mr. Meacham approached and attempted to breach, was an MPD

7    officer deployed to the Capitol on January 6 to aid the U.S.

8    Capitol Police in securing the Capitol building and grounds

9    from rioters.

10       When Mr. Meacham grabbed his baton, Officer Leasure was

11   performing his official duty of trying to maintain the integrity

12   of the barricade to keep unauthorized members of the public out

13   of, or advancing further into, the restricted area.

14       Testimony from Officer Leasure as well as video footage

15   from his body worn camera demonstrates that at approximately

16   2:16 p.m., Mr. Meacham approached the police line, grabbed

17   Officer Leasure's baton, and attempted to take it from the

18   officer.  Mr. Meacham is shown approaching the police line,

19   reaching for Officer Leasure's baton, making contact with the

20   baton, and grabbing it with one hand.  That's depicted in

21   Government Exhibit 702-A at 22 to 28 seconds.

22       Officer Leasure attempts to wrestle the baton away and

23   Mr. Meacham is eventually stopped.  This behavior undoubtedly

24   constitutes resisting, opposing, and impeding police officers.

25   His actions were resistant to the officers' attempt to keep

rioters off and away from the barricades, and his actions in

grabbing the baton interfered with the officers' job that day,

which was to protect the Capitol grounds by keeping the

barricades in place to keep the rioters from advancing further

into the grounds or building.

Second, I find Mr. Meacham committed this act forcibly.

The defendant acts "forcibly" if he used force, attempted to use

force, or threatened to use force against the officer.  Physical

force or contact is sufficient, but actual physical contact is

not required.  Mr. Meacham used physical force against Officer

Leasure when he grabbed the officer's baton and tried to take it

away from him.

Third, I find Mr. Meacham performed these actions knowingly

and voluntarily.  He was captured on video reaching for Officer

Leasure's baton on his own accord and tugging on it when Officer

Leasure resisted.  Even after Mr. Meacham lets go of the baton,

he continues to stand in front of Officer Leasure and screams

obscenities at him.  Government Exhibit 702-A and 704.

Last, I find that Mr. Meacham made physical contact with

Officer Leasure, grabbing his baton.  The video footage shows

that Mr. Meacham grabbed onto the baton that Officer Leasure was

holding, thus making physical contact both with Officer Leasure's

baton and with Officer Leasure himself.

Alternatively, I find that Mr. Meacham assaulted Officer

Leasure, by using force with the intention of committing touching

offensive to a person of reasonable sensibility.  Given the chaos of the events at the Capitol, an attempt to relieve Officer Leasure of his protective gear qualifies as an offensive touching.  Hence, I find Mr. Meacham guilty on Count 4 beyond a reasonable doubt.

Count 5 of the indictment charges Mr. Meacham under 18 U.S.C. § 1752(a)(1) and (b)(1)(A) with entering or remaining in a restricted building or grounds.  To find Mr. Meacham guilty of this offense, I must find that the government proved each of the following elements beyond a reasonable doubt:

1) that Mr. Meacham entered or remained in a restricted building or grounds without lawful authority to do so;

2) that he did so knowingly; and

3) that he used or carried a deadly or dangerous weapon during and in relation to the events.

To begin, Mr. Meacham entered or remained in a restricted building or grounds without lawful authority to do so.  A "restricted building or grounds" is defined as any posted, cordoned-off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.  It is undisputed that Mr. Meacham entered the West Terrace of the Capitol on January 6.

Officer Leasure, Captain Augustine, and Captain Summers all testified to the existence of outer and inner perimeters at the Capitol grounds on January 6.  Such perimeters were marked with

"area closed" signs, snow fences, bike racks, and, at points, police lines.  Government Exhibits 202, 205, and 208.  And at the time Mr. Meacham unlawfully remained on the Capitol grounds, Vice President Pence, a Secret Service protectee, was visiting the Capitol.  For reasons not already explained to the parties, the Court finds that the government need not prove Mr. Meacham knew Vice President Pence was visiting the Capitol.

Second, Mr. Meacham did so knowingly.  Even if every barrier had been knocked over prior to Mr. Meacham's entrance on the Capitol grounds, it is reasonable that Mr. Meacham would have observed the toppled barricades, including snow fences and bike racks, and broken police lines protecting the perimeter of the Capitol grounds on January 6 as he entered those grounds and approached the Capitol building.

