SCOTT K. WILSON, Federal Public Defender (#7347)
EMILY A. STIRBA, Assistant Federal Public Defender (#17112)
ADAM G. BRIDGE, Assistant Federal Public Defender (#14552)
OFFICE OF THE FEDERAL PUBLIC DEFENDER
DISTRICT OF UTAH
Attorneys for Defendant
46 West Broadway, Suite 110
Salt Lake City, Utah 84101
Telephone: (801) 524-4010

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>ODIN MEACHAM,<br><br>  Defendant. | **DEFENSE'S<br>SENTENCING MEMORANDUM**<br><br>Case No. 1:23-cr-00287<br><br>Hon. John D. Bates |

Of the countless moments that make up a life, there are perhaps only a handful that are truly shattering.  These are the moments around which we conceptualize our lives.  They become the temporal anchors of our lived experience, the cleaving lines separating our "before" from our "after."

For Odin Meacham, the moment he decided to walk towards the Capitol on January 6 will be one such moment in his life.  He did not do so to attack.  Like so many others, Mr. Meacham had travelled to D.C. merely to protest.  He arrived at the rally that morning in ordinary clothes; he wore no tactical or protective gear; he wore no mask; he had no weapons.  But as he walked down the National Mall, urged on by leaders who knew better, Mr. Meacham's emotions began to overwhelm him.  It was a swimming miasma so much deeper than the events of that day.  It was

the death of his father just six weeks before the election, and the lifetime of emotional abuse that his father had inflicted upon him. It was an upbringing in a closed, isolated family in a rural Utah community deeply suspicious of government. It was Mr. Meacham's profound desire to protect others and his certitude that he had failed so many people he loved. When Mr. Meacham arrived at the Capitol, his emotional dam broke. This case arose from a frenzied, 10-minute span of Mr. Meacham's life, during which he appeared like someone "who had lost reason."[1]

Mr. Meacham stands before the Court deeply remorseful for his actions. He knows that his decision to cross the line from protest to attack was completely unacceptable, no matter what his political beliefs. It was a terrible choice for which he has paid and will continue to pay dearly. In many ways, this case is the least of the cost. When Mr. Meacham travelled to D.C., he did so with his then-19-year-old nephew, Nejourde Meacham. A few months after Mr. Meacham's initial appearance, the government charged Nejourde for his own conduct on January 6. Nejourde, only 22 years old, committed suicide a few weeks later. There are no words to describe Mr. Meacham's grief, except to say that his pain and sense of responsibility will last decades longer than the furthest emanation of any sentence in this case.

The federal sentencing guidelines are not mandatory for a reason: because the full breadth of human experience does not fall neatly into a grid. There are always exceptions, always outliers. Mr. Meacham is one of them. For the reasons discussed in this memorandum, the defense urges the Court to impose a sentence of 40 months. This sentence strikes the appropriate balance between the many competing goals in a criminal sentencing, while being "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a).

---

[1] Trial Transcript, 30:21-22 (ECF 50) (Testimony of Officer Leasure).

## **BACKGROUND**

Pleasant Valley is a rural community in the northeast corner of Utah.  Forty years ago, Mr. Meacham's parents bought 400 acres of land and started a dairy farm.  Odin Meacham is the 11th and youngest child of his sprawling mixed family, with four older siblings from his father's first marriage and six older siblings between his parents.

Mr. Meacham lived his early years in near poverty.  The family lived in an unfinished, 100-year-old house that came with the farm.  "If the wind blew," Mr. Meacham's cousin Mac McKinnon recalls, "it would lift the rafters off the house."  The roof leaked.  The home had one bathroom with the dirt floor visible under the toilet.  A wood burning stove was the only source of heat.  It was no match when the temperatures dropped, and the house froze in the winter.  Mr. Meacham remembers being about four years old when he noticed the farm animals lying on the road in the mornings.  When he realized that the asphalt was warmer than dirt, he followed suit.  Mr. Meacham would sprawl near the road, trying to warm himself, until one day a neighbor spotted him and yelled at his mother.  When Mr. Meacham was in elementary school, the house burned down.  The family lost everything except the few items they were able to toss out the windows.



The old house.  Mr. Meacham's parents stand on the left; Mr. Meacham stands in front.

Life on a family farm is not the bucolic idyll that many people believe it to be. It is punishing, bone-breaking work – as Mr. McKinnon describes, "the hardest manual labor you can think of." The family rose at 4:00 a.m. to care for the cattle and other animals. They lifted bale after bale of hay, lugged 80-pound sections of pipe for irrigation. They dug fence posts and irrigation ditches by hand, carving through rock and thick vegetation with inch-long thorns, in temperatures below freezing in winter and above 100 degrees in summer.