Indeed, he even jostles the bike racks as officers attempt to reform the police barricade.  Government Exhibit 701 at 2:29 through 35 seconds.  And Meacham continuously challenged the officers who were attempting to keep away the rioters, at times using force to try to make his way through various police barricades.  Government Exhibit 704.

In fact, Captain Augustine even deployed pepper spray in Mr. Meacham's face.  Yet Mr. Meacham continued to remain on the Capitol grounds seeking to advance further.  This evidence, taken together, is sufficient to prove that Mr. Meacham knowingly, and without authority, entered the Capitol grounds,

which were restricted.

Third, I find that Mr. Meacham carried a dangerous or deadly weapon during and in relation to the offense.  As discussed for Counts 2 and 3, the wooden pole and the metal pole are both dangerous weapons, and he used both poles during this commission of this offense when he hit an officer with a wooden pole — violently, I would say — and threw the metal pole at Sergeant Kimball, striking him as well.  Hence, I find Mr. Meacham guilty on Count 5, entering or remaining in a restricted building or grounds with a dangerous weapon, beyond a reasonable doubt.

Count 6 of the indictment, again under § 1752(a)(2) and (b)(1)(A), charges Mr. Meacham with disorderly or disruptive conduct in a restricted building or grounds.  To find Mr. Meacham guilty of this offense, I must find that the government proved each of the following elements beyond a reasonable doubt:

1) that Mr. Meacham engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds;

2) that he did so knowingly and with the intent to impede or disrupt the orderly conduct of government business or official functions;

3) that his conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of government

1     business or official functions; and

2          4) that Mr. Meacham used or carried a deadly or dangerous

3     weapon during and in relation to the events.

4          First, I find that Mr. Meacham engaged in disorderly

5     conduct in a restricted building or grounds — namely, the

6     Capitol grounds — for the reasons described in Count 5.

7          "Disorderly conduct" is conduct that, when viewed in the

8     circumstances in which it takes place, is likely to endanger

9     public safety or create a public disturbance.

10         Disorderly conduct includes when a person acts in such a

11    manner as to cause another person to be in reasonable fear that

12    a person or property in a person's immediate possession is

13    likely to be harmed or taken, uses words likely to produce

14    violence on the part of others, or is unreasonably loud and

15    disruptive under the circumstances.

16         "Disruptive conduct" is a disturbance that interrupts the

17    normal business or orderly conduct of an event, public activity,

18    or gathering.

19         Though many of Mr. Meacham's actions were disruptive and

20    disorderly -- and in fact, his mere presence was likely

21    disruptive in itself, and I'll cite *United States v. Rivera*,

22    2022 WL 2187851 at *5, June 17, 2022.  And I will note a few

23    specific actions here:

24         Mr. Meacham was part of a large mob that was jostling

25    officers who had formed a perimeter at the West Terrace.

Mr. Meacham struck a U.S. Capitol Police officer and a police barrier with a wooden pole.  He threw a metal pole at an MPD sergeant.  Mr. Meacham can also be seen on video attempting to take Officer Leasure's baton before calling the officers, and particularly Officer Leasure, he called them "Nazis," "pieces of shit," "cowards," and "dogs."  Those actions are all disruptive and disorderly.

Next, I find that those actions were taken with the intent to impede or disrupt the orderly conduct of the officers' business to protect the Capitol, for the reasons explained with respect to Count 1.

The government's evidence shows that Mr. Meacham also intended to disrupt the government business that day.  As I just explained a moment ago, video footage shows Mr. Meacham assaulting police officers, screaming profanities at -- I'll change that to screaming profanities at law enforcement and engaging with other members of the mob.  Meacham's actions are consistent with the attempt to keep the chaos, which was preventing orderly government business from happening, ongoing.

Finally, I find that Mr. Meacham's actions did in fact impede the orderly conduct of government business or official functions.  The Electoral College certification — an official government function — was in fact impeded or disrupted. Inspector Hawa testified that it took hours to secure the Capitol and conduct the security sweeps necessary to permit the

vice president and other members of Congress to continue the

electoral certification.

Mr. Meacham's presence contributed to that, as the

certification could not continue until the Capitol area was

clear, as did his attempts to push against law enforcement

and encourage others to move forward.  Accordingly, I find

Mr. Meacham guilty on Count 6.