Because the margins were so thin, the children had to work the farm as soon as they could. Mr. Meacham was about five years old when he started hauling wood and feeding the animals. Within a few years he was milking and bottle-feeding the calves. He was operating a tractor at 7; at 10 he was operating welding machinery. Because of the ubiquitous safety risks in such labor, there was a casual acceptance of injury. At 13, Mr. Meacham lost a toe when a baler hitch fell on his foot. He broke his arm in a motorcycle accident as he rode around changing water. He took a few days off and worked the rest of the summer. Much of Mr. Meacham's identity has been forged by his upbringing on a farm: his astonishing work ethic, his minimization of physical pain, his self-reliance and resourcefulness, his love of animals. He and the land have shaped each other.



The Meacham Farm

But apart from the farm, there has been one singularly formative influence on Mr. Meacham's life: his father, Stan. When counsel first spoke to Mr. Meacham about his father, counsel could sense a powerful emotion in him. There was an undercurrent of feeling that was difficult to explain. Over time, as counsel spent more time with Mr. Meacham and spoke to

members of his family, that feeling became more comprehensible.  Stan was a complicated and terrible tornado of a person.  He was gregarious and narcissistic.  He was charismatic and controlling.  He had no shame or social fears; he sought to be the center of attention, always; he was most at peace when others around him were in misery.  Even so, Stan was magnetic.  He dominated others through sheer force of personality. "People didn't enjoy him," Mr. Meacham explains, "but they felt compelled by him."  In talking to Mr. Meacham's mother Rita, counsel caught a glimpse of Stan's effect on people.  "I get jumpy talking about him," Rita told counsel. She was only 23 when she married Stan, who was almost 10 years older.  "I married Stan because he could talk to people and not be scared.  I was a wallflower," Rita explained.  After a brief silence, she then said quietly: "Sometimes I hated that guy."

Stan drilled into his family that they were not allowed to have individual needs or desires outside of the family – which usually meant outside of Stan.  His controlling personality dovetailed with a grandiose, fantastical jumble of a belief system.  Stan was patriarchal.  He thought his family descended from messianic and masonic lineages.  He believed in knights templar, curses, numerology, conspiracy theories, black magic.  He preached these beliefs to his children, all undergirded by a healthy mistrust of contemporary American society.  It was a disorienting, often terrifying world view, and the natural isolation of the farm enhanced its power.

Mr. Meacham grew up under the spell of his father.  Stan was no less magnetic to his son than he was to others.  But Stan offered his love as a control tactic; it was always conditional, always ephemeral.  It was the kind of love that kept Mr. Meacham off-balance and always trying to earn it – by sacrificing for the family, making Stan happy, and joining Stan's beliefs wholesale. And as difficult as Stan was, there was much Mr. Meacham admired about his father.  Stan was intelligent and well-read.  He could hold a conversation with anyone.  He approached the world

with an unabashed force of will, which required bravery and curiosity and engagement. "That's what made him so hard to escape," Mr. Meacham says. "You wanted to hate him but you had to respect him."

Stan loomed particularly large in Mr. Meacham's life because Rita could not offer any counterweight to his overwhelming presence. At that time in her life, Rita was emotionally and physically exhausted. She had been parenting since she became a stepmother to Stan's four young children at 23. She gave birth after birth to her own children. When Stan began working as a long-haul trucker, Rita was alone for weeks at a time running the farm and caring for the children. And she was also grieving. A few years before Mr. Meacham was born, Rita gave birth to a stillborn son, Alexander. The loss of the baby was devastating, and even now, Rita's face becomes stricken as she talks about it. Rita was simply depleted during Mr. Meacham's growing years. He remembers her being absent and withdrawn – "unwarm" is the word he returns to repeatedly. She spent days in bed while his older sisters cared for him. Mr. Meacham appreciated his sisters, but like any child, he wanted his mother, and he could not understand her behavior as anything other than personal rejection. It is only now, as an adult, that Mr. Meacham sees Rita's behavior for what it almost certainly was: depression and traumatized shutdown.[2]

This is the world into which Mr. Meacham was born – and because seven years separate him from his next older sibling, he bore the brunt of it alone. The marks on him run deep. Mr. McKinnon sums it up succinctly: "You are dealing with tough but broken people." Mr. Meacham is self-sacrificing to a fault. He would bear untold personal cost to avoid being the slightest burden. He initially presents as stoic; he unfurls inch by inch. Mr. Meacham's vulnerability is like a will-