Count 7 of the indictment charges Mr. Meacham under

1752(a)(4) and (b)(1)(A) with engaging in physical violence

in a restricted building or grounds with a deadly or dangerous

weapon.  To find Mr. Meacham guilty of this offense, I must

find that the government proved each of the following elements

beyond a reasonable doubt:

1) that he engaged in an act of physical violence against

a person or property in a restricted building or grounds;

2) that he did so knowingly; and

3) that he knowingly used or carried a deadly or dangerous

weapon during and in relation to the offense.

I find that Mr. Meacham engaged in an act of physical

violence against officers on the Capitol grounds through his

actions of striking an officer with the wooden pole and throwing

the metal pole at an officer.

The term "act of physical violence" means any act involving

an assault or other infliction of bodily harm on an individual;

or damage to, or destruction of, real or personal property.

Because I find that Mr. Meacham's actions with respect to the wooden pole and metal pole both constituted assaults on police officers, I find that this element is also met here.

Alternatively, both acts of striking officers with a pole involved bodily harm on an individual. And for the reasons discussed in relation to Count 5, I find that Mr. Meacham committed such acts in a restricted grounds.

Second, I find that Mr. Meacham acted knowingly, for the same reasons discussed in relation to Counts 2 and 3. He did not act through ignorance, mistake, accident, or other innocent reason.

And last, I find that Mr. Meacham used or carried a deadly or dangerous weapon — namely, the wooden pole and the metal pole — during and in relation to the offense, for the same reason that I already discussed in relation to Counts 2 and 3. Hence, I find Mr. Meacham guilty on Count 7 beyond a reasonable doubt.

Lastly, Count 8, act of physical violence on the Capitol grounds or building. This is alleged to be in violation of § 5104(e)(2)(F) of Title 40 of the U.S. Code.

Count 8 charges Mr. Meacham with engaging in an act of physical violence in the Capitol grounds or buildings. To find him guilty of this offense, I must find that the government proved each of the following elements beyond a reasonable doubt:

1) that he engaged in an act of physical violence in the United States Capitol grounds or any of the Capitol buildings;

1    2) that he acted willfully and knowingly.

2    The defense concedes that the government has proven

3    Mr. Meacham's guilt as to Count 8, and I reach the same

4    conclusion.

5    First, I find that Mr. Meacham engaged in an act of

6    physical violence in the United States Capitol grounds or in

7    the Capitol building.  The term "act of physical violence" means

8    any act involving an assault or other infliction of bodily harm

9    on an individual; or damage to, or destruction of, real or

10   personal property.  As discussed with respect to Counts 2 and 3,

11   Mr. Meacham violently struck another officer with a wooden pole

12   and struck one officer with a metal pole, both acts involving

13   bodily harm on an individual.

14   Second, I find that Mr. Meacham acted willfully and

15   knowingly, for the same reasons discussed in relation to Counts

16   2 and 3.  He did not act through ignorance, mistake, accident,

17   or other innocent means.

18   Hence, and finally, I find Mr. Meacham guilty on Count 8

19   beyond a reasonable doubt.

20   So I've found the defendant guilty on all eight counts.

21   That is the judgment of the Court, and that concludes this

22   proceeding.  I'm going to set a sentencing date, but is there

23   anything from either side before I do so?  From the government?

24   MR. SMITH:  Your Honor, if the government could

25   briefly be heard on step-back?

1          THE COURT:  First, I'm going to set the sentencing

2     date, and then I'll hear you on step-back.

3          MR. SMITH:  Thank you, Your Honor.

4          THE COURT:  Anything from the defense?

5          MS. STIRBA:  No.

6          THE COURT:  All right.  Sentencing date.  Normally,

7     three months is what we're dealing with these days.  That puts

8     us right smack in the middle of September.  I have a couple of

9     trials.  We've had difficulty scheduling things in this time

10    period already, but Ms. Duncan is going to tell me when we can

11    do it.

12         THE DEPUTY CLERK:  Your Honor, we can do September 26

13    at 11 a.m.