---

[2] Mr. Meacham stresses that his mother is no longer absent or withdrawn. He understands the emotional gauntlet she was navigating at the time, and he emphasizes that Rita is a remarkable person – dedicated to her family, deeply kind, and astonishingly resilient. Although counsel has only known Rita since Stan's death, counsel can attest to these attributes.

o-the-wisp, something one may see in a momentary glance, but if looked at directly, disappears back into the folds. He feels unworthy of even minimal kindness. Camille McKinnon, Mac McKinnon's wife, recounted the first time she celebrated Mr. Meacham's birthday. "I gave him a t-shirt," Camille recounts. "It was just a $10 t-shirt for his birthday. He told me he hadn't done anything to deserve it. So he went out shopping and bought me something to give back." Mr. Meacham has battled depression for as long as he can remember. Part of this is genetic: his family has a long family history of depression, with two instances of suicide, multiple other attempts, and many instances of drug and alcohol addiction. Life with Stan did not help. Mr. Meacham learned from an early age to hide any happiness from his father. "If I felt happy," he explains, I would start feeling afraid, because he would see it and attack it."

Mr. Meacham's relationship with Stan steadily deteriorated as he entered his teens. He began to question his father and fight back against Stan's control. The core of the conflict seemed simple: "He had no problem causing pain and I did," says Mr. Meacham. But the truth was more complicated. Mr. Meacham also loved his father. The bond between a child and parent is strong, and Mr. Meacham craved his father's approval. Stan was able to hurt Mr. Meacham only because Mr. Meacham cared about him so much.

Mr. Meacham left home at 19. He moved to Vernal, Utah, and began working as a professional MMA fighter and other various jobs. For a short time he moved to New Jersey to live with his sister. In 2018, Mr. Meacham found himself back home at the farm. Stan was getting older, and the burden of the farm was falling increasingly on Rita's shoulders. Mr. Meacham also quietly hoped that he and his father could have a better relationship. He agreed to stay and work.

It was a brutal few years. Mr. Meacham first lived in the barn, then moved into a trailer on a corner of the land. It was so cold in the winter that once, when Mr. Meacham found three stray

kittens and brought them inside for the night, all three died from cold despite being bundled next to a heater.


The location of Mr. Meacham's trailer in 2020.


The inside of Mr. Meacham's trailer.


The primary residence on the farm.

Mr. Meacham's relationship with his father also failed to improve. The conflicts continued until one particularly explosive fight in September 2020. His father said horrible things, and Mr. Meacham said he was going to leave the farm. The next day, on September 26, Stan died of a heart attack. Mr. Meacham immediately blamed himself. It was six weeks before the election.

Mr. Meacham attended his father's funeral at the end of September. Three months later, he drove to D.C. to attend the "Stop the Steal" rally. It would be difficult to deny the connection between the two events. Our parents are the pillars of our existence, the north stars around which we make sense of the world. Mr. Meacham had just lost this guiding force in his life. It is not surprising that Mr. Meacham would seek to fill the hole left by his controlling, narcissistic,

charismatic father with someone who shared similar traits.  And Stan's death renewed in Mr. Meacham the emotions that Stan had sown in life: the guilt, the constant churn to earn love, the feeling of worthlessness, the certitude that he was not doing enough to help the people around him. In the months after his father's death, Mr. Meacham listened to the drumbeat of a stolen election on social media.  He heard accusation after accusation of government abuse, child victimization, large-scale fraud.  When Trump delegates urged people to attend the rally in D.C., Mr. Meacham felt it was his duty to go and protest the massive electoral wrong that had been committed.

## ACCEPTANCE OF RESPONSIBILITY

The defense respectfully objects to the offense level calculation in Mr. Meacham's Pre-Sentence Report (PSR) (¶¶ 71, 73).  The defense submits that Mr. Meacham should receive a two-level decrease for acceptance of responsibility.