14         THE COURT:  That is what day of the week?

15         THE DEPUTY CLERK:  That is a Thursday, Your Honor.

16         THE COURT:  A Thursday?

17         THE DEPUTY CLERK:  Yes.

18         THE COURT:  Thursday, September 26, at 11 a.m.

19         MS. STIRBA:  That's fine for the defense.

20         MR. NOHRIA:  That works for the government.

21         THE COURT:  All right.  That will be our sentencing

22    date: Thursday, September 26, at 11 a.m.  And I would like the

23    sentencing memos one week in advance.  That would be September 19.

24         Now the question of detention pending sentencing.

25         Mr. Smith.

1          MR. SMITH:  Your Honor, should I approach?

2          THE COURT:  My finger-point was a yes.

3          MR. SMITH:  Thank you, Your Honor.  The government

4    position here is that pursuant to 18 U.S.C. § 3143(a)(2),

5    detention for Mr. Meacham is mandatory.  He has been convicted

6    just now, per your ruling, of a crime of violence.  Courts in

7    the District have found that both 18 U.S.C. 111(b) and 18 U.S.C.

8    1752(a)(4) are crimes of violence and require mandatory

9    detention.

10         THE COURT:  Just a second.  Let me refer to

11   3143(a)(2).  (Pause.)   All right.  Go ahead.

12         MR. SMITH:  And, Your Honor, the government --

13         THE COURT:  Is the offense here one that is described

14   in (f)(1) of 3142?

15         MR. SMITH:  That would be the government's position,

16   Your Honor, yes.  You're citing to Section 3142(f)(1)(A)?

17         THE COURT:  Because it is a -- because one of the

18   counts is a crime of violence?

19         MR. SMITH:  Crime of violence.  Correct, Your Honor,

20   which from the government's position in the District, both

21   Section 111(b) convictions and Section 1752(a)(4) convictions

22   have been found to be crimes of violence.

23         THE COURT:  And they have a maximum term of

24   imprisonment of 10 years or more?

25         MR. SMITH:  With the (b) enhancement of Section 111(a),

1    I believe that's correct.

2          THE COURT:  I thought it was eight years.  Is it more

3    than eight years?

4          MR. SMITH:  That, we could provide clarity on later.

5          THE COURT:  I'm sorry, what?

6          MR. SMITH:  That, we could provide clarity on later.

7    I just would refer the Court to several cases out of the

8    District that do find that 111(b) does qualify under Section

9    3143(a)(2) for mandatory detention following conviction.

10          THE COURT:  Someone ought to know what the maximum

11    sentence under 111(b) is.

12          MR. SMITH:  Twenty years, Your Honor, I've been

13    informed by co-counsel.

14          THE COURT:  Does the defense agree with that?

15          MR. BRIDGE:  Yes, we do.

16          THE COURT:  All right.  So you think it comes under

17    (f)(1)(A)?

18          MR. SMITH:  Correct, Your Honor, (f)(1)(A).

19          THE COURT:  And then we would reach the question,

20    I assume, of whether I should find by clear and convincing

21    evidence that the person is not likely to flee or pose a danger

22    to any other person in the community.

23          MR. SMITH:  Correct, Your Honor.  And the government's

24    position on that reading of -- I'm assuming you're referring to

25    18 U.S.C. § 3143(a)(2)(A) and (B)?  The government's position

1    is that there's a kind of two-part finding by the court to meet

2    that standard, and that's what you just mentioned, which is

3    subsection (b).  But the government's position is also that

4    subsection (a)(1) needs to be satisfied, which is "the judicial

5    officer finds there is substantial likelihood that a motion for

6    acquittal or new trial would be granted."  And as Your Honor

7    just denied the defendant's motion for a Rule 29 acquittal, we

8    believe that there is no way for him to satisfy both parts of

9    that element of the statute.

10            THE COURT:  But I still need to reach (b).  Right?

11            MR. SMITH:  Correct.  Our position would be that you

12   can reach (b), but you also have to reach (a) as well.  If you

13   can't reach (a), then we believe that the statute doesn't apply.

14            THE COURT:  All right.  Anything else?

15            MR. SMITH:  I'll reserve if the defense has a counter.

16            THE COURT:  You'll reserve.  Okay.  I'll let you

17   respond to --

18            MR. SMITH:  I anticipate a response, if the Court

19   doesn't mind.