Under USSG §3E1.1(a), "if the defendant clearly demonstrates acceptance of responsibility for his offense," the offense level is decreased by two levels.  Ordinarily, this adjustment is not intended to apply to a "defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and then only admits guilt and expresses remorse." Cmt. 2.  However, in that same comment, the Commission recognizes that conviction by trial does not automatically preclude a defendant from receiving the adjustment. The Commission offers the example of a defendant who goes to trial "to preserve issues that do not relate to factual guilt," but that example is not exhaustive.  In each instance that a defendant goes to trial, the "determination that a defendant has accepted responsibility will be based primarily on pre-trial statements and conduct." *Id.*; *see also United States v. Shires*, 178 F.3d 1288 (4th Cir. 1999) (affirming sentence because adjustment for acceptance of responsibility was permissible where defendant had exercised his right to a jury trial and the evidence showed that he had at all

times cooperated with investigating officers and admitted to possessing a firearm and only disputed his intent to violate the law.)  Because this Court is in a unique position to assess Mr. Meacham's acceptance of responsibility, "the determination of the sentencing judge is entitled to great deference on review." Cmt. 5.

Mr. Meacham presents such a rare situation.  His pretrial conduct clearly demonstrates an acceptance of responsibility.  He has not repeated even a hint of this behavior in the years between January 6 and his arrest.  When law enforcement approached Mr. Meacham in May 2023, he was cooperative and forthcoming during his uncounseled interview, including telling police that his nephew Nejourde accompanied him to D.C. and the rally.  Mr. Meacham has never denied the basic facts of the case – that he was present at the Capitol on January 6, that he assaulted police officers, and that he used objects to do so.  Mr. Meacham has been completely compliant with release conditions; he waived his right to a jury trial; he did not contest nearly any material facts offered by the government at trial; and he did not present untruthful testimony.  Instead, Mr. Meacham's defense was a narrow one, consisting of legal challenges and tailored factual disputes about the nature of the objects used and his knowledge about the restricted area.  While Mr. Meacham continues to assert those legal defenses, he respects the Court's verdict and has expressed sincere regret for his actions.

Accordingly, counsel asks the Court to exercise its discretion and apply a two-level adjustment for acceptance of responsibility.  With a total offense level of 27, and a Category I criminal history, Mr. Meacham's guideline range would be 70-87 months.

## SENTENCING ARGUMENT

A criminal sentence involves a difficult balance of retributive and rehabilitative goals.  The Court must begin its sentencing determination with a correct calculation of the guidelines. *Gall v.*

*United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). But the Guidelines are only a "rough approximation of sentences that might achieve § 3553(a)'s objectives," *Rita v. United States*, 551 U.S. 338, 350 (2007), and the Court "may not presume that the Guideline range is reasonable." *Gall*, 552 U.S. at 50. In every case, the goal is a sentence "sufficient, but not greater than necessary" to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Mr. Meacham's case is one of those that falls outside the "heartland" contemplated by the Guidelines, and simply "warrants a different sentence" than the Guidelines recommend. *Rita*, 551 at 351. In this case, a 40-month period of incarceration best balances the statutory factors.

### 1.  Nature of the Offense

The events of January 6 forever will be a stain on this country's history. On a conceptual level, it was an event that shook public faith in our democracy and political institutions. On a human level, it was a painful and terrifying day for the law enforcement officers charged with protecting the Capitol and the people inside it. The defense does not dispute the gravity of those events, or that Mr. Meacham must face serious consequences for his part in them.

But the Court must craft a sentence tailored to Mr. Meacham's actions, and the details matter. Unlike many January 6 defendants, Mr. Meacham did not travel to D.C. for what ultimately unfolded. He had no plan to engage in violence or even go to the Capitol. He had no social media presence; he had not fomented any aggression or call for violence online. He brought no weapons, he wore no mask, he did not outfit himself in any protective gear. He came simply to attend the rally; as he told law enforcement during his recorded interview, his "particular purpose, as sad as it sounds, was Trump told us to show up. We thought it was going to make some type of difference

for what we believed he was telling us."[3]  In other words, Mr. Meacham arrived on the National Mall that morning like any protestor who has ever come to D.C. for whatever cause moves them – he thought that his presence might make some kind of difference.

Once at the Capitol, Mr. Meacham took actions against law enforcement that were completely unacceptable.  But his actions were the product of blinding emotion, not calculated aforethought.  Mr. Meacham's feelings were already coursing as he made his way to the Capitol.  When he arrived, Mr. Meacham saw a large anti-abortion sign depicting the head of an aborted fetus – a gory, gut-wrenching image that is deeply upsetting under the best of circumstances.  When Mr. Meacham saw that sign, he broke.