20            THE COURT:  Mr. Bridge, briefly.

21            MR. BRIDGE:  First, the legal standard, Your Honor.

22   I will concede that the 111(b) charges are crimes of violence,

23   but I think there's another part of this framework that we're

24   missing here, and that's 3145(c) of this --

25            THE COURT:  3145(c).

1          MR. BRIDGE:  Yes, Your Honor.  And that's -- the Court

2     remains within its authority to continue Mr. Meacham on release

3     if there are, quote, exceptional reasons why his detention would

4     be inappropriate, and if the court finds by clear and convincing

5     evidence that he is unlikely to flee or pose a danger.  And the

6     authority for that would be *United States v. Harris*, 451 F.Supp

7     3d 64, a decision from this district in 2020 by Judge Moss.

8          That statute was intended to provide, quote, an avenue of

9     relief from the mandatory provisions of the Bail Reform Act.

10    A determination of what constitutes exceptional reasons must

11    be made on a case-by-case basis, and the analysis is "a flexible

12    one and permits courts to respond to the real world circumstances

13    in a pragmatic commonsense narrative."  The authority for that,

14    *United States v. Al-Timimi,* 2020 WL 4810120 at 6, Eastern

15    District of Virginia, August 2020.

16         Mr. Meacham poses no risk of nonappearance.  He has never

17    run from his actions on January 6.  When the FBI came to his

18    door, he invited them in, spoke to them for an hour about

19    everything he did that day, identifying himself in all the

20    videos that you saw, walking agents through his thoughts and

21    intentions that afternoon.  And since his arrest and release in

22    Utah, a hearing in which the government did not even seek his

23    detention, Mr. Meacham has done everything Pretrial in this

24    court have asked him to do to the letter.

25         Mr. Meacham came to Washington to face these charges over

the past two days.  He's conducted himself well over the trial.
He understands the sentencing exposure in this case.
Mr. Meacham is not a runner.  He's an honorable young man who
got caught up in the moment on January 6.  He'll be here for
sentencing.  He'll be here for whatever sentence this court
imposes on him.

In terms of danger to the community, he doesn't pose one
either.  He wasn't a danger when the magistrate released him in
May 2023.  He isn't a danger now.  He has not re-offended in any
way.  To the contrary, after January 6, Mr. Meacham returned to
a law-abiding life he's always lived.

By nature, he's a quiet and reserved young man.  He keeps
his head down.  He works hard for a local mining company in
Utah.  He's advanced quickly within that company over the past
10 months.  I have a letter from his employer I can share with
the Court attesting to the type of employee Mr. Meacham is.
He's hardworking.  He sets money aside.  He's preparing for a
potential term of imprisonment.  His primary goal at this point
should tell the Court a lot of what kind of danger he poses.
His primary focus at this point is saving money so he won't be a
burden on his family.

In January 2021, Mr. Meacham came to believe what a lot
of people believed about the 2020 election, but he is not some
zealous -- some keyboard warrior with a social media presence.
He did not come to Washington to assault anyone or engage in a

278

riot.  To characterize his conduct as aberrational is probably
an understatement.  Mr. Meacham was a law-abiding citizen before
January 6.  He's largely moved on with his life since then, to
the extent he can, and he has no prior criminal history.  He has
not re-offended in any way, and there's no reason to believe
that would change before sentencing.

A person like Mr. Meacham, with no prior criminal history,
who acts violently but uncharacteristically on one day of his
life over the course of 10 minutes in reaction to unusual
circumstances like January 6, coupled with a record of total
compliance with pretrial release, is not the type of person that
the mandatory detention statute is meant to apply to.  He is the
exception.  He is exceptional.  This case is exceptional, and he
deserves to stay out on release.

Unless the Court has other questions, I'll submit.

THE COURT:  Thank you, Mr. Bridge.

Briefly, Mr. Smith.

MR. SMITH:  Very briefly, Your Honor.  I know we're
two to three minutes over your stop time.

Your Honor, we appreciate the defense's position.  However,
even under the statute that we're relying on here for mandatory
detention, the exceptional circumstances have -- it's a very
specific threshold and a very high threshold, and actually each
of the instances just mentioned by the defense do not reach that
threshold.

1    So I can give you case cites to each one of those and just

2    move as quickly as possible, if that's amenable to the Court.

3    So a defendant's low flight risk or lack of danger to the

4    community is not an exceptional reason per *United States v.*

5    *Hite*, 12-CR-65, 2013 WL 12158577 at 2, and that's a District

6    case from 2015.