As egregious as Mr. Meacham's ensuing behavior was, there are still mitigating aspects that the Court must consider.  The charged counts all took place within a 10-minute span.  He did not destroy any government property.  There is no evidence that anyone suffered injury.  And Mr. Meacham did not ever enter the Capitol building.  This is a distinction with a difference.  Bad behavior, even egregious bad behavior, is significantly less dangerous and threatening outside a building than inside.  Although Mr. Meacham made many wrong decisions that day, he did not take the serious next step of trying to breech the building itself.

Lastly, the Court must also consider Mr. Meacham's post-offense conduct.  Not once did Mr. Meacham crow about his experience in person or online.  He did steal any souvenirs, post anything on social media, or encourage others to follow his example.  Mr. Meacham instead returned to Utah, where he resumed a quiet life on the farm.

Two and a half years later, when police arrived looking for him, Mr. Meacham was completely cooperative.  He returned to the farm knowing that police were there to meet with

---

[3] Recorded Interview with Odin Meacham (May 15, 2023), 14:50-15:00.

him.[4]  He consented to an almost hour-long interview and never denied his participation in these

incidents.  He was so respectful that the arresting officers even offered for Mr. Meacham to change

clothes before being booked into jail:

> AGENT RYAN: We can -- we can --
> MR. MEACHAM: Does that work?
> AGENT RYAN: -- go down there, and you can grab a change --
> MR. MEACHAM: Oh, man.
> AGENT RYAN: -- of clothes if you want, a shirt, whatever you want to do.
> MR. MEACHAM: My pups are going to jump all over you guys, and I'd rather just... It's
> not going to -- hell, and a different shirt isn't going to change a damn thing for me anyways.
> So that's all right. It'll just make it easier. You know what I mean? It just seems like another
> extra step to a long process already.
> AGENT RYAN: You've been cooperative with us, so we want to – we want to give you
> the opportunity if you want to.
> MR. MEACHAM: Well, thank you.
> AGENT RYAN: We're not always – we don't always do this, but –
> MR. MEACHAM: Well, no, yeah. Of course.
> AGENT RYAN: You've been very cooperative.[5]

In sum, the specific nature of Mr. Meacham's conduct before, during, and after January 6

shows that a 40-month sentence is appropriate.

## 2.  Mr. Meacham's Personal History and Characteristics

In sentencing, the Court must "consider every convicted person as an individual and every

case as a unique study in the human failings that sometime mitigate, sometimes magnify, the crime

and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  The Court must

sentence the defendant who appears before it on that day, *Pepper v. United States*, 562 U.S. 476,

---

[4] *See* Recorded Interview with Odin Meacham, 59:08-20.
AGENT JONES: -- and that, and the fact that you're -- so big deal -- a big deal in your favor --
MR. MEACHAM: Yeah.
AGENT JONES: -- is we called you. You just came and showed up --
MR. MEACHAM: Yeah. I didn't run.
AGENT JONES: -- knowing it was us. You didn't run.

[5] *Id*. at 59:40-1:00:10.

492 (2011) (internal citation omitted), and choose a sentence that "fit[s] the offender and not merely the crime." *Id*. at 487-88 (internal quotations omitted).

From the moment he was born, Mr. Meacham was asked to bear the weight of disadvantage utterly beyond his control: financial hardship; emotional abuse and neglect; indoctrination; control. This personal history has haunted him, and the death of his father right before the election made Mr. Meacham uniquely raw. This history certainly does not excuse Mr. Meacham's conduct, but it does speak to his culpability. It provides context for his explosion at the footsteps of the Capitol.

This history also underscores how wildly aberrant this incident is in Mr. Meacham's life. He has zero other criminal history. He has zero other violent or assaultive conduct. Indeed, despite Mr. Meacham's difficult upbringing and the many other family members who have succumbed to mental illness, substance abuse, and suicide, Mr. Meacham remarkably has kept himself afloat. He has not drowned himself in alcohol or drugs or become criminally involved. He has not turned bitter. Instead Mr. Meacham has dedicated himself to being a productive, kind, and contributing member of his family and community. He has mentored youth while working as a professional fighter. He would be the first to volunteer to help a friend or family member. He has sifted through his upbringing, trying to separate the real from the fantastical. The result is a deeply generous, deeply thoughtful person who would do anything to prevent others from suffering, all while never once troubling anyone with his own.

From this personal history, the Court can rest assured that Mr. Meacham's conduct on January 6 was an anomaly. His behavior was the product of unique and irreproducible circumstance, at odds with every other aspect of his character and lived experience before and after it. A 40-month sentence appropriately accounts for the complete outlier that this offense is in his life, as well as his emotional upheaval at the time of this offense.

### 3. The Purposes of Sentencing

In many ways, the dictates of § 3553(a) ask the impossible: to funnel a complicated jumble of humanity into an orderly term of incarceration. The defense submits that 40 months of incarceration appropriately balances the competing interests in the statute.

### a. Just Punishment

The Court must consider punishment in deciding an appropriate sentence. However, the Court must also remember that the statute has an important modifier: any punishment must be "just."

A 40-month sentence is just punishment for Mr. Meacham. This is a substantial amount of time. We cannot forget this. Every day in a federal courthouse, we talk about lengths of incarceration. We cannot let sheer repetition inure us to the brutal impact of a prison sentence, to the raw horror of what it means to spend even a single day behind bars. To anyone, but particularly to someone like Mr. Meacham who has no prior record, 40 months in prison is a devastating blow. It is more than enough to punish his conduct, especially given that he will live the rest of his life with all the collateral consequences of a permanent felony conviction.

And in truth, the Court does not need to impose a single day of incarceration for Mr. Meacham to suffer for his actions. His nephew's suicide has shattered him. There are no words for the pain Mr. Meacham and his family have endured from the loss. Counsel met with Mr. Meacham shortly after it happened. Mr. Meacham said: "I can't even begin to deal with it. Eventually it will just deal with me."

Until the day he dies, Mr. Meacham will grieve the loss of his nephew. He will watch his family grieve their son, brother, and grandson, and he will blame himself for what happened. It is unimaginable anguish. A 40-month prison sentence, on top of that lifelong pain, is sufficient.

b. *Deterrence*

A 40-month sentence is more than enough to deter Mr. Meacham from further criminal conduct. In terms of specific deterrence, Mr. Meacham does not need any incarceration to avoid further criminal involvement. He has shown that with his conduct every day before and after January 6. No matter what the sentence, Mr. Meacham will never be back in a courtroom.

The Court may also consider the interest of general deterrence, the notion that lengthier sentences will prevent similarly situated individuals from committing similar crimes. As an initial matter, it is murky at best that any empirical data supports this belief. But to the extent that there *is* some connection between punishment and general deterrence, 40 months in prison accomplishes that interest. To impose additional incarceration on the assumption that it will similarly increase general deterrence plays into "at least some delusion in the concept that severe punishment effects general deterrence." *United States v. Walker*, 252 F. Supp. 3d 1269, 1297 (D. Utah 2017), *aff'd*, 918 F.3d 1134 (10th Cir. 2019). And whatever effect incarceration has on general deterrence, that "effect does not work on the level of precision that a sentencing court must in crafting sentences that truly effectuate sentencing purposes." *Id.* The Court must always keep the parsimony principle of 3553(a) as true north: a sentence cannot be greater than necessary. A 40-month sentence, on top of the fact that Mr. Meacham was apprehended and prosecuted in the first place,[6] is more than enough to send a commanding message of deterrence to other would-be January 6 defendants.

---

[6] *See Walker*, 252 F. Supp. 3d at 1297 ("[Professor] Nagin states the conclusion more precisely: is it the "*certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension" that is a more effective deterrent." (citing Daniel S. Nagin, *Deterrence in the Twenty–First Century*, Crime and Justice in America: 1975–2025, at 202 (2013) (emphasis in original).

c. *Protection of the Community*

Incapacitation is not a concern in this case. Mr. Meacham is not a danger to the public; he has proven with his lack of any other behavior resembling that of January 6.

d. *Rehabilitation*

There is a cost to incarceration, especially to people with no prior record. In the community, Mr. Meacham lives on his family farm. He is surrounded by family. He spends his days productively. Prison will disrupt these protective factors, removing him from a strong support system and surrounding him with strangers who are criminally involved and do not have his best interests at heart. Few people emerge better for it. That cost of incarceration may be warranted in some cases, but there *is* a cost.

For Mr. Meacham, a sentence longer than 40 months costs too much. Especially with aberrant behavior like this, there is a very real, compelling interest in maximizing his potential for long-term success. Although some incarceration is justified, it is critical for Mr. Meacham to return to home without serving a day longer than is necessary to achieve the statutory sentencing factors. The defense submits that 40 months of incarceration achieves this balance.

**4. Unwarranted Disparities**

No two cases – even among those that arise from January 6 – are identical. Counsel could parse through every case and find similarities and differences between Mr. Meacham's conduct and others on January 6. The defense suggests that the following cases are particularly helpful comparisons for the Court.

- *United States v. Languerand*, 1:21-CR-00353 (JDB). The defendant was sentenced to 44 months of incarceration and 24 months of supervised release after pleading to 18 U.S.C. § 111(a)(1) and (b). During a battle for control over the Lower West Terrace, defendant threw at least two pieces of wood; a heavy black audio speaker; at least four sticks; and an orange traffic bollard at law enforcement. The defendant also took hold of police riot shield and slammed it on the ground before thrusting

it towards police. Afterwards he bragged on social media about his role in the riot and posted on Instagram that he had been carrying a firearm while at the Capitol. The defendant had previously been the subject of a protective order and had a prior charge for aggravated assault. The Government argued that the defendant's "unique history of threats and violence" "distinguish[ed]" him from other January 6 defendants.[7]

- *United States v. Nix*, 1:21-CR-00678 (BAH). Defendant was sentenced to 42 months of incarceration and 36 months of supervised release after pleading to 111(a)(1) and (b). The defendant hit a police officer in the head with a flagpole, causing bodily injury (a knot on the head), and continued to thrust the flagpole at the officer. The defendant attempted to breach the unguarded doors to the Capitol, and ultimately entered the Capitol along with other rioters, spending about ten minutes inside.

- *United States v. Rodriguez*, 1:21-CR-00483 (DLF). The defendant was sentenced to 36 months of incarceration and 36 months of supervised release after pleading to 18 U.S.C. § 111(a)(1) and (b). Defendant sprayed bear spray at police at close range, injuring at least eight officers. Bear spray is 50% stronger than the maximum strength police pepper spray, which is the highest strength spray intended for use against humans. In a subsequent interview posted on social media, the defendant told the interviewer, "I was there, and I just want to let you know that we in America, we fight back!" Although the defendant did not have any criminal convictions, he had been charged twice with battery and for violating a protective order.

- *United States v. Sherrill*, 1:21-CR-00282-1 (TSC). Defendant was sentenced to 7 months of incarceration and 12 months of supervised release after pleading to one count of 18 U.S.C. § 111(a)(1) (a lesser offense of the indicted charge 111(a)(1) and (b)). Defendant obtained a metal pole from downed bike barricades – a pole seemingly identical to the one used by Mr. Meacham in this case – and struck a police officer with it. The defendant then entered the Capitol building still wielding the metal pole. He roamed the Capitol building for 34 minutes, banged on a door with his metal pole, joined a mob of rioters that overtook a police line in the Crypt, chanted "NANCY! NANCY!" as he approached House Speaker Nancy Pelosi's office, watched as rioters forced open doors and fought with officers, and took videos of the chaos around him. After January 6, the defendant deleted videos from his cell phone that he took at the Capitol and he did not admit to his assaultive conduct when interviewed by the FBI.

- *United States v. Brockhoff*, 1:21-CR-00524 (CKK). Defendant was sentenced to 36 months of incarceration and 36 months of supervised release after pleading to 111(a)(1) and (b). While within the restricted perimeter for approximately three hours, defendant threw an unidentified item at police officers; assaulted multiple

---

[7] Government's Sentencing Memorandum at 37 (ECF 34).

police officers in different locations using a fire extinguisher; obtained a police officer's helmet and wore it throughout the afternoon; entered the U.S. Capitol Building through a broken window; kicked in a door to gain entrance into a different, locked Senate conference room, which allowed others to enter the room as well; and rifled through belongings in the Senate, ultimately taking home writing on a Senate notepad.

- *United States v. Gieswein*, 1:21-CR-00024 (TNM). Defendant sentenced to 48 months of incarceration and 36 months of supervised release after pleading guilty to two counts of 18 U.S.C. § 111(a)(1) (both lesser offenses of the indicted charges 111(a)(1) and (b)). Defendant came to the Capitol dressed in paramilitary gear and armed with a baseball bat. Defendant committed five assaults on police officers with an oleum capsicum-like spray; he committed another with a water bottle; he attempted to assault another with his fists; the assaults spanned over 30 minutes and took place at five separate locations. Twice he attempted to push through defensive police lines. The defendant was one of the first rioters to enter the Capitol building (at 2:13 p.m., while Congress was still in session), and he remained inside the Capitol for over an hour.

The defense submits that its proposed sentence of 40 months fits well within this constellation of other cases. True, unlike the defendants above, Mr. Meacham was convicted after trial instead of a plea. But as the defense has stated, at trial Mr. Meacham did not contest the heart of the facts against him. The difference between plea and trial in his case should not increase his sentence by a matter of years – and certainly not up to 96 months, as the government has requested in its sentencing memorandum. This is particularly true given that Mr. Meacham's case does not involve any of the aggravating facts in the cases listed above, including 1) infliction of injury; 2) entry into the Capitol Building itself; 3) destruction of property; 4) bringing weapons; 5) stealing property; 6) posting inflammatory or proud commentary on social media; 7) outfitting himself in anticipation of violence; 8) deleting evidence; or 9) having a prior history of violence or threats.

The number of counts of conviction and the type of assault conviction (111(a) versus 111(b)) also should play a limited role. That outcome is heavily influenced by the kind of plea offer extended by the government. The defense certainly does not suggest that the government is wrong in offering different kinds of pleas to different defendants; the defense fully believes that

the government is trying to be consistent.  But when assessing comparative sentences for Mr. Meacham, the defense urges the Court to consider the overall conduct in those cases, and not the ultimate charges of conviction.

Lastly, the defense must respond to the government's comparison between Mr. Meacham's case and that of *U.S. v. Joseph Padilla*, 1:21-cr-00214 (JDB), in which this Court sentenced the defendant to 78 months.  While the charges of conviction are similar, Mr. Padilla's conduct was far graver than Mr. Meacham's.  Unlike Mr. Meacham, Mr. Padilla was present on January 6 with the stated purpose of attacking the Capitol.  Mr. Padilla was a prolific user on several social media platforms.  In the weeks before January 6, he posted several comments about his desire to participate in a violent revolution, which included occupying the Capitol building.  He made references about having to resort to "the cartridge box."  He posted a detailed plan about abducting President Biden and Vice President Harris on inauguration day.  In the two days before January 6, Mr. Padilla posted, "I fully plan to incite people to storm the Capitol building" and that "[w]e need to take and occupy the Capitol building."  On January 6, Mr. Padilla wore a N95 style mask and goggles to protect himself from pepper spray.  He pursued officers into the Lower West Terrace tunnel, a harrowing breech point.  Mr. Padilla later bragged about his conduct and admitted that his specific goal was to interfere with the certification of the election.  Lastly, Mr. Padilla testified in his defense at trial, and the Court found that testimony untruthful.[8]  These differences significantly separate Mr. Meacham and Mr. Padilla.  While Mr. Meacham does not minimize the seriousness of his own conduct, his culpability does not warrant even close to the 78-month sentence this Court imposed on Mr. Padilla.

---

[8] Padilla Sentencing Transcript 69:19-70:14 (ECF 113).

### 5. Restitution

Above all, Mr. Meacham knows he must make restitution for his actions. At the most concrete level, that restitution includes payment for the damage. The defense has spoken to Mr. Meacham about the government's intent to seek $2,000 for the harm to the Capitol, as well as potential arguments that counsel could make opposing such an order. Mr. Meacham did not want to oppose it. He knows that paying his share of the damage is an important step in atoning for his actions and making the country whole. In fact, Mr. Meacham is prepared to pay the full restitution order on the day he is sentenced. This gesture is but one expression of his acceptance of responsibility and remorse for his actions.

But there is also the deeper form of restitution. Mr. Meacham wants nothing more than to atone for his actions by taking care of his mother and family, working for the farm, and being a contributing member of his community. No matter what the sentence, Mr. Meacham will spend the rest of his life making good on that promise. It is one more way that he intends to pay back the community from which he took.

## CONCLUSION

Without question, this is a serious case. But Mr. Meacham is that exceptional person for whom a lesser sentence is merited. He is a wonderful person. He is smart. He is thoughtful. He is curious about the world, brave enough to ask questions about even his most ingrained beliefs, dedicated to his principles, steadfast to his sense of integrity. And despite years of emotional abuse, Mr. Meacham is deeply kind. He is generous to those from whom he wants nothing. He would sacrifice his self-interest immediately to help a stranger. The fact that Mr. Meacham has built the life that he has, despite such difficult circumstances, demonstrates his commitment to a valuable, loving, law-abiding life.

The defense respectfully asks the Court to impose a 40-month sentence. This sentence is sufficient to punish Mr. Meacham while also recognizing his tremendous promise for the future.

Respectfully Submitted on October 29, 2024,

By:        /s/ Emily Stirba
           EMILY STIRBA
           ADAM BRIDGE
           Counsel to Odin Meacham
           Assistant Federal Public Defenders
           Federal Public Defender
           District of Utah
           46 West Broadway, Ste. 110
           Salt Lake City, UT 84101