7                THE COURT:  That's a case from what court?

8                MR. SMITH:  From the D.D.C.

9                THE COURT:  Pardon me?

10               MR. SMITH:  That's a case from the District of

11   Columbia.  Apologies.  Additionally, the lack of a criminal

12   record is not an exceptional reason under the statute.

13   This comes from *United States v. Lea,* 360 F.3d 401, 403-404

14   (2nd Cir. 2004).  Additionally --

15               THE COURT:  What I want to know is what's the

16   government's evidence as I make an assessment -- understanding

17   that the standard is clear and convincing evidence, what's the

18   government's evidence that Mr. Meacham would be likely to flee?

19               MR. SMITH:  The government's position, Your Honor, is

20   that he has to both show that he would be unlikely to flee and

21   also satisfy an exception al circumstances condition, and our

22   position is that he hasn't satisfied any of those exceptional

23   circumstances.  The unlikelihood of fleeing alone is not

24   sufficient to meet the threshold to escape the mandatory

25   detention provisions of the statute.  And every one of the

1   examples the defense just gave, there's case law in the opposite

2   direction.

3           THE COURT:  All right.  What else?

4           MR. SMITH:  So I think I mentioned -- or maybe I

5   did not finish mentioning lack of a criminal record is not an

6   exceptional reason.  That's pursuant to *United States v. Lea,*

7   360 F.3d 401, 403-404 (2nd Cir. 2004).  Additionally, a person's

8   employment, family support, or community connections are not an

9   exceptional reason.  That's pursuant to *Lovo.  United States v.*

10  *Lovo.*  And I can provide you that cite.  That is *U.S. v. Lovo*,

11  263 F.Supp 3d 47, 49 (D.D.C. 2017.)

12          And finally, being employed is not an exceptional reason

13  to escape the mandatory detention provisions of the statute,

14  and that's pursuant to *United States v. Lea* again at 403 to 404.

15          So the government's position is that Mr. Meacham, despite

16  the information just provided to you by the defense, does not

17  satisfy the threshold provided by the statute to avoid mandatory

18  detention following conviction on a crime of violence, which

19  again in the District has been found to be satisfied by 111(b)

20  and 1752(a)(4).

21          THE COURT:  All right.  Thank you.

22          MR. SMITH:  Thank you, Your Honor.

23          THE COURT:  My view of this, informed by the statutory

24  requirements, is that ultimately there's a very low chance that

25  Mr. Meacham will flee, and so I think that he has satisfied

1    that aspect of this inquiry by clear and convincing evidence.

2        With respect to a danger to another person or the

3    community, notwithstanding the egregious conduct that

4    Mr. Meacham engaged in — and I do underscore egregious — I

5    conclude that, in the totality of circumstances, and given his

6    conduct before January 6 and after January 6, I find by clear

7    and convincing evidence that he is not likely to pose a danger

8    to any other person or the community.

9        I will note that I believe that the judges of this court

10   have frequently released defendants convicted on these charges,

11   sometimes not release defendants.  But particularly when we're

12   talking about a defendant who's been on release and in compliance

13   throughout the full course of these proceedings -- and this is a

14   case that's been pending for, what, over a year -- such defendants

15   have frequently been released pending sentencing, and I will do

16   that here as well.  So we will not step the defendant back in

17   this circumstance.  We will continue him on the same conditions

18   that he's been under.

19       And I remind you, Mr. Meacham, you're under those

20   conditions and you need to comply with those conditions, as

21   you have to date.  A failure to do so could subject you to

22   very serious consequences.  You now have a sentencing date that

23   has been set.  You need to be here at that time, in this place.

24   A failure to appear will subject you to independent criminal

25   consequences.

1          And lastly, I need to remind you that if you were to commit

2     a crime while on release under these conditions, you could be

3     subject to more serious penalties for that crime than you

4     otherwise would face.

5          With that resolved, I think we're done for the day.

6     Anything further from the government?

7               MR. SMITH:  Nothing from the government, Your Honor.

8               THE COURT:  From the defense?

9               MS. STIRBA:  Not from us.

10              THE COURT:  All right.  We'll see you on the date that

11    I set for sentencing, September 26, at 11 a.m.  Thank you.

12          (Proceedings adjourned at 3:07 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne